**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In Re: | ) | Case No.  16-02438-11als |
| | ) | |
| **CENTRAL IOWA HEALTHCARE** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Hon. Anita L. Shodeen |
| | ) | |
| 3 South 4th Avenue | ) | |
| Marshalltown, IA 50158 | ) | **FIRST DAY MOTION** |
| | ) | |
| EIN: 42-0948420 | ) | **DEBTOR'S MOTION FOR ORDER (I)** |
| | ) | **APPROVING AUCTION AND BID** |
| | ) | **PROCEDURES; (II) APPROVING** |
| | ) | **BREAK UP FEE AND EXPENSE** |
| | ) | **REIMBURSEMENT; (III)** |
| | ) | **PRESCRIBING MANNER OF NOTICE;** |
| | ) | **AND (IV) AUTHORIZING SALE OF** |
| | ) | **ASSETS FREE AND CLEAR OF** |
| | ) | **LIENS, CLAIMS AND** |
| | ) | **ENCUMBRANCES SUBJECT TO** |
| | ) | **HIGHER OR BETTER OFFERS** |
| | ) | |
| | ) | No Hearing Set |

Central Iowa Healthcare f/d/b/a Marshalltown Medical Surgical Center ("*CIH*" or "*Debtor*"), Debtor and Debtor-in- Possession in this Chapter 11 case herein, by and through its proposed General Reorganization Counsel, Jeffrey D. Goetz, Esq., of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., respectfully submits this Motion for Order (1) Approving Auction and Bid Procedures; (2) Approving Break Up Fee; (3) Prescribing Manner of Notice; and (4) Authorizing Sale of Assets Free and Clear of Liens, Claims and Encumbrances, Subject to Higher or Better Offers.  In support of this Motion ("*Motion*"), the Debtor states as follows:

1.      Debtor commenced the captioned case by filing a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("*Bankruptcy Code*") on December 20, 2016 (the "*Petition Date*").

2.      Debtor continues to operate its businesses and manage its property as debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

3.      No trustee or examiner has been appointed in this case.  No Official Unsecured Creditors Committee ("*OUCC*") has been appointed in the case.

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for relief sought herein include Bankruptcy Code §§ 105(a), 363, 365 and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy Procedures (the "*Bankruptcy Rules*").

### REQUEST FOR RELIEF

5.      As of the Petition Date, CIH has received inquiries and an offer to purchase substantially all of CIH's assets (collectively referred to as the "*Company*" and as further defined in the APA).  Good-faith and arms-length negotiations have resulted in CIH executing an Asset Purchase Agreement (hereinbefore and after, the "APA") with UnityPoint Health – Waterloo ("*Purchaser*").  Attached hereto as **Exhibit A** and incorporated by reference herein is a true and exact copy of the APA.

6.      CIH is seeking Court approval of Auction and Bid Procedures that would provide for the submission of competing bids, an auction, and final sale hearing within sixty (60) days of the filing date of this Motion ("*Filing Date*").  CIH's proposed Auction and Bid Procedures are attached hereto as **Exhibit B** and are incorporated by reference herein.  Debtor

believes that a sale pursuant to the APA and Auction and Bid Procedures is in the best interest of Debtor's estate and its creditors.

7.      By this Motion, CIH seeks authority to solicit bids and sell substantially all of its non-real estate assets associated with CIH (otherwise referred to as the "*Assets*").

8.      CIH believes this Motion, the APA and the transactions contemplated thereby are in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this Chapter 11 case.  The mission of both CIH and UPH is the provision of patient care and health care services to the communities they serve.  The proposed purchase and orderly sale process will allow for the continuation, without interruption, of the healthcare services that CIH has provided for decades to the City of Marshalltown.  Furthermore, it is CIH's belief that the proceeds of the proposed sale that allows the hospital to continue providing uninterrupted services will be greater than if the same Assets are sold in a piecemeal liquidation.   Finally, an orderly sale process will also aid in minimizing the administrative expenses of Debtor's estate.

## BACKGROUND TO THE CASE

9.      CIH is a not-for-profit corporation formed under the laws of the State of Iowa, and is tax exempt pursuant to section 501(c)(3) of the Internal Revenue Code.  CIH is governed by a 14-member Board of Trustees of which two members serve on an ex-officio basis.

10.      CIH operates a community hospital in Marshalltown, Iowa, which is located between Des Moines and Cedar Rapids. CIH's 49-bed, acute care facility is the only full-service medical center in the area. CIH provides inpatient, outpatient, emergency care, and medical clinic services for the residents of Marshall, Tama, and Grundy counties. These counties combined have a population of over 60,000 and are home to several large companies

that are significant local employers. CIH is the sixth largest employer in Marshalltown. According to U.S. Census 2015 data, Marshalltown's population is estimated at 27,620 and a median income of $50,396.

11.     Declining revenues over the past several years have placed a considerable financial strain on CIH and led to uncertainty about the hospital's ability to continue as a going concern.   The circumstances that have led CIH to filing this bankruptcy case are described in more detail in the *Declaration of Dawnett Willis*, Acting Chief Executive Officer, filed in this case which is incorporated in its entirety into this motion.

### MARKETING EFFORTS

12.     In February 2016, CIH hired Juniper Advisory LLC ("Juniper") to act as its financial advisor to solicit interest from other parties who may have wished to enter into a business combination transaction or other commercial arrangement with the System. Juniper acted as CIH's exclusive advisor to assist in evaluating proposals and determining whether or not to pursue a transaction. Juniper ultimately contacted twenty-three (23 healthcare organizations inquiring potential interest in a possible transaction.  That effort spawned one letter of intent at that time from a potential partner that was followed by a period of due diligence through late summer.   However, that potential partner withdrew interest in August of 2016.

13.     In September 21, 2016, the CIH retained Alvarez & Marsal Healthcare Industry Group, LLC to act as financial advisor and assist CIH in certain financial, operational and reorganization efforts.

14.     Ultimately, CIH engaged in discussions with Purchaser which culminated in an agreement to purchase pursuant to the APA, with Purchaser designated as the stalking horse purchaser.

15.     To facilitate the purchase and assist CIH with the uninterrupted continuation of operations during the Bankruptcy Case, the Purchaser is providing post-petition financing to CIH (the "*DIP Financing Agreement*").

16.     CIH will continue its marketing efforts during the Bankruptcy Case until the Auction concludes.

**RELIEF REQUESTED**

17.     As stated above, CIH intends to sell the Assets and believes that an orderly sale of the Assets is the best way to maximize the value of the Assets for the benefit of creditors and all parties in interest.  Accordingly, Debtor requests that a hearing be held expeditiously for the Court to enter an order (the "*Bid Procedures Order*"), substantially in the form appended hereto as **<u>Exhibit C</u>**, (i) approving the Auction and Bid Procedures; (ii) approving the Break Up Fee (as defined below); (iii) and approving the form and manner of notice (the "*Sale Notice*") of the proposed Auction and Bid Procedures.

18.     CIH requests that the Court approve the Auction and Bid Procedures and Sale Notice within fourteen (14) days of the Filing Date (the "*First Hearing*").

19.     After approval by the Court of the Auction and Bid Procedures, and the Sale Notice at the First Hearing, CIH will send such notice to all potential purchasers of the Assets known to CIH, and if Competing Bids are received, an Auction (as defined in the Auction and Bid Procedures) shall be held.

20.     CIH further requests that the Court, at a second hearing to be held promptly after the Auction (and if no Auction is held, within seven (7) days after the Bid Deadline), enter an order (the "*Sale Order*") approving the sale of the Assets to Purchaser (or to such other party or parties that make the highest or best bid(s) at the Auction), free and clear of any

and all liens, claims and encumbrances,  and approving the assumption and assignment of certain executory contracts and unexpired leases to Purchaser (or to such other party or parties that make the highest or best bid(s) at the Auction), in connection with such sale.

21.     In addition, CIH will request that the Court approve a post-petition financing agreement with the winning bidder, if the winning bidder is not Purchaser.  Pursuant to the Bid Procedures, alternative bidders will be required to provide a replacement financing arrangement to CIH as a condition to submitting a conforming bid, because Purchaser shall be entitled to terminate the DIP Financing Agreement and obtain payment in full on the balance owed immediately upon the Court's entry of a sale order approving the alternative bidder.

## AUCTION AND BID PROCEDURES

22.     To ensure that CIH has maximized the value of the Assets, CIH has caused Purchaser to agree that the sale of the Assets must be subject to the proposed Auction and Bid Procedures described in detail in **Exhibit B**.

23.     Bankruptcy Code Section 363 governs CIH's ability to sell property of the estate outside of the ordinary course of business. Although this section does not set forth a standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose. See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d. Cir. 1983); Chrysler Group LLC v. South Holland Dodge, Inc., 862 F. Supp. 2d 661, 668 (E.D. Michigan 2012); In re Dewey & LeBoeuf LLP, No. 12–12321 (MG), 2012 WL 5386276, at *5 (Bankr. S.D.N.Y. Nov. 1, 2012); In re Nicole Energy Services, Inc., 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008).  The burden of establishing a rational business justification lies with the debtor. Nicole Energy, 385 B.R. at 230 (citing Lionel, 722 F.2d at 1070-71).  However, once the debtor makes such a

showing, a presumption will attach that the decision was made on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company. See, e.g., In re Brook Valley VII, Joint Venture, 496 F.3d 892, 900 (8th Cir. 2007).

24.     Applying Bankruptcy Code Section 363, courts accord debtors substantial deference in formulating procedures for selling assets. See, e.g., In re Boston Generating, LLC, 440 B.R. 302, 329–330 (S.D.N.Y. 2010) (noting that the requirements for section 363 sales are reviewed according to the deferential "business judgment" standard); In re Adelphia Communications Corp., No. 02–41729 (REG), 2003 WL 22316543, at *30 (Bankr. S.D.N.Y. Mar. 4, 2003) (applying the "business judgment" standard presumption of validity and noting that courts are "loath to interfere with corporate decisions absent showings of bad faith, self-interest, or gross negligence"). Indeed, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and are appropriate in the context of bankruptcy sales. See, e.g., In re Dura Automotive Sys., Inc., No. 06–11202, 2007 WL 7728109, at *90 (Bankr. Del. Aug. 15, 2007) (finding that "procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales").

25.     Here, the Auction and Bid Procedures are supported by ample business justification and are reasonable and appropriate under the circumstances of this case. The proposed Auction and Bid Procedures are designed to foster an open, competitive and fair sale process, while maximizing the value the estate hopes to obtain for the Assets.  Furthermore, the Auction and Bid Procedures provide that CIH may consider issues such as continuation of mission and the continuation of healthcare services in Marshalltown as a factor in weighing

bids.  *See e.g.*  In re United Healthcare System, Inc., No. 97–1159, 1997 WL 176574 (D.N.J.

Mar. 26, 1997) (continuation of not for profit mission is a compelling factor in weighing the

debtor's sale of assets); *see also* In re HHH Choices Health Plan, LLC et al, 554 B.R. 697,

711-13   (Bankr. S.D.N.Y. 2016) (continuation of the mission to continue to provide senior

healthcare services was an important factor in considering and approving winning bid,

concluding that the approved bidder's mission "was more consistent with the mission of the

company").   CIH requests that the Court approve the Auction and Bid Procedures as fair and

reasonable under the circumstances and authorize and direct CIH to proceed in accordance

with them.

### THE COST AND EXPENSE REIMBURSEMENT IS REASONABLE AND APPROPRIATE

26.    The sole bid protections being provided to the Purchaser is a fee and expense

reimbursement of $250,000 to compensate and reimburse the Purchaser for the time, trouble

and expense it has invested in the estate's marketing and sale process ("*Break Up Fee*"), in the

event Purchaser is not the winning bidder.  Due to the complexity of the sale and the speed

with which the case has proceeded, the Break Up Fee is reasonable under the circumstances

and falls well within market terms for cost and expense reimbursement in similar cases.

27.    After considering the reasonableness of bidding incentives, courts have

approved a range of break up fees as a percentage of the purchase price in the range provided

here as being appropriate, depending on the facts and circumstances of the case. See In re

Newton Mfg. Company, Case No. 15-01128-lmj11 (Bank. S.D. Iowa June 17, 2015) (fee of

6.4 % permitted); See In re Chi-Chi's Inc., Case No. 03-13063 (Bankr. D. Del. November 4,

2003) (fee of 5.1 % permitted); In re Great Northern Paper. Inc., Case No. 03-10048 (Bankr.

D. Me. February 18, 2003) (fee of 5.4 % plus reimbursement of expenses upheld); In re FSC

Corp., Case No. 00-b-04659 (Bankr. N.D. Ill. February 28, 2000) (break-up fee of 3.4 % plus reimbursement of expenses is reasonable).

28.     The Break Up Fee in this case constitutes only 2.0 % of the base purchase price, well below the approved fees cited above.  The present sale represents a sale of a not for profit hospital system to another not for profit hospital system, and CIH proposes that the Break Up Fee falls squarely within the scope of reasonableness for a transaction of this scope and purpose.   Given its relatively small size, the Break Up Fee will not chill bidding. Furthermore, Purchaser has made it clear that it will not proceed as a stalking horse without the protection of ensuring that it receives the Break Up Fee, if the process it served to put into motion results in some other party owning CIH's Assets. CIH's ability to continue to shop the Company for a higher or better offer, or even to market test the Purchaser's offer, would be eliminated if CIH could not secure the APA, inclusive of the Break Up Fee provision.

29.     The APA will form the basis upon which other bids will be submitted and evaluated.  The proposed good faith deposit of $1,000,000 for a competing bid will provide evidence that a competing bidder is financial solvent and has the wherewithal to complete the sale.  The "Initial Minimum Overbid" of $750,000 (as defined in the Bid Procedures) exceeds the Break Up Fee by $500,000, and, therefore, the Break Up Fee establishes a threshold for overbids and will not result in a less beneficial net return from the sale.

30.     Payment of the Break Up Fee will not harm creditors.  Pursuant to the APA, CIH will incur the obligation to pay the Break Up Fee only if CIH accepts an alternative transaction for the sale of all or substantially all of the Assets of CIH to any party other than the Purchaser on terms that exceed the APA by at least $500,000, or the transaction with Purchaser fails to close through no fault of Purchaser.  It is anticipated that the Break Up Fee

will be paid only from the proceeds of an alternative transaction in which the prevailing bidder

is not the Stalking Horse, and the Initial Minimum Overbid exceeds the Break Up Fee. In light

of the benefit to CIH's estate that is realized by having an agreed-upon APA, which thereby

enables CIH to preserve the value of its estate and promote more competitive bidding,

approval of the Break Up Fee is warranted.

### THE PROPOSED TREATMENT SATISFIES ALL APPLICABLE LEGAL STANDARDS

31.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a CIH

"after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business, property of the estate." *See also* Bankruptcy Rule 6004(f)(1) ("All sales not in the

ordinary course of business may be by private sale or by public auction"). This section

generally permits a debtor to sell property of the estate outside of the ordinary course of its

business where the proposed sale is a sound exercise of the debtor's business judgment and

when such sale is proposed in good faith. See In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir.

1983); In re Nicole Energy Services, Inc., 385 B.R. 201, 210 (S.D. Ohio 2008) ("Under the

law of this [Sixth] Circuit, the Court may approve a sale of all of a debtor's assets under §

363(b) 'when a sound business purpose dictates such action.'") (quoting Stephens Industries,

Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986)).

32.     In the instant case, the proposed sale of the Assets pursuant to the APA

constitutes a sound exercise of CIH's business judgment and has been proposed in good faith.

First, an expeditious sale of the Assets will aid in minimizing the administrative expenses of

CIH's estate, resulting in greater distribution to creditors. Second, such sale will increase the

probability that operations will not be interrupted and customer and vendor relationships will

be preserved.  Finally, the sale represents the best opportunity for CIH to realize the value of the Assets on a going-concern basis, considering external factors in the marketplace.

33.     CIH believes this Motion, the APA, the Bid Procedures and the transactions contemplated thereby are in the best interests of the bankruptcy estate and in the best interests of all other interested parties in this Chapter 11 case.

34.     CIH submits that the factors described above, which support an expeditious sale of the Assets, are consistent with the traditional rationale for authorizing a sale outside of a Chapter 11 plan. See also In re Boston Generating, LLC, 440 B.R. 302, 321 (S.D.N.Y. 2010); Lionel, 722 F.2d at 1070.

## SALE FREE AND CLEAR OF LIENS

35.     Bankruptcy Code § 363(f) authorizes a CIH to use, sell or lease property of the estate outside of the ordinary course of business, free and clear of any interest in such property.  The APA provides for the sale of the Assets free and clear of all interests, liens, claims and encumbrances, including existing or asserted rights of first refusal, contractual restrictions on transferability or other similar protective rights.  Any such interests, liens, claims and encumbrances would attach to the proceeds of the sale of the Assets (the "*Sale Proceeds*") ultimately attributable to the property against or in which such interest, lien, claim or encumbrances is asserted.

36.     Under Bankruptcy Code § 363(f)(2), a sale free and clear of all interests, liens, claims and encumbrances is permissible if all parties asserting liens on or other interests in the assets consent. CIH is providing proper notice of this Motion to the United States Trustee, senior and other secured creditors, OUCC (if applicable), counter-parties to executory contracts and unexpired leases, appropriate governmental authorities, and all other parties who

have filed requests for special notice, thereby giving them the opportunity to object to this Motion. Provided no secured creditors object to this Motion, Section 363(f)(2) will be satisfied. See, e.g., In re Motors Liquidation Co., 430 B.R. 65, 72 (S.D. N.Y. 2010) (in a Chapter 11 case, noting that "secured lenders" approved a transaction under § 363(b) of the Bankruptcy Code and related transactions).

37.     Under Bankruptcy Code § 363(f)(4), a sale free and clear of all interests, liens, claims and encumbrances is permissible if the interest of any entity is in *bona fide* dispute. Under Bankruptcy Code § 363(f)(5), a sale free and clear of all interests, liens, claims and encumbrances is permissible if any party asserting an interest in the assets could be compelled to accept money satisfaction of such interest in a legal or equitable proceeding.

### APPROVAL OF PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

38.     The Purchaser and CIH have agreed that CIH shall not be required to assume and assign any executory contract or unexpired lease for which CIH must pay a cure amount as a condition to assumption and assignment.  Nevertheless, a Prevailing Bidder (as defined below) other than Purchaser may not be similarly encumbered.  For avoidance of doubt, should Purchaser be deemed the Prevailing Bidder under the Bid Procedures at the close of an auction with multiple bids, under no circumstances may Purchaser compel CIH to pay a Cure Amount (as defined below) in connection with an assumed and assigned contract.

39.     To facilitate and affect a sale of the Assets to a Prevailing Bidder other than Purchaser, CIH may be required to assume and assign to such Prevailing Bidder certain unexpired leases and executory contracts (the "*Assumed and Assigned Contracts*"). No later than seven (7) business days following the Closing Date, CIH shall cause notice to be provided to all counterparties to unexpired leases and/or executory contracts that may be

Assumed and Assigned Contracts (the "*Cure Notice*"). The Cure Notice shall provide the counterparties to the possible Assumed and Assigned Contracts notice of the amount that CIH believes must be cured upon the assumption and assignment as required under Section 365 of the Bankruptcy Code (the "*Cure Amount*").

40.    Except as may otherwise be agreed to by the both parties to an Assumed and Assigned Contract (with the consent of the Prevailing Bidder), on the Effective Date, CIH or the Prevailing Bidder, as provided for in the APA, shall cure those defaults under the Assumed and Assigned Contracts that need to be cured in accordance with Bankruptcy Code § 365(b) by (a) payment of the undisputed Cure Amounts, and/or (b) reserving amounts with respect to the disputed Cure Amounts.  In the event of a dispute regarding the Cure Amount, any payments required, following entry of a Final Order resolving such dispute, shall be made as soon as practicable thereafter.  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assumed and Assigned Contract or other documents as of the date of the Cure Notice.

41.    Objections, if any, to the proposed assumption and assignment of the Assumed and Assigned Contracts, including, but not limited to, objections relating to the Cure Amount and/or adequate assurances of future performance, must be filed by a particular time and date to be established by the Court in this case (the "*Objection Deadline*").

### APA Does Not Establish Any Sub Rosa Plan of Reorganization

42.    A sale of assets may not be approved where such sale, rather than merely changing the composition of the debtor's assets, either restructures the right of creditors or predetermines the rights of creditors under any future plan of reorganization. See In re Braniff Airways, Inc., 700 F.2d 935, 939–40 (5th Cir. 1983); In re Iridium Operating LLC, 478 F.3d

452, 465–66 (2nd Cir. 2007); In re Continental Air Lines, Inc., 780 F.2d 1223, 1227–28 (5th
Cir. 1986).

43.     In Braniff, the Fifth Circuit held that an agreement between the debtor and its
creditors established a *sub rosa* plan of reorganization because, among other things, the
agreement: (a) required that any future plan of reorganization allocate certain assets only to
employees, shareholders or unsecured creditors of the debtor; (b) required the secured
creditors to vote a portion of their deficiency claim in favor of any future plan of
reorganization approved by a majority of the unsecured creditors' committee; and (c) provided
for the release of claims by all parties against the debtors, its secured creditors and its officers
and directors. 700 F.2d at 939–40.

44.     Unlike Braniff, the transactions contemplated by the APA will not restructure
the rights of CIH's creditors or predetermine the rights of such creditors under any future plan
of reorganization.

45.     Furthermore, CIH has articulated sound business justifications for selling the
Assets now, rather than as part of a plan. A Bankruptcy Code § 363 sale motion should be
approved if it is based on good business reasoning In re Lionel Corp., 722 F.2d at 1070; In re
Equity Management Systems, 149 B.R. 120 (Bankr. S.D. Iowa 1993) (Court considered some
of the following factors: whether all parties in interest received reasonable notice; whether the
purchase price is fair and reasonable; whether there is a sound business reason for the sale;
and whether the proposed sale unfairly benefits insiders or proprietary purchasers, or unfairly
favors a creditor or class). All such factors have been met here.

46.     The Purchase Price (as defined in the APA) is a fair offer for these Assets at
this time. Furthermore, the Purchase Price (as defined in the APA) will be tested in the

marketplace via the auction and bid process. The likelihood that a chapter 11 plan can be confirmed very quickly is doubtful.  Further delay in seeking a sale of the Assets risks further diminution in enterprise value given CIH's operational structure and external market forces. CIH believes it would be imprudent to ignore such an attractive offer now when the value of the Assets could be adversely affected or deteriorate in the coming months prior to plan confirmation.  After many months of market exploration, CIH has a viable, good faith offer from a purchaser not only willing to pay a fair price, but able and determined to continue the mission to provide continued healthcare services to the City of Marshalltown.  For those reasons, CIH has accepted that offer, subject only to any higher and better offers under the Auction and Bid Procedures.

### APA WAS NEGOTIATED AT ARM'S LENGTH AND IN GOOD FAITH

47.    The APA and the transactions related thereto were negotiated, have been, and are undertaken by CIH and Purchaser at arm's length, without collusion and in good faith within the meaning of Bankruptcy Code § 363(m), and CIH accordingly requests that the Court determine that the entire sale process will be conducted in good faith within the meaning of Bankruptcy Code § 363(m) and that CIH and Purchaser are entitled to the protections of Bankruptcy Code § 363(m).  See In re Brook Valley IV., 347 B.R. 662, 676 (B.A.P. 8th Cir. 2006).

48.    In CIH's view, the APA represents substantial value to CIH's estate inasmuch as it provides a path to the continuation of healthcare services in the City of Marshalltown while providing favorable terms for the disposition of the Assets.   At the conclusion of the bid process and auction (if any), CIH will have the highest and best offer to submit to this Court for approval.

## REDUCTION OR ELIMINATION OF 14-DAY STAY
## UNDER BANKRUPTCY RULES 6004(h) AND 6006(d))

49.     Time is of the essence in approving and closing the sale, and any unnecessary delay in closing the sale could result in the collapse of the sale. Accordingly, this Court should waive the 14-day period staying any order to sell or assign property of the estate imposed by Bankruptcy Rules 6004(h) and 6006(d).

## CONCLUSION

Based upon the authorities and facts detailed above, CIHr submits that the Court should approve, at the First Hearing, the Auction and Bid Procedures and prescribe the manner of notice; and at a second hearing to be held promptly after the Auction, or if no Auction is held, within seven (7) days after the Bid Deadline (as defined in the Bid Procedures), subject to the terms of the Auction and Bid Procedures, the Court should approve the sale of the Assets to Purchaser or such other successful bidder at the Auction. Such relief is warranted because CIH has shown that the transaction contemplated by the APA is in the best interests of CIH, its estate and creditors, its employees, its patients, and the City of Marshalltown, and because the decision to enter into the APA was reached in the exercise of CIH's sound business judgment, after careful deliberation of its consequences and possible alternatives.

WHEREFORE, CIH respectfully requests that the Court hear this Motion and enter an Order: (a) finding that due and adequate notice and an opportunity to be heard in accordance with all applicable law were given to all creditors and interested parties in the Chapter 11 Case, and any and all other affected or interested parties; (b) approving the Auction and Bid Procedures and Break Up Fee; (c) finding that in the event of any discrepancy between this Motion and the APA or this Motion and the Bid Procedures, the terms of the APA and Bid

Procedures govern, and (d) setting a second hearing to, subject to the Auction and Bid

Procedures: (i) authorize the sale of the Assets free and clear of all liens, encumbrances,

claims and interests, including but not limited to mortgage liens, personal property liens,

construction and mechanics' liens, judgment liens, rights of first refusal and all other claims;

(ii) find that the sale be effective immediately and that the stay provisions of Bankruptcy

Rules 6004(h) and 6006(d) do not apply; and (iii) find that nothing related to or arising out of

the APA or the Sale Order shall cause Purchaser to be deemed to be in control of Debtor, or to

be acting as a "responsible person" with respect to the operation and management of seller,

prior to or after the Closing; and (e) providing such other relief as is just and proper under the

circumstances.


Date:  December 20, 2016                    Respectfully submitted,


                                           /s/  Jeffrey D. Goetz                              .
                                           Jeffrey D. Goetz, Esq., IS #9999366
                                           Bradshaw Fowler Proctor Bradshaw Fowler
                                           Proctor & Fairgrave, P.C.
                                           801 Grand Avenue, Suite 3700
                                           Des Moines, IA 50309-8004
                                           515/246-5817
                                           515/246-5808 FAX
                                           goetz.jeffrey@bradshawlaw.com

                                           Proposed General Reorganization Counsel
                                           for Central Iowa Healthcare f/d/b/a
                                           Marshalltown Medical Surgical Center,
                                           Debtor and Debtor-in-Possession

                                           and

                                           Aaron L. Hammer
                                           Mark S. Melickian
                                           Michael A. Brandess
                                           Sugar Felsenthal Grais & Hammer LLP

30 N. LaSalle St., Ste. 3000
Chicago, IL 60602
ahammer@sfgh.com
mmelickian@sfgh.com
mbrandess@sfgh.com

Proposed Special Healthcare
Reorganization Counsel for Central
Iowa Healthcare f/d/b/a Marshalltown
Medical Surgical Center, Debtor and
Debtor-in-Possession

**Certificate of Service**

This document was served electronically on parties who receive electronic notice through
CM/ECF as listed on CM/ECF's notice of electronic filing.

/s/ Barbara Warner

# Exhibit A

## Asset Purchase Agreement

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of December ___, 2016 (the "Execution Date"), by and between Central Iowa Healthcare, an Iowa nonprofit corporation ("Seller"), and Allen Health Systems, Inc d/b/a UnityPoint Health—Waterloo, an Iowa nonprofit corporation ("Buyer").

ARTICLE I
DEFINITIONS

1.01    <u>Definitions</u>.    The following terms have the meanings assigned below:

"*Affiliate*" means any Person that directly, or indirectly, controls, is controlled by, or is under common control with, such a specified Person.

"*Alternative Transaction*" means any of the following: (i) a single transaction or a series of transactions that together involve a sale of any of the Assets to a Third Party either pursuant to the sale process described in the Sale Procedures Order, to a Third Party that submitted a Qualified Bid (as defined in the Sale Procedures Order), or otherwise; (ii) Seller sells, transfers, or issues equity securities; (iii) any merger, consolidation or other change of control transaction involving Seller; (iv) the Bankruptcy Court enters an Order confirming a plan of reorganization or liquidation for Seller prior to Closing that does not provide for the sale of the Assets to Buyer.

"*Ancillary Agreements*" means the Bill of Sale, Warranty Deed, and the Assignment Agreement attached as **Exhibits A, B, and C** respectively.

"*Ancillary Businesses*" means the ancillary healthcare and medical business, including physician services, that Seller conducts.

"*Assigned Contracts*" means the executory contracts, including Leases, of Seller as set forth in **Exhibit D.**

"*Assignment Agreement*" means the Assignment Agreement attached as **Exhibit C**.

"*Assumed Lease*" means any Lease that is an Assigned Contract.

"*Assumed Liabilities*" has the meaning set forth in Section 2.06 of this Agreement.

"*Assets*" has the meaning described in Section 2.01 of this Agreement.

"*Bankruptcy Code*" means Title 11 of the U.S. Code, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Iowa.

"*Bid Procedures Order*" means an Order of the Bankruptcy Court substantially similar to **Exhibit E**, with such changes as are acceptable to Buyer in its sole and absolute discretion.

1

"***Bill of Sale***" means the Bill of Sale attached as **Exhibit B**.

"***Breakup Fee***" means the sum of Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00).

"***Business***" means Seller's business of providing inpatient, outpatient, and other hospital and healthcare and related services (including the Hospital, the Clinics, and the Outpatient Center) and all Ancillary Businesses of Seller.

"***Business Day***" means any day other than a Saturday, a Sunday, or a day on which commercial banks are allowed or required to close in Iowa.

"***Chapter 11 Case***" means the proceeding pending before the Bankruptcy Court in which Seller is the Debtor, with a case number of 16-02438-11als.

"***Claim***" means any action, assessment, loss or experience rating, cause of action, claim, damage, demand, proceeding, fine, injury (including death), investigation, judgment, lawsuit, liability, loss, penalty, settlement or expense of any nature, whether civil, criminal, administrative or otherwise, and includes any and all "claims" as defined in 11 U.S.C. Section 101(5), and all "interests" as used in 11 U.S.C. Section 363(f).

"***Clinics***" means all healthcare services that Seller provides at the locations set forth on **Exhibit F.**

"***Closing***" has the meaning set forth in Section 6.01 of this Agreement.

"***Closing Date***" has the meaning set forth in Section 6.01 of this Agreement. .

"***COBRA Coverage***" means continuation coverage required under Section 4980B of the Code and Part 6 of Title I of ERISA.

"***Code***" means Title 26 of the U.S. Code, as amended from time to time.

"***Contract Rights***" means all contracts and other agreements incident to the Facilities to which Seller is a party.  Seller will schedule all such written and oral agreements on Exhibit G, and "Contract Rights" includes, without limitation, the agreements identified on such schedule.

"***Cure Costs***" means the amount necessary to cure all defaults under the Assigned Contracts (as of the Closing Date) to permit Seller to assume and assign the Assigned Contracts pursuant to 11 U.S.C. Section 365 and any order of the Bankruptcy Court.

"***DIP Financing Agreement***" means that certain Debtor-in-Possession Loan Agreement by and between Buyer and Seller of even date herewith.

"***Employee Plans***" means any pension, retirement, savings, disability, medical, dental, health, life, death benefit, group insurance, profit-sharing, deferred compensation, stock option, stock purchase, bonus, incentive, executive compensation, vacation pay, holiday pay, severance benefit plan, trust, arrangement, agreement, policy or commitment, whether or not any of the

foregoing is funded or insured and whether written or oral, that is intended to provide or does provide benefits to any of Seller's employees, and (i) to which seller is a party or by which Seller (or any of Seller's rights, properties or assets) is bound; (ii) with respect to which Seller has made any payments, contributions, or commitments, or may otherwise have any liability (whether or not Seller still maintains such plan, trust, arrangement, contract, agreement, policy, or commitment); or (iii) under which any director, employee or agent of Seller is a beneficiary as a result of his or her employment or affiliation with Seller.

"*Encumbrances*" means and includes interests, contractual rights, security interests, mortgages, liens, licenses, pledges, guarantees, charges, easements, reservations, restrictions, clouds, equities, rights of way, options, rights of first refusal and all other encumbrances, whether or not relating to the extension of credit or the borrowing of money.

"*Equipment*" means all furniture, fixtures, equipment, machinery, vehicles, and other personalty now or hereafter attached to or appurtenant to the Land or used in connection with the Facilities or the Business, including the items described on **Exhibit H**.

"*ERISA*" means the United States Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"*Excluded Agreements*" means all contracts, leases, and agreements (other than those between Seller and Buyer) that are not Assigned Contracts: (i) as to which Seller is a party; (ii) to which Seller or its property is subject; or (iii) by which Seller is otherwise bound, whether oral or written.

"*Excluded Assets*" means those items specifically described on **Exhibit I**.

"*Excluded Liabilities*" means the following liabilities of, and Claims against, Seller or the Assets, together with all other liabilities and obligations of, and Claims against, Seller that are not Assumed Liabilities:

(a)   all principal, interest, fees and expenses in respect of borrowed money, letters of credit, capital leases and installment purchases;

(b)   obligations relating to Taxes, including any loss or experience ratings, retroactive adjustments to Taxes made by the taxing authority that relate to the period prior to the Closing, and taxes Seller owes associated with the Closing;

(c)   any litigation, suit, proceeding, arbitration, Claim, audit or investigation, filed or otherwise, with respect to the affairs (i) of Seller prior to the Closing Date, or (ii) of the Facilities prior to Closing Date, regardless of when any such matter is initiated;

(d)   any regulatory or enforcement proceeding, action or investigation initiated by, or on behalf of, any healthcare program or any other Governmental Authority that relates to any alleged act or failure to act that occurred on or before the Closing Date, regardless of when such proceeding, action or investigation is initiated;

(e)    liabilities or Claims relating to any Contract Rights or Leases that are not Approved Contracts assumed by Buyer;

(f)    liabilities or Claims relating to the Excluded Assets;

(g)    any liability, or Claim (whether or not disclosed) arising out of the ownership, action, inaction or conduct of Seller relating to any time prior to Closing Date;

(h)    any liability, or Claim against Seller or its Affiliates that is unrelated to the Facilities;

(i)    pertaining to any Excluded Asset;

(j)    owed or payable to, or that may be withheld from future payments by, any third party payors, health maintenance organizations, managed care plans or other similar entities (including overpayments, recoupments, or penalties) and arising out of or related to any incident, facts or circumstances, including the operation of the Business, occurring or arising prior to the Closing;

(k)    relating to, resulting from, or arising out of any former operation of Seller that Seller discontinued prior to the Closing;

(l)    under or relating to any Employee Plans;

(m)    for Cure Costs;

(n)    of Seller arising out of, or incurred in connection with, the negotiation, preparation and execution of this Agreement or the Ancillary Agreements, as well as any other transactions contemplated pursuant to this Agreement, including any expenses of counsel, financial advisors, brokers, agents, or other experts or retained professionals of Seller; and

(o)    the aggregate amount payable by Seller through the Closing Date, or arising as a result of the transactions this Agreement contemplates, for (i) legal, accounting, investment banking, broker and other fees and expenses, (ii) sales and use taxes, documentary stamps, transfer, privilege, excise or other similar Taxes or fees, arising from the transactions contemplated by this Agreement, and (iii) all other payments, costs and expenses Seller incurred in connection with or as a result of the transactions this Agreement contemplates.

"*Experimental Procedure*" means any human research project or study in which the data obtained are derived in any way through observation of, treatment of, manipulation of behavior of, or interviewing of, human subjects, except for the following: (i) gathering existing data in an anonymous form (*e.g.*, review of existing medical records without recording identities of the subjects); (ii) non-interventional observation of human behavior in a natural setting; (iii) use of human tissues and specimens that are obtained for other purposes (*e.g.*, anonymous use of tissues such as blood left over from clinical use); and (iv) anonymous questionnaires that do not involve

questions that, when answered, could lead to the identity of the subject; provided, however, that the foregoing exceptions are not applicable if they involve vulnerable populations, such as children, mentally or emotionally impaired subjects, or prisoners.

"*Facilities*" means Seller's interest in the Hospital, the Outpatient Center, Land, Improvements, Equipment, Intellectual Property, Contract Rights, Leases, Intangible Personal Property, Government Authorizations, Records and the other intangible and tangible assets, whether real or personal or mixed, that are located in, or associated with, the Hospital, the Outpatient Center, the Clinics, and/or on the Land.

"*FMLA*" means the United States Family and Medical Leave Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied.

"*Governmental Authority*" means the government of the United States or any foreign country or any state or political subdivision thereof and any entity, body or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, and other quasi-governmental entities established to perform such functions.

"*Government Authorizations*" means all licenses, permits, approvals, certificates of need and occupancy, facility certifications, consents and other authorizations from any Governmental Authority as are necessary to lawfully own and/or operate the Facilities or conduct the Business.

"*Hazardous Materials*" means any substance, material, or waste that is or becomes regulated by any Governmental Authority including: (i) petroleum, (ii) asbestos, (iii) polychlorinated biphenyls, (iv) those substances, materials or wastes designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act or listed pursuant to Section 307 of the Clean Water Act or any amendments or replacements to these statutes, (v) those substances, materials or wastes defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act or any amendments or replacements to that statute, or (vi) those substances, materials or wastes defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, or any amendments or replacements to that statute.

"*Hospital*" means Seller's acute care hospital located at 3 South 4th Avenue, Marshalltown, Iowa.

"*Improvements*" means the buildings and all other improvements, including site improvements, landscaping, fixtures, mechanical equipment, apparatus and appliances, now owned or leased or hereafter placed in the Hospital, the Outpatient Center, the Clinics, and/or on the Land.

"*Intangible Personal Property*" means all engineering and architectural plans and specifications, drawings, studies and as-built surveys relating to the Facilities that are in Seller's

5

possession, and any other intangible personal property Seller owns and uses in connection with the Facilities.

"***Intellectual Property***" means any or all of the following rights: (i) all U.S., international, and foreign patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) all inventions (whether or not patentable), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists, and all documentation relating to any of the  foregoing throughout the world; (iv) all industrial designs and any registrations and applications therefor throughout the world; (v) all internet uniform resource locators, domain names, trade names, logos, slogans, designs, common law trademarks and service marks, trademark and service mark registrations and applications therefor throughout the world; (vi) all databases and data collections and all rights therein throughout the world; (vii) all moral and economic rights of authors and inventors, however denominated, throughout the work; and (viii) any similar or equivalent rights to any of the foregoing anywhere in the world.

"***Inventory***" has the meaning set forth in Section 2.01(a) of this Agreement.

"***Key Vendor***" means a counterparty to an executory contract with Seller that is identified by Buyer for inclusion on **Schedule 2.08**.

"***Knowledge***" with respect to Seller means all facts that any officer of Seller, or of those individuals listed on **Exhibit J**, know or would have reason to know following due inquiry and diligence with respect to the matters at hand.

"***Labor Laws and Employment Laws***" means all Laws and all contracts or collective bargaining agreements governing or concerning labor relations, unions and collective bargaining, conditions of employment, employment discrimination or harassment, wages, hours, or occupations safety and health. The term includes ERISA, the Immigration Reform and Control Act of 1986, the National Labor Relations Act, the Civil Rights Acts of 1866 and 1964, the Equal Pay Act, the Age Discrimination in Employment Act, the Americans With Disabilities Act, FMLA, WARN, OSHA, the Davis Bacon Act, the Walsh-Healy Act, the Service Contract Act, the Fair Labor Standards Act, the Rehabilitation Act of 1973, the Sarbanes-Oxley Act, any worker's compensation Law, and all rules and regulations promulgated under any of the foregoing Laws.

"***Laws***" means all statutes, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, decisions, judgments, injunctions, writs, executive orders, awards, and decrees of, or issued by, any Government Authority.

"***Land***" means the real estate described on **Exhibit K**, together with all easements, hereditaments, rights of way, privileges and rights benefiting the same and all strips and gores of land lying adjacent to such land that Seller owns.

"***Leases***" means all lease or rental agreements involving or pertaining to the Facilities, to which Seller is a party, if any.

6

"***Licenses***" means all notifications, licenses, permits (including environmental, construction, and operation permits), franchises, certificates, certificates of need, accreditations, approvals, exemptions, waivers, classifications, registrations and other similar documents and authorizations any Governmental Authorities have issued, as well as all applications for any of the foregoing.

"***Lien***" means any lien (statutory or otherwise), encumbrance, Claim, indebtedness, obligation, right, demand, charge, right of setoff, mortgage, deed of trust, security interest, pledge, preference, option, lease, license, Tax, right of first refusal or similar interest, title defect, easements, rights of way, restrictive covenant, encroachment, judgment, conditional sale, title retention agreement or restriction on transfer, or any other interest, whether it is secured or unsecured, known or unknown, recorded or unrecorded, contingent or liquidated.

"***Material Adverse Effect***" means any adverse effect in the business, financial or physical condition, or results of operations of the Facilities, the Business, or Seller with respect to the Facilities, that is material when taken as a whole, excluding any adverse change that is due to the announcement or anticipated consummation of the transactions this Agreement contemplates.

"***NLRB***" means the United States National Labor Relations Board.

"***Outpatient Center***" means the outpatient center Seller operates at 55 Central Iowa Drive, Marshalltown, Iowa.

"***OSHA***" means the United States Occupational Safety and Health Administration.

"***Person***" means any individual, corporation, partnership, joint venture, association, limited liability company, trust, unincorporated organization or Governmental Authority.

"***Petition Date***" means December 20, 2016.

"***Purchase Price***" means Twelve Million Five Hundred Thousand and no/100 Dollars ($12,500,000.00).

"***Records***" means all books and records Seller (or its Affiliates) maintain in connection with the Facilities or the Business, but excluding any records relating solely to Seller corporate entity as distinct from the Facilities or Business.

"***Sale Order***" means an Order of the Bankruptcy Court, substantially similar to **Exhibit L**, with such changes as are acceptable to Buyer in its sole and absolute discretion.

"***Tax Return***" means any report, return, declaration or other information required to be supplied to any Governmental Authority in connection with Taxes, including estimated returns and reports of every kind with respect to Taxes.

"***Taxes***" means all taxes, charges, fees, levies, duties, penalties, additions or assessments imposed by any Governmental Authority, including income, excise, property, sales, transfer, use, ad valorem, profits, occupancy, environmental, sewer, tap, severance, franchise, value added or other taxes, including any interest, penalties or additions attributable thereto.

"***Third Party***" means any Person other than Seller, Buyer or an Affiliate of either.

"***Treasury Regulations***" means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code.

"***WARN***" means the United States Worker Adjustment and Retraining Notification Act, as amended from time to time, and the rules and regulations promulgated thereunder.

"***Warranty Deed***" has the meaning set forth in Section 6.02(a) of this Agreement.

1.02   General Construction. Whenever the context requires in this Agreement, the singular includes the plural and masculine includes the feminine or the neuter. The word "including" means "including without limitation." Words such as "herein," "hereof," "hereby" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section or Subsection of this Agreement.

1.03   Schedules and Exhibits. The schedules and exhibits referenced in this Agreement are incorporated herein. All items disclosed hereunder shall be deemed disclosed in connection with the specific representation to which they are explicitly referenced. If no disclosure schedule is attached with reference to a specific Section of this Agreement, then such missing schedule shall be deemed to state "None."

ARTICLE II
AGREEMENT AND CONSIDERATION

2.01   Agreement to Sell and Purchase.   In consideration of the mutual covenants and promises contained in this Agreement, Seller agrees to sell, assign, transfer and convey unto Buyer all of Seller's right, title and interest in and to the assets described in this Section 2.01 (but not any Excluded Assets) (collectively the "Assets"), and Buyer agrees to purchase all of Seller's right, title and interest in and to the Assets (but not any Excluded Assets), all upon the terms and conditions set forth herein. Except for any Excluded Assets, the Assets consist of the following assets, properties and rights of Seller as of the close of business on the Closing Date:

(a)   All inventory, including: supplies; drugs; food; disposables; consumables; office and other supplies; spare, replacement, and component parts; and other inventory property located at, or stored on behalf of, or in transit to, the Land, Hospital, Outpatient Center, Clinics, or used in the Business (collectively the "Inventory");

(b)   All Records, fixed assets, equipment, furnishings, computer hardware, vehicles, fixtures and other tangible personal property (including all medical equipment, data processing equipment and related software);

(c)   All of Seller's rights under the Assigned Contracts;

(d)   All of Seller's right, title, and interest to the Land and all licenses, permits, approvals, qualifications, easements, and other rights relating thereto;

8

(e)  All good will, patents, patent applications, copyrights, copyright applications, methods, know-how, software, technical documentation, licenses, processes, procedures, inventions, trade secrets, trademarks, trade names, service marks, service names, registered user names, technology, research records, data designs, plans, drawings, manufacturing know-how and formulas, whether patentable or unpatentable, and other intellectual or proprietary rights or property relating to the Business or the Facilities (and all rights thereto and applications therefor), and all Seller's Intellectual Property;

(f)  All rights to causes of action, lawsuits, judgments, claims and demands of any nature available to, or being pursued by, Seller, whether arising by way of claim, counterclaim, setoff, or recoupment, as well as all rights and claims arising under any Assigned Contract, but <u>not</u> including any claims or causes of action arising solely pursuant to Chapter 5 of the Bankruptcy Code;

(g)  All deposits, advances, pre-paid expenses and credits;

(h)  All rights in and under all express or implied guaranties, warranties, representations, covenants, indemnities, covenants, and similar rights in favor of Seller;

(i)  To the extent Buyer request, all Licenses relating to the Business, the Hospital, the Clinics, the Outpatient Center, or the Facilities;

(j)  All Records, and all other information, files, correspondence, records, data, plans, reports, and recorded knowledge, including all hospital medical records; patient medical and financial records and files; hospital financial records; medical staff records; customer, supplier, price and mailing lists; and all accounting or other books and records of Seller in whatever media retained or stored, including computer programs and disks;

(k)  All cash, cash equivalents or marketable securities and all rights to any bank accounts of Seller, including all escrows and reserves;

(l)  All accounts receivable and all other rights of Seller to payment from third parties, and the full benefit of all security for such accounts receivable or rights to payment (collectively the "Accounts Receivable");

(m)  All other tangible and intangible assets of any kind or description, wherever located, that Seller owns, or carries or reflects on its books or records;

(n)  All rights to any lump sum payments received after Closing payable by any governmental payor or programs such as Medicaid, Medicare or similar programs, regardless of whether such programs relate to any services prior to Closing or are associated with the Facilities' status or designation related to services prior to Closing;

(o)  Seller's Medicare and Medicaid provider numbers and lock box accounts;

(p)   The equity and/or joint venture interests set forth on **Exhibit M**, and all rights of Seller as the owners of those interests;

(q)   Any other assets used in (or related to) the operation of the Business, including any rights of coverage or recovery under any insurance policies or any rights to any tax refunds.

2.02   <u>Consideration</u>.   Buyer agrees to pay to Seller the Purchase Price in consideration for the sale of the Assets, subject to the adjustments and credits described herein.

2.03   <u>Method of Payment</u>.   Buyer will pay the Purchase Price at Closing, which will consist of the following:

(a)   All amounts Seller owes to Buyer pursuant to the Loan or Loan Documents (as defined in the DIP Financing Agreement), which will be a full credit toward the Purchase Price; and

(b)   The remaining Purchase Price in cash or other immediately available funds subject to all prorations, credits and escrows provided in this Agreement.

2.04   <u>Allocation of the Purchase Price</u>.   The Purchase Price will be allocated in the manner set forth on **Exhibit N**, said allocation being mutually agreed upon by the parties.

2.05   <u>Excluded Assets</u>.   Notwithstanding anything herein to the contrary, Buyer will not acquire any interest in the Excluded Assets listed on Exhibit I as a result of this transaction.

2.06   <u>Assumed Liabilities</u>.

(a)   Except as provided in Section 2.06(b), Buyer will not assume or in any way be responsible for any of the debts, liabilities, or obligations of any kind or nature of Seller. Without limiting the generality of the foregoing, Buyer will have no liability for any Excluded Liabilities or Excluded Assets.

(b)   As the sole exception to Section 2.06(a), effective as of the close of business on the Closing Date, Buyer will assume Seller's obligations under each Assigned Contract to the extent such obligations: (i) are not required to be performed prior to the Closing Date; (ii) are disclosed on the face of such Assigned Contract;  (iii) arise, accrue, and relate to the operations of the Business subsequent to the Closing Date; and (iv) are not related to any default, breach or other obligation relating to or arising prior to Closing (collectively the "**Assumed Liabilities**").

(c)   Without limiting the generality of Section 2.06(a), the Assumed Liabilities will not include, and in no event will Buyer assume, discharge, or satisfy any Excluded Liabilities.

2.07   <u>Inspection Period.</u>   Buyer will have a period of fifteen (15) days following the Execution Date (the "**Inspection Period**"), at Buyer's expense, to make such physical, legal, zoning, title, survey, land use, environmental, healthcare, financial and other

10

examinations, inspections and investigations of the Facilities or the use or operation thereof that Buyer, in its sole discretion, determines to make. If Buyer is not satisfied with its inspections of the Facilities, Buyer may, in its sole discretion, cancel this Agreement by providing written notice of cancellation (the **"Termination Notice"**) to Seller on or before the end of the Inspection Period.  Upon termination of this Agreement under the terms of this Section, no party to this Agreement will have any further claims or obligations under this Agreement, except those obligations that expressly survive termination of this Agreement.  In the event Buyer does not timely deliver the Termination Notice to Seller, Buyer will be deemed to have elected to waive its right to terminate this Agreement under this Section (but not any other term of this Agreement, including satisfaction of the conditions precedent to Buyer's obligation to close expressly provided herein).

2.08   <u>Revisions to List of Assigned Contracts</u>. Subject to the terms of the Bidding Procedures Order, Buyer may revise **Exhibit D** at any time prior to the Bankruptcy Court's entry of the Sale Order, by giving notice to Seller. Immediately upon Buyer's delivery of such written notice to Seller, **Exhibit D**, so revised, will define the scope of Assigned Contracts in all respects pursuant to this Agreement, including the scope of Assumed Liabilities, Assigned Contracts, Excluded Liabilities, and Excluded Agreements, and Cure Costs.

2.09   <u>Seller's Obligation to Cooperate on Key Vendors; Termination Right</u>.  Seller shall cooperate with Buyer in good faith to assist Buyer in entering into new contracts and leases or to assume and assign a Lease or Contract to Buyer on favorable terms with parties designated as Key Vendors on Schedule 2.08.   Buyer has the right, but not the obligation, to terminate this Agreement in the event it is unable to reach a satisfactory agreement with a Key Vendor within thirty (30) days following the Petition Date.

2.10   <u>Cure Costs</u>.  Notwithstanding anything to the contrary in this Agreement or in the Bankruptcy Code, Seller shall not be responsible for any Cure Costs to any counterparty to an Assumed Lease or Assumed Contract including but not limited to such leases or contracts with Key Vendors.

2.11   <u>Seller's Right to Reject</u>.  Seller may seek, at any time, to reject any contract or lease that is not identified as a contract or lease with a Key Vendor. Provided, however, that Seller will provide Buyer with ten (10) days' notice of its intent to reject such contract or lease.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

3.01   <u>Seller's Representations and Warranties</u>.   Seller represents and warrants to Buyer as follows, agrees that each of the following will be true and correct on the Execution Date and the Closing Date, and covenants as follows:

(a)   <u>Organization of Seller</u>. Seller is a nonprofit corporation duly organized and validly existing and in good standing under the laws of the State of Iowa.

11

(b)  <u>Authority</u>.   The execution and delivery of this Agreement and the Ancillary Agreements to which it is a party, and the consummation of the transactions herein contemplated have been duly and validly authorized by all necessary action on the part of Seller. Subject to the Bankruptcy Court's entry of the Bidding Procedures Order and the Sale Order, this Agreement has been, and the Ancillary Agreements will be as of the Closing Date, duly executed and delivered by Seller, and do or will (as the case may be) constitute Seller's valid, legal, and binding obligation according to their terms.

(c)  <u>Conflict or Default</u>.   Subject to the Bankruptcy Court's entry of the Bidding Procedures Order and the Sale Order, and other than conflicts or defaults that arise due to the filing of the Chapter 11 Case, the execution and delivery of this Agreement (and the Ancillary Documents) and the consummation of the transactions contemplated therein will not, to Seller's Knowledge, conflict with, violate, result in a breach by, constitute a default under or accelerate the performance provided by the terms of any Laws, or material agreement to which Seller may be subject, or that could result in the creation of a Lien upon any part of the Facilities.

(d)  <u>No Consent</u>.   To Seller's Knowledge, except as set forth on <u>Schedule 3.01(d)</u>, and except for the Bankruptcy Court's entry of the Bidding Procedures Order and the Sale Order, no consent or approval by any Governmental Authority or any non-governmental person or entity is required in connection with Seller's execution, performance and delivery of this Agreement (or the Ancillary Agreements) or Seller's consummation of the transactions contemplated therein.

(e)  <u>Title</u>.   **Exhibit K** sets forth a true and correct legal description of the Land, and includes all real estate in which Seller has an interest. Seller has, and at Closing will have, good, insurable and marketable fee simple title to the Land and a valid leasehold interest in and to the Outpatient Center except for: (i) real estate taxes for the current year not yet due and payable, (ii) such other permitted exceptions and encumbrances as may be approved by Buyer as provided in <u>Section 3.01(f)</u>, (iii) other easements, covenants and zoning restrictions of record that do not materially impair the operation of the Facilities (collectively, the "**Permitted Encumbrances**").

(f)  <u>Liens</u>.   Except for Permitted Encumbrances, neither Seller nor any part of the Facilities is subject to any (i) use or occupancy restrictions, other zoning restrictions of record; (ii) special taxes or assessments; (iii) legal or equitable interests in the Facilities claimed by any person or entity other than Seller; or (iv) Lien or Encumbrance.

(g)  <u>Improvements</u>.   To Seller's Knowledge, the Improvements, including mechanical, electrical, heating, air conditioning, drainage, sewers, water and plumbing systems and all other fixtures and tangible personal property are in good operating condition and repair, ordinary wear and tear excepted. Any material items of deferred maintenance are described on <u>Schedule 3.01(g)</u>. Seller is not aware of any material latent or patent physical or mechanical defects with any of the foregoing.

(h)  <u>Leases and Contract Rights</u>.   Exhibit G sets forth a complete and accurate list of all Leases, Contract Rights, or other agreements, whether oral or written affecting or

relating to the Facilities to which Seller is a party or that bind or affect Seller. True, accurate and complete copies of all Leases and Contract Rights are included within Exhibit G. To the extent any Leases or Contract Rights are oral, Seller has included an accurate and complete summary of same on Exhibit G. Without limiting the generality of the foregoing, Exhibit G sets forth the following that relate to Seller, the Business, or the Assets:

i.    All bonds, notes, credit or loan agreements (or commitments), mortgages, guaranties, or other contracts relating to the borrowing of money or that bind any of the Assets;

ii.   All Leases;

iii.  All contracts with third party payors, health maintenance organizations, managed care plans, or similar entities;

iv.   All contracts with Medicare, Medicaid or any other federal or state healthcare program;

v.    All contracts providing for the affiliation of the Hospital or the Outpatient Center with any educational or similar institution;

vi.   All contracts with physicians or other Persons referring, or in a position to refer, patients to the Business;

vii.  All contracts regarding Seller's participation in any networks of healthcare providers;

viii. All contracts that limit any of Seller's officers or employees from engaging in business in any particular location;

ix.   All contracts for capital expenditures or the acquisition or construction of fixed assets requiring Seller to pay more than $20,000.00;

x.    All contracts that grant any Person a Lien on any of the Assets;

xi.   All contracts for the cleanup, abatement or other actions in connection with any Hazardous Materials, the remediation of any existing environmental condition, or relating to the performance of any environmental audit or study;

xii.  All contracts granting to any Person an option or a right of first refusal, first-offer, or similar preferential right to purchase or acquire any of the Assets;

xiii. All contracts with any agent, distributor, or representative that is not terminable (without penalty or liability) within thirty (30) days;

xiv.  All contracts granting or receiving a license, sublicense or franchise;

13

xv.    All contracts providing for the reimbursement, release, or indemnification of any officer, director, employee or other Person;

xvi.    All joint venture, partnership, or operating agreements;

xvii.    All settlement agreements that have not been fully performed;

xviii.    All outstanding powers of attorney authorizing any Person to act on behalf of Seller; and

xix.    All existing contracts and commitments by which Seller, or any of the Assets, are bound that involves an annual commitment of $20,000 or more, or that is otherwise material to the Business.

(i)    <u>Leases and Contracts – Generally</u>.  Assumed Leases and Assigned Contracts are listed on Exhibit D.  Except to the extent described on Schedule 3.01(h), and except to the extent of any default or modification arising on account of the commencement of the Chapter 11 Case, such Assumed Leases and Assigned Contracts are in full force and effect; have not been modified or amended; there are no known other agreements affecting the rights and obligations under the Assumed Leases and Assigned Contracts; no rent has been paid more than two months in advance; and there are no known defaults or claims of default under the Assumed Leases and Assigned Contracts or facts or circumstances which with the passing of time or giving of notice would constitute a default.  There are no real estate commissions owed under any of the Assumed Leases including any renewals thereof.  There is no uncompleted obligation of Seller landlord to make improvements under any of the Assumed Leases.    Prior to Closing. Seller agrees to provide an estoppel certificate from the tenants occupying any building or land under any Leases.

(j)    <u>Lease Defaults.</u>  Except for proceedings pending in the Bankruptcy Court in the Bankruptcy Case and any proceeding listed on Schedule 3.01(i), there is no action, suit or proceeding pending between Seller and any lessee.  In addition, other than defaults that may have arisen on account of the commencement of the Chapter 11 Case, to Seller's Knowledge, after due inquiry, there is not any material default on the part of any party to any Lease or Sublease or any event that with notice or lapse of time would constitute such a default.

(k)    <u>Compliance with Laws</u>.  Except as fully described on <u>Schedule 3.01(j)</u>, Seller has not received any unremediated written notice of complaint from any Governmental Authority, insurance company or third party, and has not received written notice of (and has no Knowledge of) any material violation or any claim of violation of any Law, license, permit, authorization, or standard related to any legal or insurance requirement that is unremedied or that could have an adverse effect on the Facilities or Buyer. Seller has not received any written notice from any Governmental Authority of any pending proceeding to take all or any part of the Land by condemnation or right of eminent domain, and Seller has no Knowledge that such proceeding is threatened. Seller is not a party to any agreement or instrument, or subject to any judgment, order,

writ, injunction, rule, regulation, code or ordinance not also applicable to other similarly situated businesses that has an adverse effect, or might reasonably be expected to have an adverse effect, on the operations, condition or prospects of Buyer's ownership of the Facilities.

(l)   <u>Litigation and Proceedings</u>.   <u>Schedule 3.01(j)</u> sets forth a complete and accurate description, to Seller's Knowledge, of any litigation, proceeding, claim or investigation threatened or pending before any court, arbitrator or administrative agency (or to Seller's Knowledge threatened) affecting or relating to Seller, or relating to Seller's operation of the Facilities.   Except as fully described on <u>Schedule 3.01(j)</u> hereto, to Seller's Knowledge, there are no outstanding orders, consent decrees, corporate integrity agreements, rulings, decrees, judgments or stipulations by or with any court, arbitrator or Governmental Authority that affect Seller or relate to Seller's operation of the Facilities.   Seller has paid for all work commenced on the Land or materials delivered to the Land and at Closing no party shall be entitled to file a mechanic's or similar lien against the Assets.   Seller will promptly notify Buyer in writing of any changes to said Schedule.

(m)   <u>Utilities</u>.   To Seller's Knowledge, all water, gas, electricity, telephone, cable, drainage facilities, sewer and other utilities required for the operation of the Hospital either enter the Land through adjoining public streets or, if they pass through adjoining private land, they do so in accordance with recorded easements.

(n)   <u>Taxes Exempt Status; Tax Returns; Taxes</u>.   The Internal Revenue Service has determined (as evidenced by the issuance of the IRS determination letter dated _____ (the "IRS Determination Letter") that Seller is an organization described by Section 501(c)(3) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code (the "Tax Exempt Status"). The IRS Determination Letter has not been modified or revoked, and Seller has conducted its operations so as to maintain its Tax Exempt Status.   Except as described on <u>Schedule 3.01(l)</u>, Seller has filed all Tax Returns and paid all Taxes against the Facilities and/or Seller that relate to Seller's ownership and/or operation of the Facilities, or that could constitute an Encumbrance against the Facilities, if and when they are due and payable. There.   Other than as described on Schedule 3.01(l), there are no agreements, waivers or other arrangements providing for an extension of time with respect to the assessment of any tax or deficiency against the Facilities and/or Seller that relate to Seller's ownership and/or operation of the Facilities, nor does Seller have Knowledge of the pendency of any such actions, suits, proceedings, investigations or claims for additional Taxes and assessments against the Facilities.

(o)   <u>Non-Foreign Status</u>.   Seller is not a foreign entity (as the term is defined in the Internal Revenue Code and Income Tax Regulations) and Seller agrees to execute a Certificate of Non-Foreign Status pursuant to Section 1445 of the Internal Revenue Code at Closing.

15

(p)   <u>Broker's Fee</u>.   Seller is solely responsible for satisfying any Claim relating to any broker or advisor with respect to the transactions this Agreement contemplates for a brokerage commission, consulting fee, finder's fee or similar payment.

(q)   <u>Bulk Sales Law</u>.   Seller has complied, or will comply, with any applicable bulk sales law requirements applicable to the sale of the Facilities, at its sole expense.

(r)   <u>Environmental Matters</u>.   To Seller's Knowledge, the Facilities are in compliance with all federal, state and local environmental, health and safety laws, statutes ordinances and regulations, including all laws relating to Hazardous Materials, and wetlands. Seller represents and warrants that currently and as of the Closing, no oil or Hazardous Materials have been generated, released, stored or deposited over, beneath or on the Land or on or in any structures located on the Land, from any source whatsoever, by Seller, or, to Seller's best Knowledge, its predecessors in interest or any other person.

(s)   <u>Employee Plans</u>.   Except as set forth on Schedule 3.01(q), there is no accrued vacation or vacation pay, and there are no bonuses, commissions, or other fees in respect of work done prior to the Closing Date due or, to Seller's Knowledge, expected by, present or former employees of Seller. <u>Schedule 3.01(q)</u> sets forth a complete and correct list of each Employee Plan Seller has established, maintained or contributed to in connection with the Facilities.   Each Employee Plan intended to qualify under section 401(a) of the Code has at all times since its establishment complied both in form and operation, in all material respects, with the requirements of section 401(a) of the Code and each related trust has been at all times since its establishment exempt from federal income tax under section 501(a) of the Code and the Internal Revenue Service has issued each such Employee Plan a favorable determination letter or opinion letter, as applicable, which is currently applicable. All Employee Plans have complied, both in form and operation, in all material respects, with, and have been administered in material compliance with, all applicable provisions of ERISA, the Code and all other applicable laws.   Seller has made all contributions to all the Employee Plans it has established or maintained as the terms of the Employee Plan or applicable Law required all periods. There are no inquiries or proceedings pending or, to the knowledge of Seller, threatened by any Governmental Authority, or by any participant or beneficiary or by any other party with respect to any Employee Plan now or formerly maintained by Seller or to which Seller has contributed.

(t)   <u>Labor Matters</u>.   Hours worked by, payments made to, and the working conditions of, Seller's employees have not been in material violation of the Fair Labor Standards Act or any other applicable Law relating to the payment of wages, conditions of employment, employment of minors or similar matters.   Seller's practices in respect of hiring, working conditions, promotion, discharge, discipline and rates of pay of its employees have not been in material violation of any Laws, including those prohibiting discrimination by reason of sex, race, age, national origin, religion, physical handicap or other similar reason.

(u)  <u>Employees</u>.  Schedule 3.01(s) sets forth a list of all employment agreements between Seller and its employees, and a list of Persons Seller employs as of the Execution Date, each individual's title.

(v)  <u>Fraud and Abuse</u>.  To Seller's Knowledge, Seller has not engaged in any activities that are prohibited under 42 U.S.C. §1320a-7b or 42 U.S.C. 1395, or the regulations promulgated thereunder, or any applicable related Law, or that are prohibited by rules of professional conduct, including the following:  (a) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment; (b) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment; (c) any failure by a claimant to disclose knowledge of the occurrence of any event affecting the initial or continued right to any benefit or payment on its own behalf or on behalf of another, with the intent to fraudulently secure such benefit or payment; and (d) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind, or offering to pay or receive such remuneration (i) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by Medicare or Medicaid, or (ii) in return for purchasing, leasing or ordering or arranging for, or recommending, purchasing, leasing or ordering any good, facility, service or item for which payment may be made in whole or in part by Medicare or Medicaid. Seller is not and at no time has been suspended or excluded from participation in any federally funded health care program, including Medicare or Medicaid.

(w)  <u>Insurance Policies</u>.  Seller has maintained or caused to be maintained, in accordance with applicable Law, in full force and effect all policies of insurance applicable to Seller, and the Facilities, including medical malpractice insurance covering all physicians and other professional personnel Seller has engaged or employed, general liability insurance, property insurance, employer's liability and workers' compensation insurance. To Seller's Knowledge, Seller is not in default with respect to any provision in any such policies, nor has Seller failed to give any notice or to present any claim under any such policy in a timely fashion. No insurer has advised Seller in writing that it intends to reduce coverage or fail to renew an existing policy or binder. Except as set forth on <u>Schedule 3.01(x)</u>, there are no outstanding unpaid claims under any such policies, and all such policies are in full force and effect.  Buyer is not asserting any rights to past or current directors and officers insurance and related excess coverage, which rights are retained by Seller as an Excluded Asset.

(x)  <u>Scope of Assets</u>. The Assets (except the Excluded Assets) constitute all of the assets necessary and sufficient to conduct the operations of the Business in accordance with all applicable Laws and Seller's past practices.

(y)  <u>Certificate of Need</u>. The Hospital and all Ancillary Businesses operate under a valid certificate of need in compliance with all applicable Laws. All representations made in connection with obtaining any certificate of need, or any exemption from or waiver of

17

certificate of need review for any expenditure, service or project relating to the Hospital or any Ancillary Businesses were, and are, accurate and consistent with the basis for granting the certificate of need, or the determination that certificate of need review was not required. Seller has taken no action that has or is likely to subject Buyer, the Hospital, the Outpatient Center, the Clinics, the Assets, or the Business or any of their services or equipment to certificate of need review or to penalties or enforcement action under applicable certificate of need Laws. **Exhibit O** sets forth a true, correct, and complete list of all of the (i) certificates of need; (ii) letters of non-reviewability; or (iii) other exemptions from certificate of need review, that Seller holds or uses in the operation of the Business.

(z)   <u>Medical Staff</u>. Seller has previously delivered to Buyer true, correct, and complete copies of all: (i) medical staff privilege and membership application forms; (ii) delineation of privilege forms; current medical staff bylaws, rules and regulations, and amendments thereto; (iii) credentials and appeals procedures not incorporated in any of the foregoing; and (iv) contracts with physicians, physician groups, or other members of the medical staff of the Hospital or Outpatient Center. There are no pending or threatened appeals, challenges, disciplinary or corrective actions, or disputes involving any applicants, staff members, or allied health professionals with respect to the Hospital or the Outpatient Center except as set forth on **Exhibit P**. **Exhibit Q** sets forth a complete and accurate list of the names of each member of the medical staff of the Hospital and the Outpatient Center as of December 1, 2016.

(aa)  <u>Hill-Burton and Other Liens</u>. Neither Seller, nor the Hospital or Outpatient Center, nor to Seller's Knowledge, any of its predecessors in interest, have received any loans, grants, or loan guaranties pursuant to the United States Hill-Burton Act (42 U.S.C. § 291a, *et seq*.) program, the Health Professions Educational Assistance Act, the Nurse Training Act, the National Health Pharmacy and Resources Development Act, or the Community Mental Health Centers Act.  None of the Assets are subject to any liability in respect of amounts received by Seller or others for the purchase of the Assets (or any part thereof) under restricted or conditioned grants or donations, including monies received under the Public Health Services Act (42 U.S.C. § 291, *et seq*.).

(bb)  <u>Experimental Procedures</u>. Neither Seller, nor any officers, employees or agents of Seller, have performed or permitted to be performed, nor do they have Knowledge of the performance of, any Experimental Procedures involving patients in the Hospital. No institutional review board operates or has operated at the Hospital.

3.02  <u>Buyer's Representations and Warranties</u>. Buyer makes the following representations and warranties to Seller, which will be true and correct as of the date made and the Closing Date:

(a)  <u>Organization of Buyer</u>. Buyer is a nonprofit corporation duly organized, validly existing, and in good standing under the laws of the State of Iowa.

(b)  <u>Authority</u>.  The execution and delivery of this Agreement and the consummation of the transactions herein contemplated have been duly and validly authorized by all

18

necessary corporate action on the part of Buyer, and this Agreement constitutes, and the documents contemplated hereby will be, Buyer's valid and legally binding obligations, enforceable according to their terms.

(c) Conflict or Default. Neither the execution nor delivery of this Agreement, nor the consummation of the transactions herein contemplated will conflict with, violate, result in a breach by, constitute a default under or accelerate the performance provided by the terms of any Law or agreement to which Buyer may be subject.

3.03   Effect of Buyer's Inspections.   Buyer will be deemed to have materially relied on all Seller's representations, warranties and covenants, and the effect of the representations and warranties made in this Agreement will not be diminished or deemed to be waived by any inspections, tests or investigations Buyer, its employees, contractors and agents made.

3.04   Full Disclosure.   No representation or warranty by Seller or Buyer, and no statement, document, financial statement, certificate or other instrument, schedule or exhibit furnished or to be furnished hereunder or in connection with the transactions contemplated hereby (including all exhibits and schedules hereto) contains or will contain any untrue or misleading statement of fact or omit to state or contain anything necessary to make such matter correct, complete and not misleading in all respects and to fairly present the information set forth in a manner that is not misleading.

ARTICLE IV
TITLE AND SURVEY

4.01   Title Report and Policy.   Within five (5) days of the Execution Date, Seller will obtain at its expense, an abstract of title to the Land continued through the Execution Date, and will deliver the same to the Buyer for examination. The abstract will show merchantable title to the Land in Seller in conformity with this Agreement, the land title law of the State of Iowa and the Iowa Title Standards of the Iowa State Bar Association, and will not disclose any covenants, easements or other matters which would make the Land unacceptable for Buyer's intended purpose. The abstract will become the property of Buyer when Buyer pays the Purchase Price in full. Seller will pay the cost of any additional abstracting title work due to any act or omission of Seller.   Seller will make every reasonable effort to promptly perfect the title in accordance with the opinion of Buyer's attorney so that upon conveyance, title shall will be deemed marketable in compliance with the terms of this Agreement.   If Seller cannot cure any objections to title by Closing, Buyer may either accept title with such defects or terminate this Agreement either in part or whole, and if termination is in part as to one or more parcels, the Purchase Price shall be adjusted based on the Allocation of Purchase Price. If Buyer elects to obtain a title insurance policy in lieu of an attorney's opinion, Buyer and Seller will share equally the costs associated with obtaining the title commitment and title policy and any endorsements thereto. Any objections to the title commitment Buyer identifies will be treated in the same manner as title objections in the attorney's title opinion.

4.02   Survey.   Prior to Closing, Buyer may at its expense obtain a survey of the Land.   If Seller has in Seller's possession an existing survey, Seller shall provide the same to Buyer so it

19

may be updated at Buyer's expense.  If the survey or any update of an existing survey, as certified by a registered land surveyor, shows any encroachments, or any violations of zoning ordinances, setback lines or other rules or regulations governing the location of buildings or easements, or defects in access or other matters which would impair the use of the Land for Buyer's intended purpose, such matters shall be treated as title defects, and Seller shall make every reasonable effort to correct such defects or otherwise satisfy Buyer that such defects will not unreasonably affect the value or use of the Land for its intended purpose.  If any such objections cannot be so cured by Seller prior to Closing, Buyer may either accept title with such defects (whereupon such defects shall be deemed to be "**Permitted Encumbrances**"), or (ii) terminate this Agreement

## ARTICLE V
## CONDITIONS

5.01  <u>Conditions to Buyer's Obligations</u>.    Buyer's obligations under this Agreement are conditioned upon the following (which Buyer may waive, in whole or in part, in writing):

(a)  <u>Performance of Covenants</u>.  Seller has timely performed all covenants and obligations, and timely complied with all conditions required of Seller by this Agreement.

(b)  <u>Representations and Warranties</u>.  All of Seller's representations and warranties are true, complete and correct on the Execution Date and as of the Closing Date as if made at that time.

(c)  <u>Closing Documents</u>.  At the Closing, Seller will deliver or cause to be delivered each of the items required of it as specified in <u>Section 6.02</u> of this Agreement.

(d)  <u>Litigation</u>.  No notice has been received as to litigation commenced or Claim made or threatened against any Person, by any other Person with regard to this Agreement, or the transactions provided for in this Agreement that, if successfully prosecuted, would have a Material Adverse Effect on Buyer or make any representation or warranty of Seller hereunder untrue or misleading.

(e)  <u>Consent</u>.  All certifications, consents, waivers, approvals, authorizations, Government Authorizations and determinations from and by third parties necessary legally to consummate the transactions contemplated herein have been obtained, and do not place restrictions on the operation of the Facilities that Buyer deems unacceptable in its reasonable discretion.

(f)  <u>Title Policy</u>.  If applicable, the issuance of the title insurance policy described in <u>Article IV</u> of this Agreement.

(g)  <u>Condition of Assets</u>.  There is no material damage or other adverse changes in the Facilities.

20

(h)  <u>Purchase of Outpatient Center Building and Ground Lease</u>.  The closing of the Offer to Purchase Interest in Building and Ground Lease by and between Buyer and CBC Marshalltown, LLC has occurred, or occurs as of the Closing Date.

(i)  <u>Subsequent Events</u>.  No action, investigation, Claim or proceeding has been instituted or threatened, or other matters occurred, that involve the likelihood of a Material Adverse Effect on the Business or the Facilities, and no action, investigation or proceeding has been instituted or threatened before any court or Governmental Authority to restrain or prohibit, or to obtain substantial damages in respect of, this Agreement, or the consummation of the transactions herein contemplated.

(j)  <u>Other Deliveries</u>.  Seller has delivered other items and deliveries relating to the Facilities as Buyer reasonably requests.

(k)  <u>Bankruptcy Court Orders</u>.

(i)  The Bankruptcy Court has entered the Sale Order substantially in the form set forth as **Exhibit L**; and

(ii)  As of the Closing Date, the Bidding Procedures Order and the Sale Order are in full force and effect, have not been stayed, vacated, reversed, or modified without Buyer's prior written consent (which Buyer may give or withhold in its sole and absolute discretion).

5.02  <u>Conditions to Seller's Obligations</u>.  Seller's obligations under this Agreement are conditioned upon the following (which Seller may waive, in whole or in part, in writing):

(a)  <u>Performance of Covenants</u>.  Buyer has timely performed all covenants and obligations, and timely complied with all conditions this Agreement require of Buyer in all material respects, including paying the Purchase Price to Seller.

(b)  <u>Representations and Warranties</u>.  All of Buyer's representations and warranties contained herein are true, complete and correct in all material respects on the Execution Date and as of the Closing Date, as if made at that time.

(c)  <u>Conveyances</u>. Buyer and Seller have received all third party certifications, covenants, waivers, approvals, authorizations, Government Authorizations and determinations necessary to legally consummate the transactions contemplated herein.

(d)  <u>Payment of Purchase Price</u>. Buyer will deliver the cash portion of the Purchase Price by wire transfer of immediately available funds.

(e)  <u>Other Deliveries</u>.  Buyer has delivered other items and deliveries relating to the Facility as Seller reasonably requests.

(f)  <u>Sale Order</u>. The Bankruptcy Court has entered the Sale Order in substantially the same form as **Exhibit L**.

21

ARTICLE VI
CLOSING

6.01 <u>Closing</u>.

(a) Subject to satisfaction of the terms and conditions of this Agreement, including those set forth in <u>Article V</u>, the consummation of the transactions this Agreement contemplate (the **"Closing"**) will occur on a date (the **"Closing Date"**) not later than five (5) days after the satisfaction or waiver of all conditions in <u>Article V</u>, or on such other date as Buyer and Seller mutually agree.

(b) The Closing shall be held at a location and on a date and at a time mutually agreed upon by Seller and Buyer, but absent such agreement shall be held at a time and place in Des Moines, Iowa, designated by Buyer in writing to Seller.  Notwithstanding the foregoing time and place of Closing, Seller and Buyer may deliver all of their respective closing documents required hereunder with respect to the Closing on or before the Closing Date (to hold in escrow in accordance with customary conveyancing practices subject to the consummation of the Closing) by mail or overnight courier.

6.02 <u>Seller's Closing Documents</u>.   Seller will deliver to Buyer the following documents at Closing in form and substance acceptable to Buyer:

(a) <u>Warranty Deed</u>.  A General Warranty Deed (the **"Warranty Deed"**) conveying to Buyer title to the Land and Improvements in fee simple, free and clear of all Liens and Encumbrances, except Permitted Encumbrances.

(b) <u>Groundwater Hazard Statement</u>.  A Groundwater Hazard Statement.

(c) <u>Declaration of Value</u>.  A Declaration of Value.

(d) <u>Bills of Sale</u>.  One or more Bills of Sale containing general warranty of title conveying to Buyer the Equipment, the Intangible Personal Property, the Records, and all components of the Facilities that constitute personalty, free and clear of all Liens and Encumbrances.

(e) <u>Records</u>.  Originals of all Records in the possession of Seller.

(f) <u>Title Policy</u>.  If applicable, the title policy described in <u>Section 4.01</u> of this Agreement.

(g) <u>Closing Certificate</u>. A Seller's closing certificate reaffirming Seller's representations and warranties hereunder.

(h) <u>Assignment Agreement</u>.  The Assignment Agreement.

(i)  Other Documents. Other documents as Buyer reasonably requests to accomplish the transactions this Agreement contemplates, or to evidence Seller's compliance with its covenants and agreements in this Agreement.

6.03  Closing Costs.  Seller will pay (i) the cost of preparing the Warranty Deed, (ii) Iowa Real Estate Transfer Tax, as Iowa Code Chapter 428A requires, (iii) the cost of the title abstract or title insurance provided herein, and (iv) the fees of its counsel.  Buyer will pay (x) the cost of the Survey, (ii) the cost of any environmental site assessment, (y) the per page recording costs associated with recording the warranty deed, and (z) the fees of its counsel. All security deposits referenced in any Assumed Lease shall be credited to Buyer at Closing.  The rent payable under any Assumed Lease shall be prorated as of the Closing Date.

6.04  Prorations.  The parties agree to the following prorations:

(a)  Accounts Receivable.  The parties will not pro-rate Seller's Accounts Receivable. Seller's Accounts Receivable, as of the Closing Date, will become Buyer's property regardless of when they arise, or when the transactions giving rise thereto occur.

(b)  Accounts Payable.  Except as otherwise set forth in this Agreement (including within the definition of Assumed Liabilities), Seller will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities prior to the Closing Date. Buyer will be solely responsible for all accounts payable resulting from the ownership and/or operation of the Facilities after the Closing Date or the assumption of the Assumed Liabilities.

6.05  Adjustments to the Purchase Price.  The following adjustments will be made at Closing, as of 11:59 p.m. on the day preceding the Closing Date, and will be added to the Purchase Price or credited against the Buyer's payment obligations at Closing, as the case may be.

(a)  Taxes.  Real property Taxes, real and personal ad valorem Taxes, and similar charges will be prorated as of the Closing Date in the manner customary for real estate transaction in Iowa.  Because real property Taxes are paid in arrears, the portion of the Taxes allocable to Seller will be credited to Buyer on the closing statement.

(b)  Special Assessments.  Seller will pay in full all improvement lien assessments, if any, whether or not due and payable as of the Closing Date. Special assessments, whether pending or to become a lien prior to Closing, or payable in installments, or for which a change of assessment may be levied on Buyer after Closing, will be credited to Buyer in full at Closing.

ARTICLE VII
CASUALTY; RISK OF LOSS

7.01  Casualty.   In the event of a casualty causing substantial damage to the Facilities before the date of possession, Buyer may (at its option) rescind this Agreement, or may proceed to Closing and receive any insurance proceeds associated with such casualty.

7.02  Risk of Loss Generally.  Except as otherwise specifically provided above, risk of loss from the Facilities, including by operation of any law that would impose liability relating to ownership of the Facilities, will not pass to Buyer until acceptance of the deed.

ARTICLE VIII
ADDITIONAL COVENANTS

8.01  Cost Reports. Seller will file or cause to be filed all cost reports required to be filed with CMS prior to the Closing Date. Buyer will file or cause to be filed all cost reports required to be filed on or after the Closing Date.

8.02  Conduct of Business. From the Execution Date through the Closing Date, Seller will, except as expressly required hereby or as the Bankruptcy Code prohibits:

(a) Conduct its business in the ordinary course on a basis consistent with past practice and not engage in any new line of business or enter into any agreement, transaction or activity or make any commitment with respect to the Business or the Assets, except those in the ordinary course of its business that this Section 8.02 does not prohibit;

(b) Use its best efforts to preserve intact the goodwill and business organization of the Business, keep the officers and employees of Seller available to Buyer and preserve the relationships and goodwill of Seller with patients, customers, distributors, suppliers, payors, medical staff, employees, and other Persons having business relations with the Business;

(c) Maintain its existence and good standing in the State of Iowa;

(d) Keep in force all Licenses required to operate the Business;

(e) Duly and timely file all reports and returns required with all Governmental Authorities, and promptly pay when due all Taxes;

(f) Maintain in existing condition and repair (ordinary wear and tear excepted), consistent with past practices, all buildings, offices, shops, and other structures on the Land, as well as all equipment, fixtures, and other tangible personal property located on the Land or used in the Business;

(g) Maintain Inventory at levels that are in the ordinary course of business and consistent with past practice;

24

(h) Continue to collect Accounts Receivable and pay accounts payable and similar obligations in the ordinary course of business, and consistent with past practice;

(i) Perform their obligations, and not default or suffer a default, under all Assigned Contracts, and not amend any Assigned Contract;

(j) Maintain in full force and effect, and in the same amounts, all policies of insurance that Seller now maintains;

(k) Continue to maintain its books and records in accordance with GAAP;

(l) Continue its cash management practices in the ordinary course of business, and consistent with past practices;

(m) Not sell any Asset, create or suffer any Lien with respect to any Asset, or compromise or reduce any Account Receivable, other than as is consistent with past practice and in the ordinary course of its business; and

(n) Provide indigent or charity care to their patients consistent with their existing indigent or charity care commitment and policies.

8.03  Employees.

(a) <u>Hired Employees</u>. On the Closing Date and effective as of the Closing, Seller will terminate all of its employees, except as otherwise provided in this Section 8.03. Buyer will be permitted (but not required) to offer employment to these employees commencing on or after the Closing Date, subject to Buyer's standard hiring policies, on an "at will" basis ("Potential Hired Employees"), and with such wages, salary, and benefits as Buyer may determine is appropriate. Potential Hired Employees who accept any such offer are, as of the time they first perform services for Buyer, referred to as "Hired Employees." Buyer will assume no liability with respect to accrued and unused paid time off that Hired Employees may have earned in connection with their employment by Seller. Buyer has no obligation for severance pay or any other liability with respect to any employee of Seller, whether a Hired Employee, Potential Hired Employee, or otherwise. Seller will not attempt to retain any Hired Employees or in any way interfere with Buyer's efforts to employ such individuals.

(b) <u>COBRA Coverage</u>. Seller will be responsible for offering and providing any COBRA Coverage with respect to any "qualified beneficiary" who is covered by an Employee Plan that is a "group health plan" and who experiences a "qualifying event" prior to the Closing Date. Buyer will be responsible for offering and providing any COBRA Coverage required with respect to any Hired Employee (or other qualified beneficiary) who becomes covered by a group health plan sponsored or contributed to by Buyer, and who experiences a qualifying event after the Closing Date. For purposes of this Section 8.03(b), "qualified beneficiary," "group health plan," and "qualifying event" each have the meaning set forth in Section 4980B of the Code.

25

(c) <u>WARN</u>. Prior to the Closing Date, Seller will terminate all of the Hired Employees and assume all obligations and notice requirements, if any, under WARN and any analogous provision of applicable state law with regard to all terminated employees, to the extent WARN or such state law applies. Buyer may offer employment to some or all of Seller's employees, but has no obligation to offer employment to any employee of Seller. Buyer has no obligation whatsoever to any person whom Seller currently, or has previously, employed unless Buyer employs that person after the Closing Date.

(d) <u>Information</u>. To the extent not prohibited by applicable law, Seller will provide Buyer all information relating to each Potential Hired Employee that Buyer may reasonably request, including personnel files, initial employment dates, employee health files, licenses, professional certifications, Form I-9, termination dates, reemployment dates, hours of service, and compensation and tax withholding history.

8.04 Employee Plans.

(a) <u>Compliance</u>. Seller will take all action necessary to correct any compliance deficiencies Buyer identifies with respect to any Employee Plan in a manner satisfactory to Buyer;

(b) <u>Liability</u>. In no event will Buyer be liable for any compensation, benefit from (or contribution to) any Employee Plan, or other benefit that Seller established, and that is payable to any person currently or previously employed by Seller.

(c) <u>Administration</u>. Seller will be solely responsible for providing all information, forms, and other administrative assistance and materials required of a plan administrator with respect to all Employee Plans.

8.05 <u>Taxes; Expenses</u>. Buyer will pay all Taxes (other than income Taxes) or recording fees payable as a result of the sale of the Assets pursuant to this Agreement or any other action contemplated hereby, including fees paid to the Iowa Attorney General, the U.S. Attorney General, and any other governmental agency. The parties will cooperate in preparing, executing, and filing all returns, questionnaires, applications, and other documents regarding Taxes and all transfer, recording, registration and other fees that become payable in connection with the transactions that this Agreement contemplates that are required or permitted to be filed at or prior to Closing.

8.09 <u>Sale Procedures</u>. Seller will conduct the auction process in accordance with the Bid Procedures Order, and will not amend, modify, waive, or supplement the Bid Procedures in any material respect, except as the Bankruptcy Court may order.

ARTICLE IX<br>SURVIVAL OF PROVISIONS AND INDEMNIFICATION

9.01 <u>Survival</u>.  The covenants, obligations, representations and warranties of Buyer and Seller contained in this Agreement, any exhibit or schedule hereto, or any certificate or document delivered pursuant hereto shall be deemed to be material and to have been relied upon by the parties notwithstanding any investigation prior to the Closing, and will survive the

26

Closing and not be merged into any deeds or other documents delivered in connection with the Closing.

(a)  Notwithstanding the foregoing, the representations and warranties in Sections 3.01(b), (c), (d), (i), (l), (p), (q), (r) and (t), in Sections 3.02(b) and (c), and the covenants contained in Article VIII will survive the Closing for sixty (60) days after the period of the applicable statute of limitations plus any extensions or waivers granted with respect thereto.

(b)  Notwithstanding the foregoing, all other representations and warranties will survive for a period of three (3) years from the Closing Date.

(c)  The right of any party to recover damages, Losses or other relief pursuant to Sections 9.02 and 9.03 will not be affected by the expiration of any representations or warranties as set forth herein, provided that notice of the existence of any losses or claims (but not necessarily the fixed amount of any such losses) has been given by the indemnified party to the indemnifying party prior to such expiration.

9.02  Indemnification by Seller.  Seller promptly shall indemnify, defend and hold harmless Buyer, and each of the directors, officers, managers, members, employees, affiliates, and agents of the foregoing (collectively, the "**Buyer Indemnified Parties**" and each, a "**Buyer Indemnified Party**") against any and all losses, costs, Claims (whether or not disclosed herein), liabilities, obligations, damages, and expenses (including reasonable costs of investigation, court costs and legal fees) of any nature (collectively, "**Losses**") resulting from (i) any breach by Seller or failure to perform by Seller of any of its covenants, obligations, representations or warranties or breach or untruth of any covenant, obligation, representation, warranty, fact or conclusion contained in this Agreement, any exhibit or schedule hereto, or any certificate or document of Seller delivered pursuant to this Agreement, or (ii) any Excluded Asset or Excluded Liability (regardless of whether information with respect thereto is set forth on a schedule or exhibit hereto).

9.03  Indemnification by Buyer.  Buyer promptly shall indemnify, defend and hold harmless Seller and each of the directors, officers, managers, members, employees, affiliates, and agents of Seller (collectively, the "**Seller Indemnified Parties**" and each, a "**Seller Indemnified Party**") against any and all Losses resulting from (i) any breach by Buyer or failure to perform by Buyer of any of its covenants, obligations, representations or warranties or breach or untruth of any covenant, obligation, representation, warranty, fact or conclusion contained in this Agreement, any exhibit or schedule hereto, or any certificate or document of Buyer delivered pursuant to this Agreement, or (ii) any Assumed Liabilities.

ARTICLE X
REMEDIES FOR FAILURE TO CLOSE

10.01 Break Up Fee. Notwithstanding anything in this Agreement to the contrary, Seller will pay the Break Up Fee to Buyer immediately upon the occurrence of any of the following: (i) an Alternative Transaction; (ii) Seller's failure to conduct the Auction or the sale process in

27

strict compliance with the Bid Procedures, or the modification of the Bid Procedures without Buyer's prior written consent; (iii) Seller materially breaches any covenant, agreement, representation, or warranty in this Agreement; or (iv) Seller fails, for any reason other than Buyer's breach of this Agreement, to transfer the Assets to Buyer in accordance with the terms of this Agreement on or before the Closing Date.

10.02 Attorneys' Fees.  In the event either party brings a lawsuit or other proceeding against the other party to enforce any provisions of this Agreement or any instrument executed pursuant to this Agreement, the prevailing party will be paid all costs and reasonable attorney's fees by the other party, such costs and reasonable attorney's fees will be included in any such judgment.  For purposes of this Section 10.02, "prevailing party" means, in the case of a Person asserting a claim, the Person is successful in obtaining substantially all of the relief sought, and in the case of a Person defending against or responding to a claim, the Person is successful in denying substantially all of the relief sought.

10.03 Waiver.  No delay in exercising any right or remedy will constitute a waiver thereof, and no waiver by Seller or Buyer of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

ARTICLE XI
MISCELLANEOUS

11.01 Assignability.  Buyer may assign this Agreement in whole or in part and/or designate a nominee to take title to all or any part the Facilities or the operations thereof at Closing without the consent of Seller, provided that such assignment and/or designation shall only be to an Affiliate of Buyer that is a not for profit. In the event of an assignment by Buyer, the assignor shall be released from any and all of its obligations hereunder, provided that each assignee of such rights agrees to be fully bound by the terms and conditions of this Agreement as if said assignee were the original signatory hereto.  Any assignment of this Agreement shall be binding upon and inure to the benefit of the successor or assignee of Buyer.  In the event Buyer finds it necessary or is required to provide to a third party a collateral assignment of the Buyer's interest in this Agreement and/or any related documents, Seller shall cooperate with the Buyer and any third party requesting such assignment including but not limited to Seller signing a consent and acknowledgment of such assignment.

11.02 Entire Agreement.  This Agreement constitutes the entire contract between the parties, and may not be modified except by an instrument in writing that both of them sign.  All of the schedules and exhibits to this Agreement are incorporated by this reference.

11.03 Governing Law.  This Agreement will be interpreted, construed, and enforced pursuant to the laws of the State of Iowa without giving effect to the choice of law rules thereof.

11.04 <u>Notice</u>.  All notices and other communication allowed or required under this Agreement will be in writing, and delivered by Regular First Class U.S. Mail, postage prepaid, and addressed as follows:

|  |  |  |
|---|---|---|
| If to Buyer: | If to Borrower: | If to Bor |
| [UPH contact] | [CIH contact] | [CIH co |
| With a copy to: | With a copy to: | With a c |
| [UPH counsel] | [CIH counsel] | [CIH co |

All notices provided in accordance with this Section will be deemed delivered and received one (1) Business Day after placed for delivery with the U.S Postal Service.

11.05 <u>Section Headings; Drafting Party</u>.  The headings of this Agreement are for convenience of reference only, do not form a part of this Agreement, and do not in any way modify, interpret or construe the intentions of the parties. The provisions of this Agreement have been examined, negotiated, drafted and revised by counsel for each party, and no implication will be drawn against any party by virtue of the drafting of this Agreement.

11.06 <u>Waivers</u>.  Any waiver by any party of any violation of, breach of or default under any provision of this Agreement or any exhibit, schedule or other document referred to in this Agreement by any other party will not be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Agreement, or any Exhibit, Schedule or other document referred to in this Agreement.

11.07 <u>No Assumption of Liabilities</u>.  Notwithstanding any provision in this Agreement, or in any exhibit, schedule or other document referred to in this Agreement, to the contrary this Agreement is intended as and shall be deemed to be an agreement for the sale of the Assets and, except as expressly provided herein, none of the provisions hereof will be deemed to create any obligation or liability of any party to any person or entity that is not a party to this Agreement, whether under a third-party beneficiary theory, Laws relating to transferee liabilities or otherwise. Except for the Assumed Liabilities, Buyer will not assume and will not discharge or be liable for any debts, Liabilities, Claims, or obligations of Seller, whether known or unknown by Seller or Buyer.

11.08 <u>Further Assurances</u>.  Each of the parties will, at any time and from time to time after the Closing, execute and deliver, or cause to be executed and delivered, to the other party or their designee, such further consents, approvals, conveyances, assignments and other documents and instruments as any party shall reasonably request in order to carry out any and all of the terms and provisions of this Agreement.

11.09 <u>Counterparts</u>.  This Agreement may be executed in several counterparts and by facsimile transmission or email scan, each of which when so executed and delivered will be deemed an original, but all of which together shall constitute one and the same instrument.

11.10 Binding Effect. This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors, heirs, assigns and legal representatives.

11.11 Waiver of Jury Trial. BUYER AND SELLER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR THE TRANSACTIONS THAT THIS AGREEMENT CONTEMPLATES.

11.12 Jurisdiction; Venue; Service of Process. Any litigation arising out of or relating to this Agreement, or the transactions this Agreement contemplates, will be brought in the Bankruptcy Court or a court located in Polk County, Iowa. Seller and Buyer consent to the jurisdiction of any such court. **The parties each waive personal service of process in any litigation arising out of or relating to this Agreement or any transaction this Agreement contemplates, and agree that all such service of process may be made in the manner set forth for notices in Section 11.04 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 11.04 of this Agreement. The parties expressly waive any other requirements of notice or personal service that any applicable Law may require.**

ARTICLE XII
BANKRUPTCY MATTERS

12.01 Sale Motion. Seller will use its best efforts to have the Bankruptcy Court enter the Sale Order as soon as practicable following the date of this Agreement and, in any event, shall cause the Sale Order to be entered in accordance with the Milestones (as defined in the DIP Financing Agreement). Buyer and Seller will use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Sale Order, including furnishing affidavits, declarations, or other documents or information for filing with the Bankruptcy Court. Without waiving the generality of the foregoing, not later than five (5) days of the Execution Date, Seller will file a motion that seeks the entry of the Bid Procedures Order and the approval of this Agreement that will, *inter alia*, seek the Bankruptcy Court's approval of: (i) Seller's request to sell and assign the Assets and Assigned Contracts to Buyer pursuant to this Agreement and 11 U.S.C. Sections 363 and 365, free and clear of all Claims, Liens, or Encumbrances in or on the Assets (the "Proposed Sale" and the hearing to consider the Proposed Sale the "Sale Hearing"); (ii) establishing notice and service requirements to all creditors and parties in interest of the Proposed Sale and the Sale Hearing; (iii) approving the payment of the Breakup Fee as set forth in Section 10.01 of this Agreement; (iv) establishing a deadline to submit competing bids for the Assets; and (v) establishing initial overbids and bidding procedures, and setting a date for the Sale Hearing, all as set forth in the Bid Procedures Order.

12.02 Sale Order. The Sale Order will provide, *inter alia*, that pursuant to 11 U.S.C. Sections 105, 363, and 365: (i) this Agreement and the transactions contemplated hereby are approved; (ii) Buyer will have and acquire at the Closing good, valid, marketable title to the Assets free and clear of all interests, Claims, Encumbrances, or Liens (except for Permitted Encumbrances and Assumed Liabilities) to the maximum extend provided

30

under 11 U.S.C. Sections 105, 363, and 365; (iii) Seller will assume and assign to Buyer all of the Assigned Contracts as of the Closing Date; (iv) the Assigned Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, *inter alia*, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing; (v) Buyer is acquiring the Assets free and clear of the Excluded Liabilities and providing for a full release of Buyer with respect to the Excluded Liabilities; (vi) the results of the Auction (as defined in the Bidding Procedures Order), if any, are approved; (vii) Buyer will be found to be a good faith purchaser within the meaning of 11 U.S.C. Section 363(m); and (viii) the Bankruptcy Court will waive any stay that would otherwise be applicable to the immediate effectiveness of the Sale Order pursuant to Fed. R. Bankr. P. 6004(h) and 6006(d).

12.03   <u>Notice</u>. Seller will provide timely written notice of this Agreement to: (i) the U.S Trustee for Region 12; (ii) all parties to the Assigned Contracts; (iii) all Persons who have asserted any Liens or Encumbrances in or upon any of the Assets; (iv) the Internal Revenue Service, Iowa Department of Revenue, and Iowa Attorney General; (v) the service list the Bankruptcy Court maintains; (vi) all Governmental Authorities exercising jurisdiction with respect to environmental matters affecting or relating to the Assets; (vii) the Department of Health and Human services and its Centers for Medicare and Medicaid Services; and (viii) any other Person the Bankruptcy Court or applicable Law requires, or who Buyer requests.

12.04   <u>Pleadings</u>. Seller will provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers Seller prepares relating to this Agreement or the transactions this Agreement contemplates prior to filing them. All motions, applications, and supporting papers Seller prepares relating to Buyer's "good faith" determination to enter into this Agreement, and the transactions this Agreement contemplates, must be acceptable to Buyer (in Buyer's reasonable discretion) in form and substance.

12.05   <u>Alternative Transaction</u>. Seller will comply in all respects with the Bid Procedures Order. From and after the date the Bankruptcy Court enters the Bidding Procedures Order until the end of the Auction (as defined in the Bid Procedures Order), Seller is permitted to (directly or through its representatives) initiate contact with, solicit or encourage the submission of any inquiries or offers by, respond to any unsolicited inquiries or offers submitted by, and enter into any discussions of negotiations regarding any of the foregoing with any Person (in addition to Buyer and Buyer's Affiliates) in connection with any Alternative Transaction (such action being collectively a "Solicitation"); provided, however, that any such Solicitation may occur only in accordance with the Bidding Procedures Order. In addition, Seller may supply information relating to the Assets to any prospective purchaser; provided, however, that Seller will not provide any non-public information until it receives an executed agreement from any such Person containing customary non-disclosure provisions; provided, further, that any such non-disclosure agreement does not contain provisions that prohibit Seller from complying with the provisions of this Agreement. Seller will notify Buyer within one (1) business

31

day after receipt of any proposal with respect to any Alternative Transaction, and will deliver to Buyer by e-mail transmission or same day courier service true and complete copies of all documents related to (or evidencing) any such offer. Seller will: (i) keep Buyer informed on a reasonably prompt basis of the status of any such proposal or offer, and (ii) provide Buyer promptly, and in any event within one (1) business day, with copies of all significant correspondence and other written materials sent or received in connection with any such offer or proposal. From and after the date the Bankruptcy Court enters the Sale Order until the Closing Date or the date upon which this Agreement is terminated in accordance with its terms, neither Seller nor any of its Affiliates or representatives, will discuss, solicit, negotiate, enter into, or consummate any Alternative Transaction.

12.06   Cure Costs. Notwithstanding anything in this Agreement or in the Bankruptcy Code to the contrary, Seller shall not be responsible for Cure Costs.

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the date and year first written.

ALLEN HEALTH SYSTEMS, INC d/b/a
UNITYPOINT HEALTH—WATERLOO

_____

By: _____

Its: _____

CENTRAL IOWA HEALTHCARE

_____

By: _____

Its: _____

**Officer Certification Regarding Notice to Claimants**

The undersigned, Dawnett Willis, is the acting Chief Executive Officer of Central Iowa Healthcare, and executes this Certification to the foregoing agreement for the purpose of individually representing and warranting to Allen Health Systems, Inc. d/b/a UnityPoint Health Waterloo as follows:

1. I have reviewed the Schedules, Statement of Financial Affairs, and other documents filed, or to be filed, in the Chapter 11 Case.

2. I have conducted a reasonable review of the affairs of Seller to identify any Person who CIH believes has, may have, or may assert a Claim against Seller or its bankruptcy estate.

3. Except as disclosed in the Schedules, Statement of Financial Affairs, and other documents filed in the Chapter 11 Case, to the best of my Knowledge, neither I, nor Seller, nor any of the officers or directors of Seller have Knowledge of (or reason to believe there are) any Claims that any Person has, may have, or may assert against Seller or its bankruptcy estate (collectively the "Claimants").

4. Seller has, or will, provide actual notice to all Claimants consistent with the Bid Procedures Order (which in all events will occur not less than ten (10) days prior to Closing) of the Chapter 11 Case, and the transactions set forth (and contemplated) in this Agreement.

5. The undersigned acknowledges that Allen Health Systems, Inc. d/b/a UnityPoint Health-Waterloo is relying upon this Certification in entering in this Agreement and consummating the transactions it contemplates.

Dated this ___ day of December 2016

_____
Dawnett Willis
Acting Chief Executive Officer
Central Iowa Healthcare

## EXHIBITS

Exhibit A:    Bill of Sale

Exhibit B:    Warranty Deed

Exhibit C:    Assignment Agreement

Exhibit D:    Contracts and Leases

Exhibit E:    Bid Procedures Order

Exhibit F:    Clinics

Exhibit G:    Contract Rights

Exhibit H:    Equipment

Exhibit I:    Excluded Assets

Exhibit J:    Knowledgeable Officers

Exhibit K:    Land

Exhibit L:    Sale Order

Exhibit M:    Joint Ventures

Exhibit N:    Purchase Price Allocation

Exhibit O:    Certificates of Need

Exhibit P:    Staff Privileges Contests

Exhibit Q:    Medical Staff

**SCHEDULES**

| | |
|---|---|
| Schedule 2.08 | Key Vendors |
| Schedule 3.01(d): | Consents |
| Schedule 3.01(f): | Encumbrances |
| Schedule 3.01(g): | Deferred Maintenance |
| Schedule 3.01(i): | Compliance with Laws |
| Schedule 3.01(j): | Litigation |
| Schedule 3.01(l): | Tax Issues |
| Schedule 3.01(q) | Employee Compensation and Benefit Plans |
| Schedule 3.01(s) | Employment Agreements |
| Schedule 3.01(x) | Insurance Claims |

# Exhibit B

## Bid Procedures

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In Re: | ) | Case No. |
| | ) | |
| **CENTRAL IOWA HEALTHCARE** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Hon. |
| | ) | |
| 3 South 4th Avenue | ) | |
| Marshalltown, IA 50158 | ) | **FIRST DAY MOTION** |
| | ) | |
| EIN: 42-0948420 | ) | **Bid Procedures** |
| | ) | |
| | ) | |
| _____ | ) | |

The above-captioned debtor and debtor in possession (the "*Debtor*")[1] has filed a chapter 11 case pending in the Bankruptcy Court for the Southern District of Iowa (the "*Bankruptcy Court*") under Case No. 16-[        ] ([     ]).  By motion dated December __, 2016 (the "*Motion*"), the Debtor sought, among other things, approval of the process and procedures set forth below (the "*Bid Procedures*") through which it will determine the highest and best offer for certain assets related to the Debtor's healthcare business (the "*Assets*"). On _____,        201_, the Bankruptcy Court entered an order (the "*Bid Procedures Order*"), which, among other things, approved the Bid Procedures.

On _____, 2017, at [10:00] [a.m.] (Central Time), as further described below, in the Motion, and in the Bid Procedures Order, the Bankruptcy Court shall conduct a hearing  (the "*Sale Hearing*") at which the Debtor shall seek entry of an order (the "*Sale Order*") authorizing and approving the sale of the Assets (the "*Proposed Sale*") to the Purchaser (as defined below) or to one or more other Qualified Bidders (as defined below) that the Debtor, in its sole discretion, determines to have made the highest and best offer.

**Agreement**

On December _____, 2016, the Debtor entered into an asset purchase agreement (the "*Agreement*"), with UnityPoint Health - Waterloo (the "*Purchaser*"), pursuant to which the Purchaser proposes to acquire the Assets. Pursuant to the Agreement, the Purchaser would provide consideration for the Assets as provided in the Agreement in the sum of $12,500,000 in cash (the "*Purchase Price*"). The transaction contemplated by the Agreement is subject to

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement.

competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to Bankruptcy Code sections 363 and 365.

## Assets for Sale

The Debtor is offering the Assets for sale in one or more transactions, which are certain assets related to the Debtor's healthcare business.

## Participation Requirements

To participate in the bidding process and to receive access to due diligence (the "*Diligence Materials*"), a party interested in the Assets (a "*Potential Bidder*") must first deliver (unless previously delivered) to the Debtor and its counsel the following:

1.    <u>Confidentiality Agreement</u>. An executed confidentiality agreement in form and substance acceptable to the Debtor (a "*Confidentiality Agreement*"); and

2.    <u>Proof of Financial Ability to Perform</u>. Written evidence that the Debtor reasonably concludes demonstrates the Potential Bidder has the necessary financial ability to close the contemplated transaction and to provide Post-Petition Financing (as defined below). Such information should include, *inter alia,* the following:

(a)    the Potential Bidder's current financial statements (audited if they exist);

(b)    contact names and numbers for verification of financing sources;

(c)    evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(d)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor demonstrating that such Potential Bidder has the ability to close the contemplated transaction; *provided* that the Debtor shall determine, in its reasonable discretion, in consultation with the Debtor's advisors and professionals duly-approved by the Bankruptcy Court, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential  Bidder's financial qualifications.

## Access to Due Diligence Materials

Only Potential Bidders that execute and deliver a Confidentiality Agreement are eligible to receive due diligence access or additional non-public information. If the Debtor determines that a Potential Bidder that has satisfied the requirements of subsections 1 and 2 above does not constitute a Qualified Bidder (defined herein), then such Potential Bidder's right to receive due diligence access or additional non-public information shall terminate. The Debtor will designate an employee or other representative to coordinate all reasonable requests for additional information from and due diligence access for Potential Bidders. The Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (defined herein) but may do so in its reasonable business judgment. The Debtor is not responsible for, and will bear

no liability with respect to, any information obtained by Potential Bidders in connection with the Proposed Sale.

## Bidding Process

The Debtor and advisors and professionals duly-appointed by the Bankruptcy Court, shall:  (i) determine whether a Potential Bidder is a Qualified Bidder (defined herein); (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions above; (iii) receive offers from Bidders; and (iv) negotiate any offers made to purchase the Assets (collectively, the "*Bidding Process*").

## Bid Deadline

**The deadline for submitting bids shall be _____, 2017, at 5:00 p.m. (Central Time) (the "Bid Deadline").**

Prior to the Bid Deadline, a Bidder that desires to make an offer, solicitation, or proposal (a "Bid") shall deliver written copies of its Bid to:

1)      Debtor - Central Iowa Healthcare,  3 South 4th Avenue, Marshalltown, IA 50158, Attn:  Dawnett Willis;

2)      General Reorganization Counsel - Bradshaw, Fowler, Proctor & Fairgrave, P.C., 801 Grand Avenue, Suite 3700, Des Moines, Iowa 50309, Attn: Jeffrey D. Goetz;

3)      Special Healthcare Reorganization Counsel - Sugar Felsenthal Grais & Hammer LLP, 30 N. LaSalle St., Ste. 3000, Chicago, IL 60602, Attn: Mark S. Melickian;

4)      Financial Advisor to the Debtor – Alvarez & Marsal, 600 Madison Avenue, New York, NY 10022, Attn:  Ronald M. Winters;

5)      Purchaser – UnityPoint Health – Waterloo, [address and contact party];

6)      Counsel to the Purchaser, Belin McCormick P.C., 666 Walnut St., Suite 2000, Des Moines, IA  50309; Attn:  Matthew T. Cronin;

7)      Any patient care and privacy ombudsmen appointed in this case; and

8)      Counsel to the Official Committee of Unsecured Creditors (if such committee has been  appointed).

(collectively, the "*Notice Parties*"), by the Bid Deadline, *provided* that any confidential financial information should be delivered to the Debtor and its counsel only.

A Bid received after the Bid Deadline shall not constitute a Qualified Bid (defined herein).

## **Bid Requirements**

To be eligible to participate in the Auction, each Bid and each Bidder submitting such a Bid must be determined by the Debtor to satisfy each of the conditions set forth below. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

1.      Good Faith Deposit. Each Bid must be accompanied by a deposit (the "*Good Faith Deposit*") in the form of a certified check or cash payable to the order of the Debtor in an amount equal to $1,000,000. The Purchaser shall not be required to submit a Good Faith Deposit.

2.      Minimum Bid. The consideration proposed by the Bid may include only cash and/or other consideration acceptable to the Debtor and shall be in an amount greater than or equal to the aggregate of the sum of:

*(a)*      $12,500,000 in cash; *plus*

*(b)*      $250,000 in cash for the Break Up Fee; *plus*

*(c)*      $500,000 in cash (the initial Overbid); *plus*

(d)      Post Petition Financing, as defined below.

Collectively, the cash bid required for the initial overbid (the total of 2(a), (b) and (c)), or $12,850,000, is the "Baseline Bid."

3.      Post Petition Financing; Satisfaction of Break Up Fee.  In addition to offering the Baseline Bid in cash, each Bid must be accompanied by a firm and binding commitment to provide Post Petition Financing to replace in full the DIP Financing Agreement provided by the Purchaser in this Bankruptcy Case.  Bidder will be required to pay off all outstanding obligations under the DIP Financing Agreement, replace such financing on substantially similar but no less favorable terms to the Debtor, and pay Purchaser the Break Up Fee within one (1) business day of entry of the Sale Order.

4.      Irrevocable. Each Bid must be irrevocable until the Bankruptcy Court enters the Sale Order; *provided* that if such Bid is accepted as the Prevailing Bid or Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable until two (2) business days after the Assets have been sold pursuant to the Sale Order (the "*Termination Date*").

5.      The Same or Better Terms. Each Bid must be on terms that, in the Debtor's business judgment, are the same or better than the terms of the Agreement and the DIP Financing Agreement.

6.      Executed Purchase Agreement. Each Bid must be based on the Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an alternate transaction (the "*Modified Agreement*"). A Bid shall include a copy of the Agreement marked against the

Modified Agreement to show all changes requested by the Bidder (including those related to the purchase price and to remove all provisions that apply only to the Purchaser as the stalking horse bidder, such as the Expense Reimbursement provisions contained in the Agreement). The Modified Agreement must further provide for immediate payment of the Break Up Fee to the stalking horse bidder upon approval of the Sale Order.  Finally, the Modified Agreement must contain a representation that the Bidder shall make all necessary HSR Act filings, if any, and pay all costs and expenses of such filings (including the Debtor's costs and expenses).

7.      Executed DIP Financing Agreement.  Each Bid must also be accompanied by a proposed agreement to provide Post Petition Financing, signed by an authorized representative of such Bidder, pursuant to which the Bidder  proposes  to  provide Post Petition Financing (including immediate satisfaction of outstanding amounts owed on existing financing) (the "Replacement DIP Agreement"). A Bid shall include a copy of the original DIP Financing Agreement and related order marked against the Replacement DIP Agreement to show all changes requested by the Bidder and to remove all provisions that apply only to the original DIP financing party.

8.      Contingencies. Each Bid (a) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence other than as may be included in the Agreement, but (b) may be subject to the accuracy in all material respects at the closing of the Proposed Sale of specified representations and warranties or the satisfaction in all material respects at the closing of the Proposed Sale of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

9.      Financing Sources. Each Bid must contain written evidence of (a) liquidity sufficient to fund the payoff and replacement of the existing Post-Petition Financing within one (1) business day of being declared the winning bidder, and (b) a commitment for financing or other evidence of the ability to consummate the Proposed Sale and provide Post Petition Financing satisfactory to the Debtor with appropriate contact information for such financing sources.

10.     Continuation of Health Care Services.  In reviewing Bids, in addition to the above financial components and evidence of financial wherewithal, the Debtor will consider the impact of the proposed Bid and plans of the Bidder for the purchased Assets, the Bidder's mission and vision.  and the impact on health care services in the Marshalltown area.

11.     No Fees Payable to Qualified Bidder. Except with respect to the Expense Reimbursement and the Break Up Fee provided to the Purchaser pursuant to the Agreement, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code section 503 related in any way to the submission of its Bid or the Bid Procedures.

12.     Qualified Bidder and Qualified Bid.  A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid" and such Bidder shall constitute a "*Qualified Bidder*." Notwithstanding anything herein to the contrary, the Agreement submitted by the Purchaser shall be deemed a Qualified Bid and the

Purchaser a Qualified Bidder. In addition, the Purchaser will receive, from each Bidder, a copy of any Bids at the time such Bid is submitted to the Debtor. The Debtor shall inform counsel to the Purchaser whether the Debtor will consider such Bids to be Qualified Bids no later than two business days prior to the Auction.

In the event that any Potential Bidder is determined by the Debtor not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit with interest thereon, if any has accrued, within three (3) business days after that determination.

The Debtor shall have the right to reject any and all Bids that it believes, in its reasonable discretion, do not comply with the Bid Procedures.

## Auction

If one or more Qualified Bids for the Assets (other than the Agreement submitted by the Purchaser) are received by the Bid Deadline, the Debtor will conduct an auction (the "*Auction*") to determine the highest and best Qualified Bid or combination of Qualified Bids with respect to the Assets.   This determination shall take into account, among other things: (i) the amount and nature of the consideration, including any assumed liabilities; (ii) the number, type, and nature of any changes to the Agreement requested by each Bidder; (iii) the extent to which such modifications are likely to delay closing of the Proposed Sale of the Assets and the cost to the Debtor of such modifications or delay; (iv) the total consideration to be received by the Debtor; (v) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (vi) the net benefit to the estate, taking into account the Purchaser's rights to the Break Up Fee; (vii) the terms of the proposed Replacement DIP Agreement, and (viii) any other matter as the Debtor's fiduciary duty may require (the "*Bid Assessment Criteria*").

For avoidance of doubt, the Debtor hereby agrees that the value attributed by the Debtor to any Bid made by the Purchaser at that Auction shall at least be equal to the sum of the following: (i) the dollar value of the cash consideration contained in such Bid; (ii) the dollar value of any additional consideration contained in such Bid; (iii) the dollar value of the Break Up Fee; and (iv) the dollar value of the Expense Reimbursement. If no Qualified Bid (other than the Agreement) is received by the Bid Deadline, the Debtor may determine not to conduct the Auction.

## Procedures for Auction

The Auction, if necessary, shall take place on _____, 2017 at _____[__].m. (Central Time) at the offices of counsel for the Debtor, Bradshaw, Fowler, Proctor & Fairgrave, P.C., 801 Grand Avenue, Suite 3700, Des Moines, Iowa 50309, or other such place and time as the Debtor shall notify all Qualified Bidders, including, without limitation, the Purchaser, counsel for the Purchaser, and other invitees. The Auction shall be conducted according to the procedures described below.

Only the Debtor and its professional advisors, the Purchaser, and other Qualified Bidders, in each case, along with their representatives and counsel, shall attend the Auction in

person, and only the Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction.

No later than _____, 2017 at [12:00 p.m.], the Debtor will (i) notify all Qualified Bidders, including the Purchaser, of the highest and best Qualified Bid, as determined by the Debtor in the Debtor's discretion (the "*Baseline Bid*"), and (ii) provide to all Qualified Bidders copies of all submitted bids.

The Debtor and its professionals duly-appointed by the Bankruptcy Court herein shall direct and preside over the Auction. Other than as expressly set forth herein, the Debtor may conduct the Auction in the manner it determines will result in the highest, best, or otherwise financially superior offer for any of the Debtor's Assets.

### Terms of Overbids

An "*Overbid*" is any Bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with the following conditions:

1.  Minimum Overbid Increments: Any Overbid after and above the Baseline Bid shall be made in increments of at least $250,000 in cash. Additional consideration in excess of the amount set forth in the Baseline Bid may include only cash and/or other consideration acceptable to the Debtor, except as provided in paragraph 2 below.   and, in the case of a Bid by the Purchaser, a credit bid of the Break Up Fee.

2.  Purchaser May Credit Bid Outstanding Loan Obligations and the Break Up Fee: The Purchaser shall be permitted to bid at the Auction, if any, and shall be permitted to credit bid the full amount of the Break Up Fee, and the amount of then-outstanding Obligations (as defined in the DIP Financing Agreement) pursuant to any Overbid in connection with each round of bidding in the Auction.

3.  Remaining Terms are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above; *provided* that the Bid Deadline shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtor accepts a higher Overbid.

To the extent not previously provided (which shall be determined by the Debtor), a Qualified Bidder submitting an Overbid must submit at the Debtor's request, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid; *provided* that the Purchaser shall not be required to submit any additional evidence.

**Note regarding the Effect of Replacement DIP Financing Obligation**.  To the extent that Qualified Bidder is selected as a winning bidder and provides replacement DIP financing,

such bidder shall be entitled, at closing, to a credit against the ultimate purchase price for amounts advanced to Debtor on account of such replacement DIP financing.

## Announcing Overbids

The Debtor shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid.

## Backup Bidder

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Bid or combination of Bids at the Auction, as determined by the Debtor, in the exercise of its business judgement, will be designated as the potential backup bidder (collectively, the "*Potential Backup Bidder*").

In the event that a Qualified Bidder or Qualified Bidders other than the Purchaser are identified by the Debtor as the Potential Backup Bidder, such Qualified Bidder or Qualified Bidders shall be required to serve as the backup bidder or backup bidders (collectively, the "*Backup Bidder*"). If the Purchaser is determined to be the Potential Backup Bidder, the Purchaser may, in its sole discretion, elect not to serve as the Backup Bidder, and the Debtor may identify the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Bid or combination of Bids, if any, as the Backup Bidder. The Backup Bidder shall be required to keep its initial Bid or combination of Bids (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is 30 days after the date of the Auction (the "Outside Backup Date") or the closing of the transaction with the Prevailing Bidder (defined herein).

Following the Sale Hearing, if the Prevailing Bidder (defined herein) fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Prevailing Bidder (defined herein), the Debtor may designate the Backup Bidder to be the new Prevailing Bidder (defined herein), and the Debtor will be authorized, but not required, to consummate the transaction or transactions with the Backup Bidder without further order of the Bankruptcy Court. In such case, the defaulting Prevailing Bidder's deposit shall be forfeited to the Debtor. The deposit of the Backup Bidder shall be held by the Debtor until the earlier of 72 hours after (i) the closing of the transaction or transactions with the Prevailing Bidder (defined herein) and (ii) the Outside Backup Date.

## Additional Procedures

In addition to and not in lieu of any other provisions herein, the Debtor, with the consent of any applicable creditor's committee, may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent with any of the provisions of the Bid Procedures Order or the Agreement. Such rules by way of example may provide that all Bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for

all bidding with the understanding that the true identity of each Qualified Bidder (*i.e.*, the principals submitting the Bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

The Debtor, any applicable creditor's committee, and the Purchaser may, upon mutual agreement, subject to the terms of any cash collateral orders or debtor in possession financing orders in the chapter 11 cases, extend the Bid Deadline or the Auction, as determined, beyond the dates provided herein; *provided* that neither the Bid Deadline nor the Auction may be extended more than 30 days. In the event of such an agreed-upon extension, the Debtor shall provide notice to the Notice Parties and any Qualified Bidders of such extension, any related time and location details with respect to same, and any consequent continuance of the Sale Hearing.

## Consent to Jurisdiction as Condition to Bidding

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtor, these chapter 11 cases, the Bid Procedures, the Agreement, the Auction, or the construction and enforcement of any Prevailing Bidder's (defined herein) purchase agreement.

## Sale Is as Is/Where Is

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents, or its estate except to the extent set forth in the Agreement or the purchase agreement of another Prevailing Bidder (defined herein). The Purchaser and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures or, (i) as to the Purchaser, the terms of the sale of the Assets shall be set forth in the Agreement, or (ii) as to another Prevailing Bidder (defined herein), the terms of the sale of the Assets shall be set forth in the applicable purchase agreement.

## Free of Any and All Interests

Except as otherwise provided in the Agreement or another Prevailing Bidder's (defined herein) purchase agreement and subject to the approval of the Bankruptcy Court, all of Debtor's right, title, and interest in and to the Assets subject thereto shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (collectively, the "Interests") in accordance with Bankruptcy Code section 363(f), with such Interests to attach to the net proceeds of the sale of the Assets.

## Closing the Auction

The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids for the Assets that the Debtor determines in its reasonable business judgment, after consultation with its advisors and professionals duly-appointed by the Bankruptcy Court herein, is the highest and best Qualified Bid or combination of Qualified Bids. Thereafter, the Debtor shall select one or more of such Qualified Bids, the combination of which produces the highest and best recovery to the estates, as the overall highest and best Qualified Bid or Qualified Bids (each such Bid a "*Prevailing Bid*," and each Bidder submitting such Prevailing Bid, a "*Prevailing Bidder*"). In making this decision, the Debtor, shall consider the Bid Assessment Criteria.

The Auction shall close when each Prevailing Bidder for any such Assets submits fully-executed sale and transaction documents memorializing the terms of its respective Prevailing Bid.

Promptly following the Debtor's selection of the Prevailing Bid and the conclusion of the Auction, the Debtor shall announce the Prevailing Bid and Prevailing Bidder and shall file with the Bankruptcy Court notice of the Prevailing Bid and Prevailing Bidder.

The Debtor shall not consider any Bids submitted after the conclusion of the Auction.

## Expense Reimbursement

Pursuant to the Bid Procedures Order, the Purchaser is entitled to the Break Up Fee in accordance with the terms of the Agreement and the Bid Procedures Order.

Pursuant to the Bid Procedures Order, except for the Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, break up fee, termination fee or similar fee or payment.

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest bearing escrow accounts by the Debtor, but shall not become property of the Debtor's estates absent further order of the Bankruptcy Court. The Good Faith Deposit of any Qualified Bidder that is neither a Prevailing Bidder nor a Backup Bidder shall be returned to such Qualified Bidder not later than five business days after the Sale Hearing. The Good Faith Deposit of each Backup Bidder, if any, shall be returned to the respective Backup Bidder on the date that is the earlier of 72 hours after (i) the closing of the transaction with the Prevailing Bidder or Prevailing Bidders for the Assets and (ii) the Outside Backup Date. Upon return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If a Prevailing Bidder or Prevailing Bidders timely close their winning transactions, their respective Good Faith Deposits shall be credited toward their respective purchase prices.

## **Sale Hearing**

The Sale Hearing shall be conducted by the Bankruptcy Court on _____, 2017 at [10:00] [a].m., or on such other date as may be established by the Bankruptcy Court.

If the Prevailing Bidder fails to consummate an approved sale in accordance with the applicable purchase and sale agreement or such agreement is terminated, the Debtor shall be authorized, but not required, to deem the Backup Bid, as disclosed at the Sale Hearing, the Prevailing Bid, and the Debtor shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such Backup Bid without further order of the Bankruptcy Court.

## **Form of Sale Notice**

To be developed

## <u>Exhibit C</u>

## Order Approving Bid Procedures

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.  16-02438-11als |
| | ) | |
| **CENTRAL IOWA HEALTHCARE** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Hon. Anita L. Shodeen |
| | ) | |
| 3 South 4th Avenue | ) | |
| Marshalltown, IA 50158 | ) | **FIRST DAY MOTION** |
| | ) | |
| EIN: 42-0948420 | ) | **ORDER (A) APPROVING THE BID** |
| | ) | **PROCEDURES AND BID** |
| | ) | **PROTECTIONS, INCLUDING A** |
| | ) | **BREAK-UP FEE, IN CONNECTION** |
| | ) | **WITH THE AUCTION AND** |
| | ) | **SCHEDULING AN AUCTION AND** |
| | ) | **SALE HEARING; (B) APPROVING** |
| | ) | **ASSUMPTION OF ASSET PURCHASE** |
| | ) | **AGREEMENT; (C) APPROVING** |
| | ) | **FORM AND MANNER OF NOTICE;** |
| | ) | **(D) APPROVING PROCEDURES FOR** |
| | ) | **DETERMINING CURE AMOUNTS;** |
| | ) | **AND (E) GRANTING OTHER** |
| _____ ) | | **RELATED RELIEF** |
| | ) | |
| | ) | No Hearing Set |

THIS MATTER having come before the Court on the motion (the "Motion") [Docket No.

__] dated December __, 2016, of the Debtor for entry of an order approving, among other things:

(a) bid procedures including certain bid protections in connection therewith including a Break

Up Fee (as defined below) (substantially in the form attached hereto as **Exhibit A**, the "*Bid*

*Procedures*") and scheduling an Auction and the Sale Hearing for the sale of the Assets (as that

term is defined in the Bid Procedures); (b) the assumption of the Agreement (as attached as

Exhibit A to the Motion and as that term is defined in the Bid Procedures); and (c) the form and

manner of notice of sale by auction of the Assets (substantially in the form attached hereto

as **Exhibit B**, the "*Sale Notice*").[1]  After due deliberation, and having reviewed the Motion, any objections thereto, and materials submitted by the parties, and having considered the statements of counsel on the record, and the evidence adduced with respect to the Motion at a hearing to consider same, and having considered the agreements announced by the parties, and having determined that the relief requested in the Motion is in the best interests of the Debtors and their estates, in light of the circumstances described by counsel and reflected in the evidence,

**THE COURT HEREBY FINDS THAT:**[2]

A.     This court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this district and in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief requested herein are sections 105(a), 363(b) and (f), 365, 503, and 507 of title 11 of the United States Code (the "*Bankruptcy Code*") and Fed. R. Bankr. P. 2002(a)(2), 6004(a), (b), (c), (e) and (f), 6006(a) and (c), 9007, and 9014.

C.     Notice of the Motion having been given to the Notice Parties (as defined below) is sufficient in light of the circumstances and the nature of the relief requested in the Motion.  The Debtor has articulated good and sufficient reasons for this court to grant  the relief requested in the Motion regarding the sales process, which is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtor's estate,

---

[1]     Unless otherwise stated, capitalized terms not defined herein shall have the meanings set forth in the Agreement and the Bid Procedures.

[2]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Fed. R .Bankr. P. 7052, made applicable to this proceeding pursuant to Fed. R. Bankr. P. 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

including, without limitation: (i) approval of the Bid Procedures and the bid protections contained therein (the "*Bid Protections*") and, under the circumstances described herein, the Break Up Fee (as defined below); (ii) determination of final Cure Amounts in the manner described herein; and (ii) the form and manner of notice of sale by auction.

D.     The Break Up Fee to be paid under the circumstances described in the Agreement to the Purchaser (as that term is defined in the Bid Procedures) are: (i) actual and necessary costs and expenses of preserving the Debtor's estates within the meaning of sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon the Debtor's estate by the Purchaser; (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by the Purchaser; (iv) necessary to induce the Purchaser to continue to pursue the sale transaction and  to continue to be bound by the Agreement; and (v) necessary to induce the Purchaser to continue to pursue the sale transaction and to continue to be bound by the Agreement.

E.     The Break Up Fee also induced the Purchaser to submit a bid that will serve as a minimum floor bid on which the Debtor, its creditors and other bidders may rely. The Purchaser has provided a material benefit to the Debtor and its creditors by increasing the likelihood that the best possible price for the Assets (as defined in the Bid Procedures) will be received. Accordingly, the Bid Procedures, Bid Protections, and the Break Up Fee are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtor's estate.

F.    Assumption of the Agreement constitutes a fair and reasonable exercise of Debtor's business judgment and is fair, reasonable and in the best interests of Debtor's estate, creditors and equity holders.

G.    The Sale Notice is reasonably calculated to provide all interested parties with timely and proper notice of the Sale Hearing and Auction, including the date, time and place of the Auction, and the time fixed for the filing of objections to the Auction or sale of the Assets.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED EFFECTIVE IMMEDIATELY THAT:**

1.    The Bid Procedures and Sale Notice are hereby approved in their entirety. The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bid Procedures and Bid Protections.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled (and all reservations of rights included therein) as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled on the merits except as otherwise set forth herein.

3.    The Debtor is authorized and directed to assume the Agreement pursuant to section 365 of the Bankruptcy Code, and the Agreement is hereby deemed to be assumed by the Debtor immediately upon the entry of this order.

4.    Within two (2) business days of entry of this order, the Debtor (or its agent) shall serve by first class mail, postage prepaid, copies of: (i) this order (the "*Bid Procedures*

*Order*") the Bid Procedures; and (iii) the Sale Notice, upon the following entities (collectively,

the "*Notice Parties*"):[3]

    a)  the United States Trustee;

    b)  counsel to any OUCC;

    c)  the Internal Revenue Service and the Iowa Department of Revenue

    d)  the United States Department of Justice;

    e)  state, county, and municipal governments having jurisdiction over any of the Assets;

    f)  all parties that have requested special notice pursuant to Fed.R.Bankr.P. 2002;

    g)  all persons or entities known to the Debtor that have or have asserted a lien on, or security interest in, all or any portion of the Assets;

    h)  all Contract Parties;

    i)  counsel to the Stalking Horse Bidder;

    j)  all potential bidders previously identified by or otherwise known to the Debtor; and

    k)  all of the Debtor's employees.

5.    The Break Up Fee as set forth in the Agreement are hereby approved.

6.    If the Purchaser becomes entitled to receive the Break Up Fee in accordance

with the terms of the Agreement, then the Purchaser shall be, and hereby is:

    (a)    granted an allowed administrative claim in the Debtor's chapter 11 case in an amount equal to the Break Up Fee, under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code; and

    (b)    granted a priority in payment, and priority in lien, over any and all

---

[3]    The Sale Notice will direct parties to contact Debtor's counsel for more information and to obtain a copy of any related document (subject to any necessary confidentiality agreement).

claims of holders with existing liens on the Assets (as defined in the Bid Procedures) or the proceeds of the sale thereof, as the case may be.

7.      No person or entity, other than the Purchaser, shall be entitled to any expense reimbursement, Break Up fee, "topping," termination, or other similar fee or payment.

8.      The Break Up Fee shall be paid by the winning bidder to Purchaser within one (1) business date of the entry of the order approving the sale of Assets.

9.      If the Purchaser objects to the manner in which the Debtor has conducted the Auction or the Debtor's determination of a Qualified Bid as the highest or best  bid, it shall have standing at the Sale Hearing to contest the Debtor's determination or conduct of the Auction, and shall be permitted to make a further bid at the Sale Hearing for consideration by the Bankruptcy Court as the highest or best bid.

10.      As further described in the Bid Procedures, the Sale Hearing will commence on _____, 2016 at [**10:00 a.m.] prevailing Central time** or at such other hour on that date as the Court shall announce.  Bids shall not be accepted at the Sale Hearing.  The Sale Hearing may be adjourned by the Bankruptcy Court from time to time without further notice to creditors or parties-in-interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing. Objections, if any, to the remainder of the relief requested in the Motion must: (a) be in writing and filed with this court **no later than** _____, 2016 (the "*Objection Deadline*"); (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules;  and (c) be served upon the Debtor, counsel for the creditors' committee (if any), and counsel for the Purchaser so as to be **actually received** on or before the Objection Deadline.

6

11.    The Auction to conduct bidding with respect to the sale of the Assets, if necessary, shall have commenced by no later than _____, 2017 at _____[ ].m. and shall have been completed no later than _____, 2017 at _____ at [ ].m.  No Bids shall be accepted after conclusion of the Auction, including at the Sale Hearing.

12.    Notwithstanding the possible applicability of Fed.R.Bankr.P. 6004(h), 7062, 9014 or otherwise, the terms and conditions of this order shall be immediately effective and enforceable upon its entry.

13.    All time periods set forth in this order shall be calculated in accordance with Fed.R.Bankr.P. 9006(a).

14.    The Debtor is authorized and empowered to take all actions necessary to implement the relief granted herein.

15.    To the extent that this order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this order shall govern.

16.    This court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of the Agreement and this order.


IT IS SO ORDERED.

Date:


_____
United States Bankruptcy Judge

Reviewed and approved:


/s/_____
Jeffrey D. Goetz
Bradshaw Fowler Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700 Des Moines, IA 50309-8004 515/246-5817
515/246-5808 FAX
goetz.jeffrey@bradshawlaw.com

and

/s/_____
Aaron L. Hammer
Mark S. Melickian
Michael A. Brandess
Sugar Felsenthal Grais & Hammer LLP
30 N. LaSalle St., Ste. 3000
Chicago, IL 60602
ahammer@sfgh.com
mmelickian@sfgh.com
mbrandess@sfgh.com

## Exhibit A


**Bid Procedures**


Exhibit to Come Upon Approval

## **Exhibit B**

**Form of Sale Notice**

Exhibit to Come Upon Approval