## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.  16-02438-11als |
| | ) | |
| **CENTRAL IOWA HEALTHCARE** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Hon. Anita L. Shodeen |
| | ) | |
| 3 South 4th Avenue | ) | |
| Marshalltown, IA 50158 | ) | **FIRST DAY MOTION** |
| | ) | |
| EIN: 42-0948420 | ) | **DEBTOR'S EMERGENCY MOTION** |
| | ) | **FOR INTERIM AND FINAL ORDERS** |
| | ) | **AUTHORIZING DEBTOR TO (A)** |
| | ) | **OBTAIN DEBTOR IN POSSESSION** |
| | ) | **FINANCING, (B) GRANTING** |
| | ) | **SUPERPRIORITY CLAIMS AND** |
| | ) | **LIENS, AND (C) SETTING FINAL** |
| | ) | **HEARING** |
| | ) | |
| _____ | ) | No Hearing Set |

Central Iowa Healthcare f/d/b/a Marshalltown Medical Surgical Center ("*CIH*" or "*Debtor*"), Debtor and Debtor-in- Possession in this Chapter 11 case herein, by and through its proposed General Reorganization Counsel, Jeffrey D. Goetz, Esq., of the law firm of Bradshaw, Fowler, Proctor & Fairgrave, P.C., respectfully submits this Motion for Order pursuant to the provisions of Sections 105, 361, 362, 363, 364, 503, and 507 of Title 11 of the United States Code (the "*Bankruptcy Code*") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"), respectfully file this Motion for Interim and Final Orders Authorizing Debtor to (i) Obtain Debtor in Possession Financing, and (ii) Grant Superpriority Claims and Liens, and set a final hearing (the "*Motion*"), and would show this Honorable Court as follows:

## INTRODUCTION

1.      A 9-page concise statement of the material terms of the DIP Facility (defined herein) is summarized in paragraph 12 on pages 3 through 11 pursuant to Bankruptcy Rule 4001(c)(1)(B).

2.      CIH is a medical services provider to the City of Marshalltown, Iowa.

3.      Immediately prior to the Petition Date, CIH employed approximately 527 individuals including corporate and administrative personnel, including 327 full-time and 168 part-time employees.

4.      On December 20, 2016 (the "*Petition Date*"), the Debtor commenced this Chapter 11 case (the "*Chapter 11 Case*") by filing a voluntary petition for relief under the Bankruptcy Code, in the United States Bankruptcy Court for the Southern District of Iowa (the "*Court*").

5.      Pursuant to Bankruptcy Code Sections 1107 and 1108, since the Petition Date, the Debtor has continued in possession of its property and operation of its business as debtor-in-possession.

6.      No motion for the appointment of a Chapter 11 Trustee has been filed in this Chapter 11 Case.  No committee of unsecured creditors has been formed.

## ADDITIONAL BACKGROUND

7.      In the lead-up to this chapter 11 case, the Debtor engaged in extensive negotiation with UnityPoint Health – Waterloo, a not for profit hospital system based in Cedar Rapids, Iowa, regarding the purchase of the Debtor's assets.  UnityPoint Health – Waterloo is part of the UnityPoint Health system, which provides healthcare to 1 out of 3 patients in Iowa pursuant to its stated mission to improve the health of the people and communities it serves.

2

Those discussions resulted in the execution of an asset purchase agreement between UnityPoint Health – Waterloo and the Debtor which is the subject of a sale motion filed contemporaneously with this Motion.  The proposed purchase would support continuation of the Debtor's mission to provide healthcare services to the City of Marshalltown and its surrounding areas.

8.      In the course of the purchase negotiations, the Debtor communicated to UnityPoint Health – Waterloo that it required financial support during the course of the case to facilitate the path to consummation of the sale.  UnityPoint Health – Waterloo, as lender (the "Lender"), has agreed to provide debtor in possession financing on the terms and conditions of this Motion.

9.      Prior to the Petition Date, the Debtor borrowed money from time to time pursuant to loan and security agreements with Great Western Bank and United Bank & Trust ("Prepetition Lenders").  The Prepetition Lenders are the holders of "Prior Permitted Liens" that will remain senior to the liens granted to Lender pursuant to this Motion.  The loans and security interests of Great Western Bank and United Bank & Trust shall be the subject of separate cash collateral orders in this case.

10.      In support of this Motion, the Debtor relies on the *Declaration of Dawnett Willis  in Support of First Day Motions* (the "First Day Declaration").

## JURISDICTION

11.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and § 157 and over the Chapter 11 Cases and the persons and property affected hereby. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (D), (K), (M) and (O).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the

SFGH:4844-2027-9093v2

relief sought herein are sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy

Code and Bankruptcy Rules 4001(a), (b), (c) and (d) and 6003.

**CONCISE STATEMENT OF MATERIAL PROVISIONS
PURSUANT TO BANKRUPTCY RULE 4001(b)(1)(B) AND (c)(1)(B)**

12.    By this motion, the Debtor seeks entry of an Interim Order, substantially in the

form attached hereto as **Exhibit A**, and a Final Order, substantially in the form attached here

as **Exhibit B**, that:

a)    Authorizes the Debtor to enter into a financing facility (the "DIP Facility"), for an aggregate amount of $4,500,000, pursuant to the terms and conditions of the *Debtor-in-Possession Loan Agreement*, dated as of December 20, 2016 (the "DIP Financing Agreement"), in the form appended as **Exhibit 1** to the Interim Order, and to (i) execute the DIP Financing Agreement and to perform such other and further acts as may be required in connection with the DIP Financing Agreement. (ii) grant Lender adequate protection for all obligations under the DIP Financing Agreement (a) a superpriority administrative expense claim pursuant to section 364(c)(1), (b) a first priority lien on all unencumbered assets of the Debtors pursuant to section 364(c)(2), and (c) a junior lien on all encumbered assets of the Debtors pursuant to section 364(c)(3), and (d) a first priority priming lien on all assets of the Debtors pursuant to section 364(d) (collectively, the "DIP Protections"), *provided that*, in all cases, the DIP Protections shall be subject and junior to the Prior Permitted Liens;

b)    modify the automatic stay imposed pursuant to section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and Final Order;

c)    waive any applicable stays under the Bankruptcy Rules and provide for the immediate effectiveness of the Interim Order and the Final Order; and

d)    By this Motion, schedule a Final Hearing to allow for entry of the Final Order within fourteen (14) days of the entry of the Interim Order.

SFGH:4844-2027-9093v2

## CONCISE STATEMENT OF RELIEF REQUESTED

In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, below is a summary[1] of the terms of the proposed financing arrangements:

a) <u>Borrower</u>:  The Debtor.

b) <u>Lender</u>:  UnityPoint Health – Waterloo.

c) <u>Amount and Type of Facility</u> (Section 2):  The DIP Facility will be a senior secured facility in an aggregate principal amount of $4,500,000.

d) <u>Interim Availability</u> (Section 2):  On the date that is on or after the entry date of the Interim Order (the "<u>Initial Borrowing Date</u>") and until January 4, 2017, availability to the Debtor will be up to $1,400,000 or such lesser amount as may be approved by order of the Bankruptcy Court.

e) <u>Full Availability</u> (Section 2):  From and after the date of entry of the Final Order, availability to the Debtor will be up to $4,500,000, inclusive of the Interim Availability.

f) <u>Use of Proceeds; Limits on Use</u> (Sections 4, 13(g) and (h)):  As stated above, the proceeds of the DIP Facility will be used for working capital requirements and general corporate purposes of the Debtor.

g) <u>Priority and Security</u> (Interim Order ¶ 12):  All obligations of the Debtor to the Lender under the DIP Facility shall be junior to the Prior Permitted Liens of Great Western Bank and United Bank & Trust against the Debtor existing as of the Petition Date including liens granted to those lenders pursuant to cash collateral orders entered by the Court, but shall otherwise be granted:

    a. pursuant to Bankruptcy Code section 361, a replacement lien to the extent of any decrease in the value of the DIP Collateral;

    b. pursuant to Bankruptcy Code section 364(c)(1), superpriority administrative expense claim status in the case which claims in respect of the DIP Facility shall be superior to all other claims, excluding the

---

[1] The summaries and descriptions of the terms and conditions of the DIP Financing Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof.  The summaries and descriptions are qualified in their entirety by the DIP Financing Agreement and the Interim Order.  In the event there is any conflict between this Motion and the DIP Financing Agreement or Interim Order, the DIP Financing Agreement or Interim Order, as applicable, will control in all respects.

SFGH:4844-2027-9093v2

proceeds of the claims and causes of action under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, the "Avoidance Actions"));

c.  pursuant to Bankruptcy Code section 364(c)(2), a valid and perfected security interest in, and lien on, all Collateral of the Debtors  (now or hereafter acquired and all proceeds thereof);

d.  pursuant to section 364(c)(3) of the Bankruptcy Code, a junior lien on all encumbered assets of the Debtor  (now or hereafter acquired and all proceeds thereof; and

e.  pursuant to section 364(d)(1), a valid and perfected senior lien on all assets of the Debtor (now or hereafter acquired and all proceeds thereof).

h)  Maturity Date (Section 1(aa)):  The DIP Facility matures on the earliest of: a) 120 days from the Petition Date; b) the date on which Borrower enters into a definitive agreement to sell all or substantially all of its assets to a third party other than Lender or an affiliate of Lender; c) 45 days from the Petition Date if the Bankruptcy Court has not entered the Final Order by such time; d) the date on which an Event of Default occurs; or e) the date on which any "Termination Event" set forth in the Interim Order or Final Order occurs.

i)  Interest Rates and Interest Period (Sections 1(f) and (p)):  The base interest rate under the DIP Facility is 9.5% per annum, and the default interest rate is 14.5% per annum.

j)  Milestone Dates (Section 35):  The DIP Financing Agreement requires that certain "milestone" dates be met to prevent default:

   i.  **Interim Order**. On or before December 21, 2016, the Bankruptcy Court will have entered the Interim Order.

   ii.  **Final Order**. On or before January 4, 2017, the Bankruptcy Court will have entered the Final Order.

   iii.  **Bid Procedures Order**. On or before January 4, 2017, the Bankruptcy Court will have entered the Bid Procedures Order, and approved the Asset Purchase Agreement.

   iv.  **Auctio**n. On or before February 3, 2017, the Auction will have concluded.

   v.  **Sale Approval**. On or before February 10, 2017, the Bankruptcy Court will have entered an order, in form and substance satisfactory to Lender, confirming the Auction and authorizing the sale of Borrower's assets in accordance with the Asset Purchase

SFGH:4844-2027-9093v2

Agreement and Bid Procedures Order pursuant to 11 U.S.C. Sections 105, 363, and 365.

  vi. **Sale of Assets**. On or before March 1, 2017, Borrower will have concluded the sale of substantially all of its assets to Lender pursuant to the Asset Purchase Agreement.

k) <u>Carve-out</u>:  There is no carve out under the DIP Facility or Interim or Final Orders.

l) <u>Budget</u> (Sections 1(j); 13(c) and (d)):  Commencing upon entry of the Interim Order, and every fourth week thereafter, Debtor shall provide a 13-week rolling cash flow forecast detailing cash receipts and cash disbursements on a weekly basis broken down for the Debtors for the next 13 weeks.  The initial 13-week Budget is attached as **<u>Exhibit 2</u>** to the Interim Order.

m) <u>Commitment Fee</u> (Section 9):  Lender shall be entitled to a Committee Fee of $50,000 that is earned upon entry of the Interim Order and payable on the Maturity Date.

n) <u>Conditions to Obligations of Lender</u> (Section 10):  The conditions precedent to borrowing under the DIP Facility are customary and include, among other things, the following:

  i. Liens and Claims. Lender shall have a valid and perfected Lien on, and security interest in, all Collateral on the basis and with the priority set forth in the Interim Order, and that Lien and security interest shall be senior to all other Liens except for the Prior Permitted Liens.  Except to the extent the DIP Financing Orders permit the same, Borrower will not suffer or permit any administrative expense claim (as set forth in 11 U.S.C. Section 503), Lien or other claim to arise or continue to the extent such Lien, expense, or claim is pari passu with or senior to Lender's claims or Liens.

  ii. Compliance With Budget.  Borrower will not make any expenditure unless it strictly complies with the Budget within the Permitted Variance.

  iii. Absence of Default. Lender has no obligation to fund the Loan, advance credit, or make any financial accommodation to Borrower if a Default has occurred and is continuing, or if such funding, advance, or accommodation would cause a Default.

  iv. Insurance. Lender has received valid certificates of in-force insurance in form and amount satisfactory to Lender for all policies Lender requires.

SFGH:4844-2027-9093v2

v. Motions. All motions and other documents to be filed with and submitted to the Bankruptcy Court regarding the Loan, and the Bankruptcy Court's approval thereof, shall be in form and substance satisfactory to Lender in its sole discretion.

vi. Orders. With respect to all advances during the Initial Financing Period, the Bankruptcy Court has entered the Interim Order, in form and substance satisfactory to Lender, in its sole discretion. With respect to all advances after the Initial Financing Period, the Bankruptcy Court has entered the Final Order approving the Loan in form and substance satisfactory to Lender, and the DIP Financing Orders must remain in full force and effect, without modification, at the time of each advance.

vii. Milestones. All applicable milestone dates have been fully and timely satisfied or waived (in Lender's sole and absolute discretion).

viii. Asset Purchase Agreement. Lender and Borrower shall have executed the Asset Purchase Agreement.

ix. Representations and Warranties. All representations and warranties of Borrower in the DIP Financing Agreement remain true and correct.

x. Material Adverse Effect. No Material Adverse Effect has occurred.

o) Covenants (Sections 13): The DIP Financing Agreement contains affirmative, negative and financial reporting covenants customary for facilities of this nature, including, without limitation:

i. Operation of Business. Borrower will continue to operate as a debtor in possession of its assets pursuant to 11 U.S.C. Sections 1107 and 1108.

ii. Repayment. Borrower will timely and fully pay to Lender all sums due and owing to Lender when such sums are due and owing. Borrower's obligations under the DIP Financing Agreement are absolute according to their terms and are not contingent upon Lender: 1) properly obtaining, perfecting, or maintaining any Lien with respect to any property; 2) properly obtaining or retaining any payment obligation with respect to any other party; 3) monitoring the Loan; or 4) enforcing any other rights Lender may have with respect to any other person or property. Borrower waives any claim or defense it may have now, or may hereafter acquire, that relates to: 1) Lender's failure to exercise any rights Lender may have against any person or property; 2) the manner in which Lender monitors or modifies the Loan; or 3)

SFGH:4844-2027-9093v2

Lender's release of any person or property that may be responsible for (or available to apply towards) payment of the Loan.

iii.    Reporting. Borrower will provide to Lender: (i) its monthly consolidated unaudited financial statements within thirty (30) days of the end of each calendar month, which financial statements the Chief Executive Officer will certify as being true, correct, and accurate; (ii) every four calendar weeks, an updated rolling thirteen (13) week budget, which budget Lender must authorize and approve (in Lender's sole discretion); (iii) beginning on the first Thursday at the close of the first full week following the Petition Date, and continuing on each Thursday thereafter, a variance report (the "Variance Report") that sets forth Borrower's actual cash receipts and disbursements for the immediately preceding week on a line-item basis (in a form reasonably acceptable to Lender) and describes the variance of each item compared to the Budget in effect for the applicable period on a weekly and cumulative basis, which the Chief Executive Officer of Borrower will certify in writing is true, correct, and accurate; and (iv) notification to Lender of the existence of a Material Adverse Effect within one (1) business day of becoming aware of such Material Adverse Effect.

iv.    Permitted Variance; Loan to Budget.  Borrower's use of Loan Proceeds shall be in accordance with the Budget and any extension to the Budget, it being understood and agreed that the actual amounts for (i) total receipts may not be less than the Budget amount by 20% for any rolling four week period as measured on a bi-weekly basis calculated beginning with  the first full calendar week following the Petition Date, and (ii) total disbursements  may not be greater than the Budget amount by 20% for any rolling four week period as measured on a bi-weekly basis calculated beginning with the first full calendar week  following the Petition Date.  Nothwithstanding the Permitted Variance with respect to use of funds, Lender shall have no obligation, at any time, to loan beyond the strict limits of the Budget, as set forth in Section 2 of the DIP Financing Agreement.

v.    Other Information. Borrower will promptly provide Lender with all other information Lender reasonably requests within two business days of Lender's request, and will allow Lender to inspect the assets, facilities, operations, books and records of Borrower within two business days of Lender's request for the same. Borrower will make its employees, officers, agents, and retained professionals reasonably available to communicate with Lender upon Lender's request for the same.

vi.    Further Assurances. Borrower will execute and deliver to Lender all further documents, financing statements, agreements, mortgages and

security agreements, and will take all other action (including filing and recording any mortgages, financing statements, or fixture filings) Lender may reasonably request, to: 1) effectuate the transactions the DIP Financing Agreement contemplate; or 2) to perfect, protect, or preserve any Liens that the DIP Financing Orders or other DIP Financing Agreement create; provided, however, that Lender shall not take or request that Borrower take any action to impair or terminate a Prior Permitted Lien.

vii.   Use of Loan Proceeds. Neither Borrower, nor any subsequent trustee or creditors committee, nor any other person may use any proceeds of the Loan or any proceeds of any Collateral to: seek authorization to obtain Liens that are on parity with, or senior to, the Liens in favor of Lender; to investigate or prosecute any claim, defense or objection that challenges the rights of Lender, or request any remedy or relief against or adverse to Lender (or any employee, officer, agent, affiliate, or director of Lender).  Borrower will not permit any subsidiary or affiliate to use, directly or indirectly, the proceeds of the Loan.

viii.  Modification of DIP Financing Orders. Borrower will not: i) seek, support, consent to, or suffer to exist any modification or termination of any of the DIP Financing Orders without the prior written consent of Lender; ii) apply to the Bankruptcy Court for authority to take any action that this Agreement or the DIP Financing Agreement prohibit without the prior written consent of Lender; or iii) request authorization to incur, or suffer to exist, any claim other than the claim of Lender that would be entitled to superpriority treatment pursuant to 11 U.S.C. Sections 364(c)(1), (c)(2), (c)(3), and (d)(1).

ix.   Prepetition Debts. Borrower will not make any payments to creditors on account of any Prepetition Debts without Lender's prior written consent and the Bankruptcy Court's approval.

p)   Events of Default (Section 14):  The DIP Financing Agreement contains certain events of default.  By way of example, and as more fully set forth in Section 14 of the DIP Financing Agreement, the following constitute "Events of Default":

i.   *Payment*. Borrower fails to pay any Obligation to Lender as and when due and payable;

ii.   *Milestones*. Any Milestone fails to timely occur;

iii.   *Representations and Warranties*. Any representation or warranty Borrower has made, or makes in the future proves to have been incorrect, incomplete, or misleading in any material respect on or as of the date it is made or deemed made, and Borrower does not cure such

10

breach to Lender's satisfaction within five (5) business days of receipt of written notice of such breach by Lender;

iv.  *Covenants*. Borrower fails to perform or observe any term, covenant, or agreement with Lender, and Borrower does not cure such breach to Lender's satisfaction within five (5) business days of receipt of written notice of such breach by Lender;

v.  *Lender's Rights*. Any of the Liens, or other rights of Lender in the Collateral at any time are not (or Borrower claims the right is not) a first (super) priority, valid, and perfected interest in the Collateral as set forth in the DIP Financing Orders;

vi.  *Other Proceedings*. Borrower becomes involved in any proceeding that Lender reasonably believes would result in a forfeiture of all or a substantial part of Borrower's assets, or in the entry of a material judgment against Borrower;

vii.  *Bankruptcy Matters*. Any of the following occurs in the case:

a.  The Chapter 11 Case is dismissed or converted to a proceeding under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court authorizes the appointment of a trustee or otherwise displaces the debtor as a debtor in possession of its assets pursuant to 11 U.S.C. Sections 1107 and 1108.

b.  Any party other than Lender obtains relief from the automatic stay imposed pursuant to 11 U.S.C. Section 362(a), or obtains confirmation from the Bankruptcy Court that such automatic stay does not apply;

c.  Any person files a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code that does not propose to immediately and indefeasibly repay the Obligations in full and in cash;

d.  Borrower files, supports, or fails to resist any pleading that seeks to vacate or modify any of the DIP Financing Orders without Lender's prior written consent;

e.  Entry of an order that modifies or amends any of the DIP Financing Orders without Lender's prior written consent;

f.  Reversal, vacation or stay of any of the DIP Financing Orders;

g.  Borrower seeks to sell any of its assets outside of the ordinary course of business, except pursuant to the Bidding Procedures;

11

h. Appointment of a responsible officer or examiner with enlarged powers relating to the business operations of Borrower without Lender's prior written consent;

i. Borrower files, supports, or fails to resist a motion that seeks an order granting any claim or Lien (except in favor of Lender) that is senior to, or *pari passu* with, Lender's claims and rights, or any court enters such an order;

j. Except as provided in this Agreement or the DIP Financing Orders or any other court order, Borrower pays, or is authorized to pay or provide, any adequate protection with respect to any Prepetition Debt;

k. Borrower loses its exclusive right to file a plan of reorganization pursuant to 11 U.S.C. Section 1121(b), or that right is modified;

l. Unless otherwise provided in the Interim Order or the Final Order, or upon Lender's prior written consent, Borrower seeks (or the Bankruptcy Court authorizes) an order pursuant to 11 U.S.C. Section 365 authorizing Borrower to reject a material lease that is part of (or whose premises contains any of) the Collateral;

m. The Bankruptcy Court fails to authorize (or terminates the authorization of) Borrower to use cash collateral as contemplated in the Budget.

n. Borrower selects any bid other than Lender's as the Prevailing Bid.

q) Fees (Sections 20, 29): Borrower will reimburse Lender for all costs and expenses (including all attorneys' fees) Lender incurs in protecting or enforcing its rights under the DIP Financing Agreement. Lender may seek allowance of its fees and expenses as provided for under 11 U.S.C. § 506(b) by filing a motion or through any other procedure permitted under the Bankruptcy Code or any order of the Bankruptcy Court. Borrower shall not object to such request on any ground other than reasonableness.

r) Waiver of Rights (Interim Order ¶ 14): The Debtors waive certain rights and causes of action and grant certain releases, including their rights under section 506(c) of the Bankruptcy Code, pending entry of the Final Order.

s) Waiver or Modification of the Automatic Stay (Section 15; Interim Order ¶ 14): Subject to ten (10) business days prior notice, the automatic stay will be vacated to permit the exercise of remedies by the Lender.

t)  <u>Hold Harmless and Indemnification</u> (Section 21):  Lender is not responsible for performing Borrower's obligations with respect to the Collateral. Borrower will indemnify and hold Lender harmless from all claims, damages, and liabilities (including attorneys' fees and legal expenses) (collectively, "Indemnified Claims") in any matter relating to or arising out of any Loan Document, or in any way relating to the Collateral (including those Indemnified Claims involving hazardous materials). Borrower will promptly provide Lender with written notice of any Indemnified Claim. Upon Lender's request, Borrower will defend Lender from all Indemnified Claims, and will pay the attorneys' fees, legal expenses and other costs Lender incurs in connection therewith. Lender may, in its sole discretion, at Borrower's expense, employ Lender's own legal counsel to defend any Indemnified Claims.  Indemnified Claims shall not include any claims, assertions, or actions undertaken by an official committee, patient care ombudsman or patient privacy ombudsman appointed in this case, or by the Office of the United States Trustee.

u)  <u>Automatic Perfection</u>.  (Section 17(d); Interim Order ¶ 20).  The DIP Liens shall be valid, binding, enforceable, non-avoidable and automatically perfected without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which otherwise may be required under the laws of any jurisdiction to validate or perfect such security interests and liens.

## DEBTOR'S EXERCISE OF BUSINESS JUDGMENT FOR DIP FACILITY

13.    The Debtor has exercised its valid business judgment in seeking approval of the instant Motion for the reasons set forth below.

14.    Based upon the Debtor's budget, the Debtor has an immediate need to use the DIP to operate its business and otherwise continue as a going concern.  The Debtor projects that it will have cash shortfalls post-petition without the influx of new working capital.

15.    Lender's support of the Debtor is absolutely essential for the Debtor to continue as going-concern, and to maintain value pending a sale of the Debtor's assets.  Given the Debtor's current cash flow, the Debtor cannot continue to operate and do business and will not continue as a going concern without additional credit support from Lender.

Given the critical nature of the support of Lender to the continued existence of the Debtor and the preservation of the value of the Debtor's estate, and the continuation of the Debtor's healthcare mission which is consistent with Lender's own healthcare mission, Debtor believes that the relief requested in the Motion is reasonable under the circumstances. The Lender is providing up to **$4.5 million in new post-petition funds** for working capital needs of the Debtor, subject to the Budget, which will allow the Debtor to maintain uninterrupted healthcare services to its patients, maintain availability of services in the Marshalltown community and other communities that it serves in the ordinary course, and keep its focus on its mission during the course of the case, pending the sale of the Debtor's assets.

### RELIEF REQUESTED

16.     By this Motion, the Debtor seeks the entry of interim and final orders (the "*Interim Order*" and the "*Final Financing Order*" respectively) :

a)  Authorizing the Debtor to obtain secured post-petition financing on a super-priority basis (the "*DIP Facility*") subject only to the Prior Permitted Liens (as defined herein and in the DIP Financing Agreement);

b)  Authorizing the Debtor to execute and enter into the DIP Financing Agreement, attached as **Exhibit 1** to the proposed Interim Order, between the Debtor and Lender (a copy of which has been filed with the Court), and to perform such other and further acts as may be required in connection with the DIP Financing Agreement and approving the DIP Financing Agreement;

c)  granting super-priority administrative expense claims to Lender for the post-petition financing subject only to the Prior Permitted Liens (defined herein), and granting liens for the post-petition financing to Lender in all Post-Petition Collateral (defined herein) in accordance with the DIP Financing Agreement and the Interim Order;

d)  Granting of adequate protection to Lender of its interests in the DIP Collateral, pursuant to Code § 361; and

14

e) scheduling a final hearing (the "*Final Hearing*") to consider entry of a final order authorizing, among other things, the Debtors to obtain financing under the DIP Facility and the DIP Financing Agreement and approving the terms and conditions of the DIP Facility and DIP Financing Agreement on a final basis (the "*Final Order*");

17.     Debtor further requests that Section 362 of the Bankruptcy Code not operate as a stay with respect to any application by Lender of funds pledged to it by the Debtor or of any action required by or permitted to Lender under the DIP Financing Agreement.

18.     It is necessary for the Debtor to obtain post-petition financing for a period of time and in an amount which would allow the Debtor to continue to preserve and maximize the value of its assets.  An immediate need exists for the Debtor to obtain credit from Lender. Without such funds, the Debtor will not be able to continue the operation of its business and maximize the value of its assets pending the completion of the sale of such assets.  Debtor has attempted to obtain, but is unable to obtain, financing as proposed herein from other sources. After considering all alternatives, the Debtor has concluded, in the exercise of its business judgment, that the financing offered by the Lender represents the best financing option, provides increased liquidity and additional credit support to provide for working capital needs and improves the Debtor's ability to successfully sell its assets.

19.     Lender has indicated a willingness to extend post-petition secured credit under the terms and conditions of the Interim Order and the DIP Financing Agreement.  The Debtor is unable to obtain financing on terms more favorable than terms offered by Lender under the DIP Financing Agreement, and is unable to obtain adequate unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense. The Debtor is also unable to obtain secured credit under Bankruptcy Code Section 364(c) on terms more favorable than those set forth in the DIP Financing Agreement.

20.     The terms of the DIP Financing Agreement are fair and reasonable, were negotiated by the parties at arm's length and in good faith and are the best available to the Debtor under present market conditions and the Debtor's financial circumstances.  Based on the foregoing, any credit extended under the DIP Financing Agreement by Lender is extended in good faith, as that term is used in Bankruptcy Code Section 364(e).

21.     The Debtor requests that the Court enter the Interim Order in order to satisfy its interim need for post-petition financing, as determined in the exercise of its sound business judgment.  Entry of the Interim Order is necessary to prevent irreparable harm to the Debtor, including the harm that would result from the disruption of the Debtor's business, maximize the value of its assets, and is in the best interest of the Debtor's estate. Absent entry of the Interim Order, the Debtor's Estate will be immediately and irreparably harmed. Consummation of the DIP Financing Agreement is in the best interest of the Debtor's Estate.

22.     The Debtor requests that it be authorized to enter into the DIP Financing Agreement and to incur post-petition debt under the DIP Facility pursuant to the terms of the DIP Financing Agreement and the Interim Order.

23.     In accordance with the terms of the DIP Finance Agreement, the Debtor requests that it be authorized to use the DIP Facility to fund the working capital requirements and other financing needs of the Debtor during the pendency of this Case.  Use of funds shall further be consistent with the 13-week budget (the "*Budget*") attached to the Interim Order and incorporated herein by reference, which may be revised and updated from time to time by delivery of a revised and updated budget by the Debtor to Lender and which shall be effective and become the Budget referred to herein only upon written approval of such budget by Lender in its sole and absolute discretion.

16

24.     The DIP Facility shall not be used to pay any fees or expenses incurred at any time in connection with the filing or prosecution of any action which seeks to invalidate, challenge, dispute, avoid, subordinate or otherwise impair Lender's claims or rights under the DIP Financing Agreement.

25.     In furtherance of the foregoing, the Debtor requests that it be authorized to perform all acts, to make, execute and deliver all instruments and documents (including the execution or recordation of security agreements, mortgages and financing statements) that may be required by Lender or convenient for the Debtor's performance under the DIP Financing Agreement or the Interim or Final Orders.

26.     The Debtor requests that its obligations, agreements and covenants (under the DIP Financing Agreement be declared valid and binding and enforceable against the Debtor. Accordingly, no payment, advance, financial accommodation, transfer or grant of security under the DIP Financing Agreement shall be avoidable, voidable or recoverable under the Bankruptcy Code or under any applicable law (including Bankruptcy Code Section 502(d), or subject to any defense, reduction, setoff, recoupment or counterclaim.

27.     The Debtor requests that advances made under the DIP Facility, until the Maturity Date, as summarized herein and defined in the DIP Financing Agreement, be governed by the terms and conditions of the DIP Financing Agreement, including, without limitation, the terms and conditions governing the applicable interest rates.

28.     The Debtor understands that the post-petition indebtedness incurred under the DIP Facility will be:

a)   allowable under Bankruptcy Code section 503(b)(1) as an administrative expense with priority pursuant to the provisions of Bankruptcy Code section 364(c)(1) over all other administrative expenses of the kind specified in Bankruptcy Code section 503(b) or section 507(b) and all other expenses and claims;

SFGH:4844-2027-9093v2

b)  secured by a security interest in and as a lien on all present and future property of the Debtor's Estate, including both real and personal property, whether now held or hereafter acquired by the Debtor's Estate, with the exception of avoidance actions and the proceeds thereof under Bankruptcy Code sections 544, 547, 548, 549 and 553;  and

c)  such lien and security interest shall have priority over all other liens, claims and expenses in the Debtor's Case except with respect to the Prior Permitted Liens and the liens granted to the holders of Prior Permitted Liens pursuant to cash collateral orders entered in this case.

29.    Entry of the Interim Order shall automatically perfect the liens granted by any Interim Order.

30.    The Events of Default contained in the DIP Financing Agreement are hereby incorporated herein by reference.

31.    In no event shall Lender be subject to the equitable doctrine of marshalling or any similar doctrine.

32.     Subject to the entry of a final order, in consideration of the Debtor's use of the DIP Collateral in accordance with the DIP Financing Agreement, and in view of the effect of such use, (i) to the fullest extent permitted by applicable law, the DIP Collateral shall not be subject to any surcharge under Bankruptcy Code Section 506(c) and (ii) the "equities of the case" exception in Bankruptcy Code Section 522 shall not apply with respect to the DIP Collateral.

33.    The Debtor acknowledges that except as otherwise stated herein, the provisions of an Interim Order shall be binding upon all persons and entities and shall inure to the benefit of Lender, the Debtor, and its respective successors and assigns, including, without limitation, any subsequent chapter 11 or chapter 7 trustee.

SFGH:4844-2027-9093v2

34.     The Debtor acknowledges that no subsequent stay, modification, termination, failure to extend the term or vacation of an Interim Order shall affect, limit or modify the validity, priority or enforceability of any liability of the Debtor under the DIP Financing Agreement or the other DIP Financing Agreement, or any lien or security interest granted to Lender under the such documents.  All credit extended under the DIP Financing Agreement is made in reliance on an Interim Order and the obligations the Debtor incurs to Lender under the DIP Financing Agreement cannot be subordinated, lose superpriority status, or be deprived of the benefit of the liens granted to Lender, by any subsequent order in the Debtor's chapter 11 case or a converted chapter 7 case.  The provisions of an Interim Order dealing with the liability of the Debtor under the DIP Financing Agreement shall not be modified or superseded by any order confirming a plan of reorganization (including the use of the cram-down provisions of Bankruptcy Code Section 1129(b)) in the Debtor's chapter 11 Case.  If any party shall appeal the order approving the DIP Facility or shall successfully challenge the validity, perfection or priority of any pre-petition liens in favor of Lender, Lender may terminate its commitment to fund under the DIP Financing Agreement and stop funding upon written notice to the Debtor.

35.     The provisions of an Interim Order and any actions taken pursuant thereto, shall survive entry of any order which may be entered: (a) converting the Debtor's chapter 11 Case to a chapter 7 case; (b) confirming or consummating any plan confirmed pursuant to Bankruptcy Code Section 1129; or (c) dismissing any of the Debtor's chapter 11 Case or any subsequent chapter 7 case pursuant to Bankruptcy Code sections 303, 305 or 1112. The terms and provisions of an Interim Order as well as the priorities in payment, liens and security interests granted pursuant to the DIP Financing Agreement and this Interim Order shall

SFGH:4844-2027-9093v2

continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain its priority until all Obligations are indefeasibly paid and satisfied.

36.     The Debtor requests that the right of Lender to credit bid the then-outstanding Obligations owed to Lender by the Debtor (pursuant to Bankruptcy Code Section 363(k)), in whole or in part, in connection with any sale or disposition of assets in this Case (including in connection with a plan for which confirmation is sought under Bankruptcy Code Section 1129(b)(2)(A)(i)) be hereby expressly reserved and preserved.

37.     The Debtor and Lender may enter into any non-material amendments or modifications to the DIP Financing Agreement without notice or a hearing or further order of the Court; provided, however, that any such modifications shall be filed with the Court and shall not be adverse to the Debtor or its Estate.

38.     In summary, the relief requested in this Motion is necessary, essential, and appropriate for the preservation of the Debtor's Estate, and is in the best interests of the Debtor, its Estate, and its creditors.  The Debtor submits that the terms and conditions of the DIP Facility are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.  Finally, after exploring other options for post-petition financing, the Debtor has concluded that obtaining the DIP Facility which Lender is willing to provide is the only new credit, secured or unsecured, available to Debtor, other than any credit constituting available cash collateral of the holders of Prior Permitted Liens that is approved in this case.

SFGH:4844-2027-9093v2

39.     Notice of this Motion will be provided by e-mail, fax or overnight carrier to: (a) the Office of the United States Trustee for the Southern District of Iowa; (b) the holders of the Prior Permitted Liens; (c) counsel for Lender; (d) the 20 largest unsecured creditors, and (e) all those creditors and interested parties who have filed notices of appearances in the Chapter 11 Cases. Because of the nature of the relief requested, the Debtor respectfully submits that no other or further notice of the relief requested in this Motion need be given.

WHEREFORE, based upon the foregoing, the Debtor requests that this Court (a) approve this Motion; (b) grant the relief requested in this Motion, including approving the DIP Facility under the terms and conditions set forth in the DIP Financing Agreement and the Interim Order; (c) enter the Interim Order; and (d) grant such other and further relief as may be just and equitable under the circumstances.

[signatures on following page]

SFGH:4844-2027-9093v2

Date:  December 20, 2016                    Respectfully submitted,


                                           /s/  Jeffrey D. Goetz
                                           Jeffrey D. Goetz, Esq., IS #9999366 Bradshaw
                                           Fowler Proctor & Fairgrave, P.C.
                                           Jeffrey D. Goetz
                                           Bradshaw Fowler Proctor & Fairgrave, P.C.
                                           801 Grand Avenue, Suite 3700 Des
                                           Moines, IA 50309-8004 515/246-5817
                                           515/246-5808 FAX
                                           goetz.jeffrey@bradshawlaw.com

                                           Proposed General Reorganization Counsel for
                                           Central Iowa Healthcare f/d/b/a Marshalltown
                                           Medical Surgical Center, Debtor and Debtor-
                                           in-Possession

                                           and

                                           Aaron L. Hammer
                                           Mark S. Melickian
                                           Michael A. Brandess
                                           Sugar Felsenthal Grais & Hammer LLP
                                           30 N. LaSalle St., Ste. 3000
                                           Chicago, IL 60602
                                           ahammer@sfgh.com
                                           mmelickian@sfgh.com
                                           mbrandess@sfgh.com

                                           Proposed Special Healthcare Reorgnization
                                           Counsel for Central Iowa Healthcare f/d/b/a
                                           Marshalltown Medical Surgical Center, Debtor
                                           and Debtor-in-Possession


### CERTIFICATE OF SERVICE

This document was served electronically on parties who receive electronic notice through
CM/ECF as listed on CM/ECF's notice of electronic filing.

                    / s / Barbara Warner

SFGH:4844-2027-9093v2

# **Exhibit A**

## **Interim Order**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.  16-02438-11als |
| | ) | |
| **CENTRAL IOWA HEALTHCARE** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Hon. Anita L. Shodeen |
| | ) | |
| 3 South 4th Avenue | ) | **INTERIM ORDER (I) AUTHORIZING** |
| Marshalltown, IA 50158 | ) | **DEBTOR TO (A) OBTAIN DEBTOR IN** |
| | ) | **POSSESSION FINANCING,  AND (II)** |
| | ) | **GRANT SUPERPRIORITY CLAIMS** |
| EIN: 42-0948420 | ) | **AND LIENS** |
| | ) | |
| | ) | |

Upon the motion dated December 20, 2016 (the "Motion") [Dkt. No. [_]], of the above-captioned debtor and debtor-in-possession (collectively, the "Debtor") for entry of an order (the "Interim Order"), *inter alia*, seeking (a) authority for the Debtor to borrow money from the Lender pursuant to the terms of the DIP Financing Agreement (attached hereto as Exhibit 1), and use such funds strictly in accordance with the budget (attached hereto as Exhibit 2) (the "Budget") to finance the operations of the Debtor's business; (b) adequate protection to the Lender in the form of an allowed superpriority claim and a lien for advances made under the DIP Financing Agreement; and (c) scheduling, pursuant to Bankruptcy Rule 4001, a final hearing for this Court to consider entry of a final order (the "Final Order") granting the Motion.

This Court held an interim hearing on December _____, 2016 (the "Interim Hearing"), and upon the record made by the Debtor at the Interim Hearing, including, without limitation, the admission into evidence of the *Declaration of Dawnett Willis in Support of First Day Motions* [Dkt. No. [_]] (the "First Day Declaration"), filed on December ___, 2016 (the "Petition Date"), the testimony presented or proffered at the hearing, and the other evidence submitted or adduced

and the arguments of counsel made at the Interim Hearing; and all objections to the entry of this

Interim Order having been overruled, withdrawn or resolved pursuant to the terms of this Interim

Order; and after due deliberation and consideration and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1.      *Motion Granted*.   The relief requested in the Motion is granted as described

herein. Except as otherwise expressly provided in this Interim Order, any objection to the entry

of this Interim Order that has not been withdrawn, waived, resolved, or settled, is hereby denied

and overruled on the merits.

2.      *Opportunity to Object*.   Pursuant to Bankruptcy Rule 4001(d)(2), any objection to

the entry of a Final Order on the Motion must be filed on or before January ___, 2017 (the

"Objection Date").   A final hearing (the "Final Hearing") on the Motion shall take place on

**January ___, 2017 at [   :   ] [ ].m.**, before the Honorable [_____], United States Bankruptcy

Judge for the Southern District of Iowa, (the "Court"), at 110 East Court Avenue, Des Moines,

Iowa 50309.

3.      *Form of Objections*.   Objections must be in writing and be filed with the Clerk of

the Court so that any such objections are received on or before the Objection Date.   Copies of

any objection shall be served upon counsel for the following:  (a) the Debtor, Bradshaw, Fowler,

Proctor & Fairgrave, P.C., 801 Grand Avenue, Suite 3700, Des Moines, Iowa 50309, Attn:

Jeffrey D. Goetz, and Sugar Felsenthal Grais & Hammer LLP, 30 N. LaSalle St., Ste. 3000,

Chicago, IL  60602, Attn:  Mark S. Melickian, and (b) the Lender, Belin McCormick PC, 666

Walnut Street, Suite 2000, Des Moines, Iowa 50309-3989, Attn:  Matthew T. Cronin.

4.      *Lender's Good Faith*.   The Debtor and the Lender have demonstrated to the Court

that they have negotiated at arm's length, that the Lender has acted in good faith in the

negotiation and preparation of this Interim Order, and that both parties have been represented by counsel and intend to be and are bound by the terms of the DIP Financing Agreement and this Interim Order.  The terms of this Interim Order reflect the Debtor's exercise of prudent business judgment under exigent circumstances and are consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

5.     *Notice*.  Notice of the Motion and the interim hearing with respect thereto has been given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, and 9006 and as required by sections 102, 105, 361, 362, 363 and 364 of the Bankruptcy Code.  Other than the notice provided for herein, no further notice of the relief sought in the Motion is necessary.

6.     *Jurisdiction*.  This Court has jurisdiction over this Case and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     *Findings Concerning DIP Financing*.  The Court finds that the Debtor requires financing to continue their operations and to preserve the value of their pre-petition assets.  The Court further finds that the Debtor is unable to obtain financing on more favorable terms from sources other than the Lender pursuant to, and for the purposes set forth in, the DIP Financing Agreement and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit allowable as a general unsecured claim, as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or otherwise without granting liens ("*DIP Liens*") to the Lender under Section 364(c)(2), Section 364(c)(3), and 364(d)(1) of the Bankruptcy Code

3

and the Superpriority Claims (as defined herein) under section 364(c)(1) of the Bankruptcy Code, on the terms and conditions set forth in this Interim Order and the DIP Financing Agreement, and subject only to the Prior Permitted Liens (as defined in the DIP Financing Agreement).  The Court further finds as follows concerning the DIP Financing Agreement:

(a)     The terms of the use of the DIP Financing Agreement and the Collateral described therein pursuant to this Interim Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(b)     The DIP Financing Agreement and the use of the Collateral have been the subject of good faith negotiations conducted at arm's length among the Debtor and the Lender and all of the obligations and indebtedness arising under or in connection with the DIP Financing Agreement and this Interim Order (collectively, the "DIP Obligations") shall be deemed to have been extended by the Lender in "good faith" as such term is used in Sections 363(m) and 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise.

(c)     Absent the relief set forth in this Interim Order, the Debtor and their business operations will be immediately and irreparably harmed.  In particular, the Debtor requires immediate postpetition financing, and continued use of the Collateral in order to, among other things, continue to serve its patient base and provide healthcare services in Marshalltown while the case is pending, as well as maintain the ability to pay payroll and employee benefit expenses and otherwise preserve the value of the Debtor's estates for the

benefit of its creditors and stakeholders.  The borrowing under the terms of the DIP Financing

Agreement and the use of the Collateral in accordance with this Interim Order and the DIP

Agreement are, therefore, in the best interest of the Debtor.

8.      *Approval of DIP Financing Agreement*.   The Court hereby approves the DIP

Financing Agreement, on an interim basis as set forth herein, and authorizes the Debtor and any

of their subsidiaries to execute, deliver, and perform their respective obligations under the DIP

Financing Agreement.  The Debtor is hereby authorized to borrow and be obligated under the

DIP Financing Agreement in an aggregate principal amount not to exceed One Million Four

Hundred Thousand Dollars ($1,400,000) (the "Interim Advance") on an interim basis to and

through January 4, 2017, in accordance with the Budget to fund  operational and working capital

purposes of the Debtor, interest and fees under the DIP Financing Agreement, and the allowed

costs and expenses of this Case, in each case (other than the fees and expenses of the Lender

reimbursable pursuant to the terms of the DIP Financing Agreement), solely in accordance with

the interim Budget attached as Exhibit 2.  The Interim Advance is hereby approved and shall be

made available to the Debtor upon effectiveness of the DIP Financing Agreement and otherwise

in accordance with the Budget without further request from the Debtor, provided, that such

Interim Advance shall be made solely in accordance with the DIP Financing Agreement and the

Budget.

9.      *Authorization.*   In furtherance of the foregoing and without further approval of

this Court, the Debtor is authorized and directed to perform all acts (and to the extent such acts

have already occurred, such acts are hereby ratified), including without limitation (a)    the

execution, delivery and performance of the DIP Financing Agreement; and (b) the performance

of all other acts required under or in connection with this Interim Order and the DIP Financing

Agreement.  The DIP Financing Agreement and the obligations thereunder constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of this Interim Order and the DIP Financing Agreement.  No obligation, payment, transfer, or grant of security by the Debtor under the DIP Financing Agreement or this Interim Order shall be voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including, without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

10.    *Budget*. Attached hereto as Exhibit B and incorporated by reference herein is the thirteen-week budget (which has been approved by the Lender) setting forth the Debtor's projected loan advances, receipts and disbursements for such period (the "Initial Approved Budget").  The Debtor's borrowing of funds and use of the DIP facility (the "DIP Facility") shall be consistent with the types of expenses set forth in the Initial Approved Budget and subject to the requirements set forth in the DIP Financing Agreement and in accordance with the permitted variances and other terms contained in the Interim Order and the DIP Financing Agreement.  The Lender shall have no obligation with respect to the Debtor's use of the DIP Facility and shall not be obligated to ensure or monitor the Debtor's compliance with the Initial Approved Budget or to pay (directly or indirectly) any expenses incurred or authorized to be incurred pursuant to the Initial Approved Budget.  Any and all cash borrowed under the DIP Facility shall be used by the Debtor in accordance with Interim Order, the Initial Approved Budget, and the DIP Financing Agreement.  Lender's consent to the Initial Approved Budget shall not be construed as consent to the use of the DIP Facility after the occurrence of an Event of Default (as defined below),

regardless of whether the aggregate funds shown on the Initial Approved Budget have been expended.

11.    *Budget Compliance.*  The Debtor will use funds borrowed under the DIP Facility solely within the parameters of the Budget and the Permitted Variance (as defined in the DIP Financing Agreement).

12.    *Priority of DIP Liens and Superpriority Claims; Adequate Protection.*  The liens and claims granted to Lender pursuant to the DIP Financing Agreement and this order shall be junior to the liens of the holders of Prior Permitted Liens (including such liens and protections granted to the holders of Prior Permitted Liens in cash collateral orders entered by the Court), but shall in all other respects be:

(a)    entitled to adequate protection pursuant to Section 361;

(b)    entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code (the "Superpriority Claim") with priority over all administrative expense claims, secured claims, and unsecured claims now existing or hereafter arising under the Bankruptcy Code. The superpriority claims of the Lender may be repaid from any cash of the Debtor;

(c)    secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests in and liens over unencumbered assets of the Debtor's estate; and, pursuant to Section 364(c)(3), by a junior lien on all encumbered assets of the Debtor's estate, and pursuant to Section 364(d)(1), by a priming lien over the assets of the Debtor's estate (collectively, the "DIP Liens"), including all of the Debtor's rights all pre- and postpetition property of the Debtor (including, without limitation, inventory, accounts receivable, other rights to payment whether arising before or after the

7

Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all of the foregoing), whether now existing or hereafter acquired (collectively, the "DIP Collateral"); and

(d)     include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

13.     *Liens Senior to Certain Other Liens.*   Other than with respect to Prior Permitted Liens, which are senior in all respects to the DIP Liens, the DIP Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date; or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

14.     *Remedies After an Event of Default.* If an Event of Default occurs, all obligations under the DIP Financing Agreement will become immediately due and owing in full. Lender may thereafter, in its sole and absolute discretion, deliver written notice to Borrower, the Bankruptcy Court, the U.S. Trustee, and any Committee appointed in this case of the occurrence of the Event of Default (the "Notice of Event of Default").   Ten (10) days following the delivery of a Notice of Event of Default, the automatic stay provisions of 11 U.S.C. Section 362 shall be vacated and modified to the extent necessary to permit Lender to exercise all rights and remedies set forth in the DIP Financing Agreement (the "Termination Date").   Upon the occurrence of the Termination Date, Lender may also (in its sole and absolute discretion) take any of the following

8

actions without further notice, and without further order from, or application to, the Bankruptcy Court:

       a.    <u>Terminate Commitment</u>. Terminate any obligation to make any further advances or financial accommodations to Borrower;

       b.    <u>Collateral</u>. Enforce all rights against any DIP Collateral in the possession of Lender, including disposing of the DIP Collateral solely for application towards the obligations; and/or

       c.    <u>Other Action</u>. Take any other action, or enforce any other right or remedy, provided by any applicable law, or the DIP Financing Agreement.

       15.    *Limitations on Charging Expenses Against DIP Collateral*.  Subject to entry of the Final Order, no expenses of administration of this case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

       16.    *Limitations under Section 552(b) of the Bankruptcy Code*.  The Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring, or profits from any of the collateral under section 552(b) of the Bankruptcy Code.

9

17. *Payments Free and Clear.*  Any and all payments or proceeds remitted to the Lender pursuant to the provisions of Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

18. *Reporting Requirements.* Debtor shall comply with its reporting requirements under the DIP Financing Agreement and under the Bankruptcy Code.

19. *On-Site Diligence Requirements.*  The Debtor shall permit the Lender and its representatives (including its legal counsel, accountants, advisors, financing sources, and agents) to have full access, upon reasonable notice and during normal business hours throughout the period prior to the closing of any sale of all or substantially all of the Debtor's assets, to (a) the properties, books and records (including tax returns), premises, contracts, and documents of the Debtor, including all financial and operating data and other information concerning the Debtor's business and/or the Debtor, as the Lender may reasonably request, and (b) officers and employees of the Debtor; *provided however*, that Debtor shall not be required to permit access to or deliver records or information to the extent restricted or forbidden by law.  The Debtor shall use its commercially reasonable efforts to maximize the amount of information to which it provides the Lender access, whether by obtaining consent of third parties, entering into confidentiality agreements, or otherwise.

20. *Perfection of the DIP Liens.*

(a)    The Lender and its agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens granted to them under Interim Order. Whether or not the Lender or its agents shall, in their respective sole discretion, choose to file such financing

10

statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens, such DIP Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of Interim Order.

(b)     A certified copy of Interim Order may, in the discretion of the Lender and its agents, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of Interim Order for filing and recording.

(c)     The Debtor shall promptly execute and deliver to the Lender or its agents all such agreements, financing statements, instruments, and other documents as the Lender may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

21.     *Preservation of Rights Granted Under Interim Order.*

(a)     No claim or lien (other than the DIP Liens) having a priority senior to or *pari passu* with those granted by the Final Order to the Lender shall be granted or allowed while any portion of the DIP Obligations and the DIP Liens are oustanding; *provided, however*, that the DIP Liens and DIP Obligations shall remain subject and junior to the Prior Permitted Liens.

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash or otherwise satisfied, in the case of clause (i) below, the Debtor shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Financing Agreement if the Debtor seeks, or if there is entered, (i) any modification of Interim Order without the prior written consent of the Lender, and no such consent shall be implied by any

11

other action, inaction, or acquiescence by the Lender, or (ii) an order converting or dismissing this case.

(c)     If any or all of the provisions of Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall, to the extent provided in sections 363(m) and 364(e) of the Bankruptcy Code, not affect (i) the validity, priority, or enforceability of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification, or vacatur or (ii) the validity, priority, or enforceability of the DIP Liens.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of the DIP Facility by the Debtor prior to the effective date of such reversal, stay, modification, or vacatur shall, to the extent provided in sections 363(m) and 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of Interim Order, and the Lender shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, Interim Order, and the DIP Financing Agreement.

(d)     Except as expressly provided in the Interim Order, the order approving the sale of all or substantially all of the assets of the Debtor (the "Sale Order"), or in the DIP Financing Agreement, or as agreed to by the parties, the DIP Liens, the Superpriority Claim, the 507(b) Claim, and all other rights and remedies of the Lender granted by Interim Order and the DIP Financing Agreement shall survive, and shall not be modified, impaired or discharged by (i) the entry the Sale Order or the closing of such approved sale, (ii) the entry of an order converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code, dismissing any of the Cases, or (iii) the entry of an order confirming a plan of reorganization or liquidation in any of the Cases. The terms and provisions of Interim Order and the DIP Financing Agreement shall continue in the cases or in any superseding Chapter 7 cases under the Bankruptcy Code, and the

12

DIP Liens, the DIP Obligations, the Superpriority Claim, the Section 507(b) Claim, the other administrative claims granted pursuant to Interim Order, and all other rights and remedies of the Lender granted by Interim Order and the DIP Financing Agreement shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash or otherwise satisfied.

22.     *Limitation on Use of the DIP Obligations and the DIP Collateral*.  The Debtor shall use the DIP Facility and DIP Collateral solely as provided in the Interim Order, the Initial Approved Budget, and the DIP Financing Agreement. Except as expressly set forth herein, neither the DIP Facility nor the DIP Collateral may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent, or enforceability of any amount due under the DIP Financing Agreement, or the liens or claims granted under Interim Order or the DIP Financing Agreement, (b) assert any Claims and Defenses or any other causes of action against the Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the Lender's assertion, enforcement, or realization on the Collateral or the DIP Collateral in accordance with the DIP Financing Agreement or Interim Order, or (d) seek to modify any of the rights granted to the Lender hereunder or under the DIP Financing Agreement, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Financing Agreement and the Initial Approved Budget.

23.     *Events of Default*.  The Events of Default in the DIP Financing Agreement are herein incorporated by reference in their entirety.

24.    *Insurance*.  Debtor shall keep in force all insurance policies required by Lender under the DIP Financing Agreement.

25.    *Order Governs*.   Except as specifically amended, supplemented or otherwise modified by Interim Order, in the event of any inconsistency between the provisions of Interim Order and the DIP Financing Agreement, the provisions of Interim Order shall govern.

26.    *Limitation of Liability*.   Subject to entry of the Final Order, in determining to make any loan under the DIP Financing Agreement, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order and the DIP Financing Agreement, the Lender shall not be deemed solely by reason thereof to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor.   Furthermore, nothing in this Interim Order or the DIP Financing Agreement shall in any way be construed or interpreted to impose or allow the imposition upon the Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtor.

27.    *Headings Merely Descriptive*.   All headings in this Interim Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

28.    *Service of Interim Order*.   The Debtor shall serve this Interim Order on all of the following parties: (a) the Office of the United States Trustee; (b) the Lender, and any other secured lender appearing in this case, and their respective counsel of record, if applicable; (c) all creditors known to the Debtor who have or may assert liens against any of the Debtor's assets; (d) the thirty (30) largest unsecured creditors of the Debtor, on a consolidated basis; and (e) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules.

14

29.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Interim Order.

30.     *Final Hearing*.  The Final Hearing is scheduled for **[_____], 2017 at [__:__] [_].m.** (prevailing Central time) before this Court. The Objection Date for parties to object to terms set forth in the Motion or relief granted in this Interim Order shall be the end of business on **[_____], 2017**.

Signed on _____:

_____
UNITED STATES BANKRUPTCY
JUDGE

15

# Exhibit 1

**Debtor-in-Possession Finance Agreement**

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

On this 20th day of December 2016, Central Iowa Healthcare, an Iowa non-profit corporation ("Borrower") and Allen Health Systems, Inc. d/b/a UnityPoint Health-Waterloo, an Iowa non-profit corporation ("Lender") enter into this Debtor-in-Possession Loan Agreement (the "Agreement") as follows:

## RECITALS

WHEREAS, Borrower filed a Petition for Relief pursuant to Chapter 11 of Title 11 of the U.S. Code with the United States Bankruptcy Court for the Southern District of Iowa (the "Bankruptcy Court") on December 20, 2016 (the "Petition Date");

WHEREAS, Borrower continues to possess its assets and manage its business as a debtor-in-possession pursuant to 11 U.S.C. Sections 1107(a) and 1108;

WHEREAS, Borrower asked Lender to provide the Loan to Borrower in the aggregate principal amount of **Four Million Five Hundred Thousand and no/100 Dollars ($4,500,000.00)**;

WHEREAS, to secure repayment of the Loan and the performance of Borrower's other obligations under this Agreement, Borrower has agreed to provide Lender with Liens on the Collateral; and

WHEREAS, Lender is willing to make the Loan to Borrower on the express terms and conditions of this Agreement.

NOW, THEREFORE, for this and other good and valuable consideration, the receipt and sufficiency of which the parties expressly acknowledge, Lender and Borrower agree as follows:

1. **Definitions**. The following terms will have the meaning set forth below for purposes of this Agreement:

   a. ***"Asset Purchase Agreement"*** means that certain Asset Purchase Agreement between Lender and Borrower of even date herewith.

   b. ***"Auction"*** has the meaning set forth in the Bid Procedures Order.

   c. ***"Availability Period"*** means the period from the date of this Agreement to, but excluding, the Maturity Date.

   d. ***"Banking Day"*** means any day that is not a Saturday, Sunday or other day on which commercial banks in the State of Iowa are authorized or required to remain closed.

   e. ***"Bankruptcy Code"*** means Title 11 of the U.S. Code, as amended from time to time.

   f. ***"Base Rate"*** means the pre-default interest rate provided for in Section 6 of this Agreement.

   g. ***"Bidding Procedures"*** means the bidding procedures set forth in the Bid Procedures Order.

1

h. ***"Bid Procedures Order"*** means a final, non-appealable order that the Bankruptcy Court enters in substantially the same form as **Exhibit A**.

i. ***"Borrowing Request"*** means a Borrowing Request in the form attached as **Exhibit B**.

j. ***"Budget"*** means the forecasted balance sheets, income statements and cash flow statements of Borrower attached as **Exhibit C** for the period from December ___, 2016 to March _____, 2017, and any subsequent budgets (as referenced in Section 13(c)) that Lender approves in writing.

k. ***"Cash Collateral"*** means any cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents held or obtained by the Borrower that is subject to a Prior Permitted Lien.

l. ***"Chapter 11 Case"*** means the case pending in the Bankruptcy Court with respect to Borrower with a case number of 16-02438-11als.

m. ***"Collateral"*** means all personal property, real property and other assets of Borrower, whether now owned or hereinafter acquired (including any such assets acquired under any trade or fictitious names), and whether leased to or from Borrower, regardless of where located, including: (a) cash and cash equivalents; (b) all funds in any account of Borrower; (c) all accounts and other receivables; (d) contract rights; (e) instruments, documents, and chattel paper; (f) machinery; (g) equipment; (h) inventory; (i) work in process; (j) general intangibles; (k) patents, trademarks, tradenames, copyrights and all other intellectual property; (l) capital stock; (m) investment property; (n) commercial tort claims and all other claims and causes of action; (o) supporting obligations; (p) letter of credit rights; (q) the proceeds of all claims or causes of action (excluding rights or the proceeds thereof of any actions arising under Chapter 5 of the Bankruptcy Code); and (r) to the extent not covered by the foregoing, Collateral also includes: i) all other assets or property of Borrower (whether tangible or intangible, real, personal, or mixed); ii) all products and proceeds of each of the foregoing; iii) all accessions to, substitutions of, and replacements for any of the foregoing; iv) all rents, profits, and proceeds of the foregoing; and v) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower form time to time with respect to any of the foregoing; *provided, however*, that Collateral shall not include Borrower's rights or entitlement to proceeds, indemnity, warranty or contribution under past or present insurance policies covering directors and officers, professional negligence, workers compensation, or similar non-property related liabilities.

n. ***"Debtor in Possession Account"*** means the account described on **Exhibit D**.

o. ***"Default"*** has the meaning set forth in Section 14 of this Agreement.

p. ***"Default Rate"*** means a fixed rate *per annum* of 14.5%.

q. ***"DIP Financing Orders"*** means the Interim Order and the Final Order, as applicable.

r.  ***"Event of Default"*** means a Default that has not been cured or waived following notice of Default by Lender to Borrower within any time period designated in this Agreement.

s.  ***"Final Order"*** means a final, non-appealable order of the Bankruptcy Court approving the Loan, in form and substance satisfactory to Lender in Lender's sole and absolute discretion.

t.  ***"Indemnified Tax"***  means any tax imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Documents, all filing or recording fees or stamps, and similar charges, but will not include any taxes relating to Lender's income, profit, or general business operations.

u.  ***"Interim Order"*** means the interim order of the Bankruptcy Court approving the Loan in form and substance satisfactory to Lender, in its sole discretion.

v.  ***"Lien"*** means any mortgage, encumbrance, pledge, hypothecation, security interest, lien (whether statutory or otherwise) of any kind with respect to any asset.

w.  ***"Loan"*** has the meaning set forth in Section 2 of this Agreement.

x.  ***"Loan Documents"*** means this Agreement, the DIP Financing Orders, and any other documents, instruments, or agreements executed or delivered in connection with this Agreement regarding the Loan.

y.  ***"Main   Office"*** means   the   main   office   of   Lender,   currently   located   at _____.

z.  ***"Material Adverse Effect"*** means an effect that (whether due to a single event, act, or condition, or multiple events, acts, or conditions) causes or reasonably threatens to cause a material adverse effect on: a) the business, results of operations, financial condition, assets, liabilities or prospects of Borrower taken as a whole (other than the commencement of the Chapter 11 Case); b) the ability of Borrower to perform its obligations under the Loan Documents; c) the rights or remedies of Lender under the Loan Documents; d) the validity or enforceability of any of the Loan Documents; e) the value of the Collateral; or f) the perfection or priority of any Liens in favor of Lender pursuant to the Loan Documents.

aa. ***"Maturity Date"*** means the earliest of: a) 120 days from the Petition Date; b) the date on which Borrower enters into a definitive agreement to sell all or substantially all of its assets to a third party other than Lender or an affiliate of Lender; c) 45 days from the Petition Date if the Bankruptcy Court has not entered the Final Order by such time; d) the date on which an Event of Default occurs; or e) the date on which any "Termination Event" set forth in any DIP Financing Order occurs.

bb. ***"Milestones"*** has the meaning set forth in Section 35 of this Agreement.

cc. ***"Obligations"*** means all amounts Borrowers owe to Lender pursuant to or in connection with   any   Loan   Document,   including   all   principal,   interest,   fees,   expenses,

3

indemnification, and reimbursement obligations, whether direct or indirect, absolute or contingent, liquidated or unliquidated, now owing or hereinafter arising.

dd. ***"Permitted Adequate Protection Payments"*** means adequate protection payments made to the holder of a Prior Permitted Lien pursuant to court order.

ee. ***"Permitted Variance"*** has the meaning set forth in Section 13(d) of this Agreement.

ff. ***"Prepetition Debt"*** means any debt, as defined in 11 U.S.C. Section 101(12) that arose before the Petition Date.

gg. ***"Prevailing Bid"*** will have the meaning set forth in the Bid Procedures Order.

hh. ***"Prior Permitted Liens"*** has the meaning set forth in Section 10(d) of this Agreement.

ii. ***"Superpriority DIP Claims"*** means all of Lender's claims on account of the Obligations, which claims will be entitled to the benefits of 11 U.S.C. Section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1), subject to the Prior Permitted Liens.

jj. ***"Termination Date"*** has the meaning set forth in Section 15 of this Agreement.

kk. ***"UCC"*** means the Uniform Commercial Code as set forth in Iowa Code Chapter 554; provided, however, that if as a result of mandatory provisions of Law, the Uniform Commercial Code as in effect in any other state governs the perfection, effect of perfection, or rights as a result of perfection of any Lien in favor of Lender, the term also means the Uniform Commercial Code in effect in such other state. Unless otherwise defined in this Agreement, any term used in this Agreement that is also defined in the UCC will have the meaning provided in the UCC.

ll. ***"Variance Report"*** has the meaning set forth in Section 13(c) of this Agreement.

2. **Loan**. Subject to the terms and conditions of this Agreement, and within the strict limits of the Budget as allowed within the Permitted Variance, Lender agrees to lend to Borrower, from time to time during the Availability Period, such amounts as Borrower may request under this Agreement, not to exceed the total sum of **Four Million Five Hundred Thousand and no/100 Dollars ($4,500,000.00)** (the "Loan"); provided, however, that the total aggregate principal amount of the Loan from the date of this Agreement through and including January 4, 2017 (the "Initial Financing Period") will not exceed the sum of **One Million Four Hundred Thousand and no/100 Dollars ($1,400,000.00)**.

3. **Payment and Re-borrowing**. During the Availability Period, and subject to the limitations in Section 2 of this Agreement, Borrower will be entitled to borrow and prepay the Loan in accordance with the terms and conditions of this Agreement; provided, however, that Borrower may not borrow any amounts under this Agreement if there is an existing Event of Default, and Borrower may not re-borrow any portion of the Loan that Borrower has repaid.

4. **Advances**. Borrower will submit no more than one Borrowing Request per calendar week. Each Borrowing Request must strictly comply with the Budget, within the Permitted

Variance, and the terms of this Agreement. No Borrowing Request may request an advance beyond the cash needs of Borrower for the week that is the subject of the Borrowing Request. Borrower will provide Lender with a Borrowing Request on or before 12:00 p.m. CST on each Wednesday during the Advance Period. The Borrowing Request will, among other things, set forth the anticipated advance Borrower requests for the week beginning on the Monday immediately following the Borrowing Request. If there is no existing Default, the Borrowing Request complies with this Agreement, and subject to the terms and conditions of the Loan Documents, Lender will make an advance from the Loan, directly to the Debtor in Possession Account, as requested in a Borrowing Request on or before 4:00 p.m. CST on the Friday immediately following Lender's receipt of the Borrowing Request. Borrower will immediately reimburse Lender for all wire and other bank fees Lender incurs in making each advance.  Interest will accrue on all funds advanced beginning on the date that Lender advances those funds to the Debtor in Possession Account.

5.  **Repayment**. On the Maturity Date, Borrower will repay to the order of Lender, at its Main Office, the principal amount of all outstanding Loans, plus all accrued interest, fees, expenses, and other Obligations then outstanding.  If Lender is the purchaser of Borrower's assets under the Asset Purchase Agreement, repayment of all Loans shall be accomplished through a credit bid of all Obligations then outstanding under the Loans against the Purchase Price (as defined in the Asset Purchase Agreement).

6.  **Interest and Fees**. Borrower will pay interest on the unpaid principal of the Loan at the rate of 9.5% *per annum* (the "Base Rate") until the outstanding principal balance is paid in full. Interest will accrue on all unpaid principal of the Loan at the Default Rate from and after an Event of Default until the outstanding principal balance is paid in full.   Interest will be calculated on the basis of a year of 360 days for the actual number of days elapsed.

7.  **Payments**. All payments due pursuant to any Loan Document will be made in lawful money of the United States, and in immediately available funds.

8.  **Books and Records**. Lender will record in its books and records all advances, charges, expenses, interest, payments, and other debits or credits pursuant to this the Loan, or the Loan Documents (the "Books and Records"). Absent manifest error, the Books and Records will be conclusive evidence of the amount owing pursuant to the Loan, or the Loan Documents. Borrower waives presentment, notice of dishonor, protest, and any other notice or formality with respect to the Loan or the Loan Documents.

9.  **Commitment Fee**. Borrower will pay Lender a commitment fee (the "Commitment Fee") of **Fifty Thousand and no/100 Dollars ($50,000.00)** on the Maturity Date. The Commitment Fee is fully earned upon the execution of this Agreement and the entry of the Interim Order.

10. **Conditions to Obligation of Lender**. Lender's obligation to make the Loan, and to make each advance under the Loan, is conditioned upon the timely satisfaction of each of the following:

   a. ***Evidence of Existence***.  Borrower will deliver to Lender certified (as of the date of this Agreement) copies of Borrower's organizational documents, appropriate resolutions authorizing Borrower to enter into the Loan and execute the Loan Documents as required,

5

and incumbency certificates. Borrower will provide Lender any written evidence Lender requests concerning Borrower's principal places of business, tax identification number, doing business names and all information Lender may require to perfect its interest in the Collateral.

b. ***Execution and Delivery***. All Loan Documents must be duly executed, acknowledged, and delivered to Lender.

c. ***Authorization***. Borrower will provide Lender with the evidence Lender requires that Borrower's representatives are authorized to execute and deliver the Loan Documents to Lender.

d. ***Liens and Claims***. Lender shall have a valid and perfected Lien on, and security interest in, all Collateral on the basis and with the priority set forth in the Interim Order, and that Lien and security interest shall be senior to all other Liens that exist as of the Petition Date; provided, however, that the liens of Great Western Bank and United Bank & Trust (the "*Prior Permitted Liens*") shall remain senior to the liens of Lender.  Except to the extent the DIP Financing Orders permit the same, Borrower will not suffer or permit any administrative expense claim (as set forth in 11 U.S.C. Section 503), Lien or other claim to arise or continue to the extent such Lien, expense, or claim is *pari passu* with or senior to Lender's claims or Liens.

e. ***Compliance With Budget***. Borrower will not make any expenditure unless it strictly complies with the Budget within the Permitted Variance. Borrower will strictly comply with all aspects of the Budget with the exception of any Permitted Variance.

f. ***Absence of Default***. Lender has no obligation to fund the Loan, advance credit, or make any financial accommodation to Borrower if a Default has occurred and is continuing, or if such funding, advance, or accommodation would cause a Default.

g. ***Fees and Expenses***. Borrower has paid all fees, charges, payments, or escrows provided for in the Loan Documents.

h. ***Insurance***. Lender has received valid certificates of in-force insurance in form and amount satisfactory to Lender for all policies Lender requires.

i. ***Motions***. All motions and other documents to be filed with and submitted to the Bankruptcy Court regarding the Loan, and the Bankruptcy Court's approval thereof, shall be in form and substance satisfactory to Lender in its sole discretion.

j. ***Orders***. With respect to all advances during the Initial Financing Period, the Bankruptcy Court has entered the Interim Order, in form and substance satisfactory to Lender, in its sole discretion. With respect to all advances after the Initial Financing Period, the Bankruptcy Court has entered the Final Order approving the Loan in form and substance satisfactory to Lender, and the DIP Financing Orders must remain in full force and effect, without modification, at the time of each advance.

6

k. ***Milestones***. All applicable Milestones have been fully and timely satisfied or waived (in Lender's sole and absolute discretion).

l. ***Asset Purchase Agreement***. Lender and Borrower shall have executed the Asset Purchase Agreement.

m. ***Additional Documentation***. Lender has received any other information, approvals, opinions, signatures, or documents it may reasonably request.

n. ***Borrowing Request***. Borrowers have timely delivered a Borrowing Request to Lender in compliance with Section 4 of this Agreement.

o. ***Representations and Warranties***. All representations and warranties of Borrower in the Loan Documents remain true and correct.

p. ***Compliance with Law***. The advance does not violate any Law or order, including any order the Bankruptcy Court has issued.

q. ***Material Adverse Effect***. No Material Adverse Effect has occurred.

r. ***Budget***. The advance complies with the Budget within the Permitted Variance in all material respects.

11. **Indemnified Taxes**. Borrower will make all payments pursuant to any Loan Document without deduction or withholding for any tax, except as applicable Law requires. If applicable Law requires Borrower to deduct or withhold any tax from any such payment, Borrower will immediately pay the full amount deducted or withheld to the relevant governmental authority. If the tax is an Indemnified Tax, then the amount owing pursuant to the applicable Loan Document, will increase by the amount so deducted or withheld.

12. **Representations and Warranties**. Borrower represents and warrants to Lender as follows:

a. ***Formation, Good Standing, and Due Qualification***. Borrower is a non-profit corporation, duly formed, validly existing, and in good standing under the laws of the State of Iowa. Borrower is authorized to do business in the State of Iowa, and, pursuant to 11 U.S.C. Sections 1107 and 1108, has the authority to own its assets and to transact the business in which it is now engaged or in which it proposes to be engaged, subject to the restrictions set forth in the Bankruptcy Code.

b. ***Corporate Power and Authority***. Subject to the restrictions set forth in the Bankruptcy Code, Borrower has the authority to execute, deliver, and perform its obligations under the Loan Documents. Borrower has taken the necessary action to authorize the Chapter 11 Case, and to execute, deliver and perform its obligations under the Loan Documents without any further consent or approval other than Bankruptcy Court's entry of the DIP Financing Orders. The execution, delivery, and performance under the Loan Documents does not (and will not): 1) violate or contravene any bylaws, agreements, order, law, rule, or regulation; or 2) result in a breach or default under any agreement to which Borrower is a party.

7

c. ***Legally Enforceable Agreement***. Each of the Loan Documents are, or when delivered will be: 1) legal, valid, and binding obligations of Borrower; and 2) enforceable against Borrower in accordance with their respective terms.

d. ***Disclosures and Financial Information Accurate***. All financial information Borrower has given to Lender was when made, and remains, accurate. Borrower has disclosed to Lender all material liabilities (whether fixed or contingent, liquidated or unliquidated, due or yet to mature).  No statement of fact that Borrower has made in any Loan Document contains any untrue statement of material fact or fails to disclose a fact necessary to prevent the statements made from being misleading. All information that Borrower will provide to Lender in the future will be true and correct, and will fully disclose all material facts.

e. ***Location of Collateral***. All of the Collateral is and shall be located either at Borrower's address as disclosed to Lender or at the location set forth in the Schedule of Collateral Location that Borrower will execute and deliver to Lender.

f. ***Environmental Compliance***. Borrower and its property are and shall be in compliance with all environmental, health and safety laws, rules and regulations. Borrower is not subject to any liability or obligation for remedial action thereunder. No investigation or inquiry by any governmental authority is or shall be pending or, to the knowledge of Borrower, is threatened against it, or any of its property with respect to any toxic waste, toxic substance or hazardous material. Except in the ordinary course of its business, no hazardous materials are or shall be located on or under the property of Borrower. Except in the ordinary course of its business, Borrower has not caused or permitted, and will not cause or permit, any toxic or hazardous waste or substance to be stored, transported, or disposed of on or under or released from any of its property.

g. ***Agreements and Representations.*** Borrower has not relied on any agreement, promise, or statement from Lender in entering into any Loan Document except to the extent such agreement, promise, or statement is expressly set forth in the subject Loan Document.

h. ***Lenders' Duty***. Lender does not (and will not) have any fiduciary or similar duty to Borrower, Borrower's bankruptcy estate, or to any other person.

i. ***Lender's Relationship***. Lender's relationship to Borrower is solely that of lender.  Lender has not participated, and will not participate, in any type of joint venture or partnership with Borrower. The execution and consummation of the Loan Documents (and transactions contemplated therein) do not, and will not, constitute or amount to a joint venture or partnership.

13. **Covenants**. Borrower agrees that so long as there are any outstanding Obligations, and so long as Lender has any obligation to advance funds to Borrower, Borrower will comply with the following:

a. ***Operation of Business***. Borrower will continue to operate as a debtor in possession of its assets pursuant to 11 U.S.C. Sections 1107 and 1108.

8

b. ***Repayment***. Borrower will timely and fully pay to Lender all sums due and owing to Lender when such sums are due and owing. Borrower's obligations under the Loan Documents are absolute according to their terms and are not contingent upon Lender: 1) properly obtaining, perfecting, or maintaining any Lien with respect to any property; 2) properly obtaining or retaining any payment obligation with respect to any other party; 3) monitoring the Loan; or 4) enforcing any other rights Lender may have with respect to any other person or property. Borrower waives any claim or defense it may have now, or may hereafter acquire, that relates to: 1) Lender's failure to exercise any rights Lender may have against any person or property; 2) the manner in which Lender monitors or modifies the Loan; or 3) Lender's release of any person or property that may be responsible for (or available to apply towards) payment of the Loan.

c. ***Reporting***. Borrower will provide to Lender: (i) its monthly consolidated unaudited financial statements within thirty (30) days of the end of each calendar month, which financial statements the Chief Executive Officer will certify as being true, correct, and accurate; (ii) every four calendar weeks, an updated rolling thirteen (13) week budget, which budget Lender must authorize and approve (in Lender's sole discretion); (iii) beginning on the first Thursday at the close of the first full week following the Petition Date, and continuing on each Thursday thereafter, a variance report (the "Variance Report") that sets forth Borrower's actual cash receipts and disbursements for the immediately preceding week on a line-item basis (in a form reasonably acceptable to Lender) and describes the variance of each item compared to the Budget in effect for the applicable period on a weekly and cumulative basis, which the Chief Executive Officer of Borrower will certify in writing is true, correct, and accurate; and (iv) notification to Lender of the existence of a Material Adverse Effect within one (1) business day of becoming aware of such Material Adverse Effect.

d. ***Permitted Variance***.  Borrower's use of Loan Proceeds shall be in accordance with the Budget and any extension to the Budget, it being understood and agreed that the actual amounts for (i) total receipts may not be less than the Budget amount by 20% for any rolling four week period as measured on a bi-weekly basis calculated beginning with the first full calendar week following the Petition Date, and (ii) total disbursements may not be greater than the Budget amount by 20% for any rolling four week period as measured on a bi-weekly basis calculated beginning with the first full calendar week  following the Petition Date. Provided, however, that in no event will the Loan exceed the limitations set forth in Section 2 of this Agreement.

e. ***Other Information***. Borrower will promptly provide Lender with all other information Lender reasonably requests within two business days of Lender's request, and will allow Lender to inspect the assets, facilities, operations, books and records of Borrower within two business days of Lender's request for the same. Borrower will make its employees, officers, agents, and retained professionals reasonably available to communicate with Lender upon Lender's request for the same.

f. ***Further Assurances***. Borrower will execute and deliver to Lender all further documents, financing statements, agreements, mortgages and security agreements, and will take all other action (including filing and recording any mortgages, financing statements, or

9

fixture filings) Lender may reasonably request, to: 1) effectuate the transactions the Loan Documents contemplate; or 2) to perfect, protect, or preserve any Liens that the DIP Financing Orders or other Loan Documents create; provided, however, that Lender shall not take or request that Borrower take any action to impair or terminate a Prior Permitted Lien.

g. ***Use of Loan Proceeds***. Neither Borrower, nor any subsequent trustee or creditors committee, nor any other person may use any proceeds of the Loan or any proceeds of any Collateral to: seek authorization to obtain Liens that are on parity with, or senior to, the Liens in favor of Lender; to investigate or prosecute any claim, defense or objection that challenges the rights of Lender, or request any remedy or relief against or adverse to Lender (or any employee, officer, agent, affiliate, or director of Lender).  Borrower will not permit any subsidiary or affiliate to use, directly or indirectly, the proceeds of the Loan.

h. ***Modification of DIP Financing Orders***. Borrower will not: i) seek, support, consent to, or suffer to exist any modification or termination of any of the DIP Financing Orders without the prior written consent of Lender; ii) apply to the Bankruptcy Court for authority to take any action that this Agreement or the Loan Documents prohibit without the prior written consent of Lender; or iii) request authorization to incur, or suffer to exist, any claim other than the claim of Lender that would be entitled to superpriority treatment pursuant to 11 U.S.C. Sections 364(c)(1), (c)(2) (c)(3), or 364(d)(1), other than as expressly provided in this Agreement.

i. ***Prepetition Debts***. Borrower will not make any payments to creditors on account of any Prepetition Debts without Lender's prior written consent and the Bankruptcy Court's approval.

14. **Default**. Any of the following will constitute a Default:

a. ***Payment***. Borrower fails to pay any Obligation to Lender as and when due and payable;

b. ***Milestones***. Any Milestone fails to timely occur;

c. ***Representations and Warranties***. Any representation or warranty Borrower has made, or makes in the future proves to have been incorrect, incomplete, or misleading in any material respect on or as of the date it is made or deemed made, and Borrower does not cure such breach to Lender's satisfaction within five (5) business days of receipt of written notice of such breach by Lender;

d. ***Covenants***. Borrower fails to perform or observe any term, covenant, or agreement with Lender, and Borrower does not cure such breach to Lender's satisfaction with five (5) business days of receipt of written notice of such breach by Lender;

e. ***Lender's Rights***. Any of the Liens, or other rights of Lender in the Collateral at any time are not (or Borrower claims the right is not) a first (super) priority, valid, and perfected interest in the Collateral as set forth in the DIP Financing Orders;

10

f.   ***Other Proceedings***. Borrower becomes involved in any proceeding that Lender reasonably believes would result in a forfeiture of all or a substantial part of Borrower's assets, or in the entry of a material judgment against Borrower;

g.   ***Bankruptcy Matters***. Any of the following occurs in the Chapter 11 Case:

    i.   The Chapter 11 Case is dismissed or converted a proceeding under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court authorizes the appointment of a trustee or otherwise displaces the debtor as a debtor in possession of its assets pursuant to 11 U.S.C. Sections 1107 and 1108.

    ii.   Any party other than Lender obtains relief from the automatic stay imposed pursuant to 11 U.S.C. Section 362(a), or obtains confirmation from the Bankruptcy Court that such automatic stay does not apply;

    iii.   Any person files a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code that does not propose to immediately and indefeasibly repay the Obligations in full and in cash;

    iv.   Borrower files, supports, or fails to resist any pleading that seeks to vacate or modify any of the DIP Financing Orders without Lender's prior written consent;

    v.   Entry of an order that modifies or amends any of the DIP Financing Orders without Lender's prior written consent;

    vi.   Reversal, vacation or stay of any of the DIP Financing Orders;

    vii.   Borrower seeks to sell any of its assets outside of the ordinary course of business, except pursuant to the Bidding Procedures;

    viii.   Appointment of a responsible officer or examiner with enlarged powers relating to the business operations of Borrower without Lender's prior written consent;

    ix.   Borrower files, supports, or fails to resist a motion that seeks an order granting any claim or Lien (except in favor of Lender) that is senior to, or *pari passu* with, Lender's claims and rights, or any court enters such an order;

    x.   Except as provided in this Agreement or the DIP Financing Orders or any other court order, Borrower pays, or is authorized to pay or provide, any adequate protection with respect to any Prepetition Debt;

    xi.   Borrower loses its exclusive right to file a plan of reorganization pursuant to 11 U.S.C. Section 1121(b), or that right is modified;

    xii.   Unless otherwise provided in the Interim Order or the Final Order, or upon Lender's prior written consent, Borrower seeks (or the Bankruptcy Court authorizes) an order pursuant to 11 U.S.C. Section 365 authorizing Borrower to reject a material lease that is part of (or whose premises contains any of) the Collateral;

     xiii.     The Bankruptcy Court fails to authorize (or terminates the authorization of) Borrower to use cash collateral as contemplated in the Budget.

     xiv.     Borrower selects any bid other than Lender's as the Prevailing Bid.

15. **Remedies upon Event of Default**. If an Event of Default occurs, all Obligations will become immediately due and owing in full. Lender may thereafter, in its sole and absolute discretion, deliver written notice to Borrower, the Bankruptcy Court, the U.S. Trustee, and any committee of unsecured creditors of the occurrence of the Event of Default (the "Notice of Event of Default").  Ten (10) days following the delivery of a Notice of Event of Default, the automatic stay provisions of 11 U.S.C. Section 362 will be vacated and modified to the extent necessary to permit Lender to exercise all rights and remedies set forth in any of the Loan Documents (the "Termination Date").  Upon the occurrence of the Termination Date, Lender may also (in its sole and absolute discretion) take any of the following actions without further notice, and without further order from, or application to, the Bankruptcy Court:

    a.    ***Terminate Commitment***. Terminate any obligation to make any further advances or financial accommodations to Borrower;

    b.    ***Collateral***. Enforce all rights against any Collateral in the possession of Lender, including disposing of the Collateral solely for application towards the Obligations; and/or

    c.    ***Other Action***. Take any other action, or enforce any other right or remedy, provided by any applicable Law, or the Loan Documents.

16. **Borrower Cooperation**. Upon the receipt of the Notice of Event of Default, Borrower will fully cooperate with Lender in the exercise of Lender's rights and remedies. Borrower waives any right to seek relief under the Bankruptcy Code (including 11 U.S.C. Section 105) to the extent the relief would restrict or impair Lender's rights and remedies under the DIP Financing Orders, or the Loan Documents.

17. **Bankruptcy Matters**.

    a.    **Superpriority**. Except as otherwise provided herein, Borrower agrees that the Obligations will be: i) Superpriority DIP Claims over all administrative expense claims and unsecured claims against Borrower now existing or hereinafter arising, including all administrative expense claims set forth in 11 U.S.C. Sections 105, 326, 328, 330, 331, 332, 333, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code; and ii) secured pursuant to  11 U.S.C. Sections 364(c)(2) and (c)(3), and (with the exception of Prior Permitted Liens) Section 364(d)(1), and to the extent provided in the DIP Financing Orders will not be subject to any claims against the Collateral pursuant to 11 U.S.C. Section 506(c).

    b.    **Orders Control**. In the event the Interim Order or the Final Order conflict with any of the Loan Documents, the Interim Order or the Final Order, as the case may be, will control. Provided, however, that nothing in this Section 17(b) waives or releases any

12

rights or remedies Lender may have in the event the court enters any order that does not comply with the terms and conditions of this Agreement.

c.   **Perfection**. Notwithstanding anything in this Agreement, or elsewhere, to the contrary:

   i.   Lender's Liens in the Collateral will be valid, enforceable, and perfected (with the priority set forth in this Agreement and the DIP Financing Orders) immediately upon entry of the Interim Order, and will continue to be so valid, perfected, and prior regardless of any non-bankruptcy law, and without regard to the dismissal or conversion to another Chapter of the Bankruptcy Code of the Chapter 11 Case. Lender will not be required to file or enter any financing statement, mortgage, control agreement, or other document or notice, and will not be required to take possession of any Collateral, in order to obtain or perfect any of its rights (including any Lien or the priority thereof) as granted pursuant to the Loan Documents, or the DIP Financing Orders. However, Lender may (in its sole discretion), at Borrower's expense, file or enter into any financing statement, mortgage, control agreement, or other document or notice that it desires with respect to any right (including any Lien) that is granted pursuant to the Loan Documents, or the DIP Financing Orders. If Lender elects to enforce its rights pursuant to the preceding sentence, the document or action will be deemed to have occurred as of the date the Bankruptcy Court enters the Interim Order, and Lender's actions will not negate or impair the existence, validity, or priority of this Section 17(c) or any other rights in favor of Lender.

   ii.   The Liens, priorities, Superpriority DIP Claims, and other rights and remedies of Lender pursuant to the Loan Documents, and the DIP Financing Orders, will not be modified or impaired by any other extension of credit to Borrower (whether pursuant to 11 U.S.C. Section 364 or otherwise), or by the dismissal or conversion of the Chapter 11 Case to another Chapter of the Bankruptcy Code, or by any other act or omission unless Lender grants its prior written consent to the same.

18.   **Credit Bid**. Lender may credit bid any or all of the then-outstanding Obligations against any bid Lender submits to purchase any of the Collateral pursuant to any sale, including the Auction, or any sale pursuant to the UCC, 11 U.S.C. Section 363, or any plan of reorganization.

19.   **Grant of Security**. To secure the full and prompt performance of all of the Obligations, effective immediately upon the entry of the Interim Order, pursuant to 11 U.S.C. Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1), Lender is granted a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, first (and super) priority security interest in and lien on all Collateral, subject only to the Prior Permitted Liens. To the extent applicable Law allows, Borrower irrevocably authorizes Lender, its counsel and other representatives to at any time (and from time to time)  file in the name of Borrower or otherwise all such UCC financing statements or continuation statements Lender may deem necessary or appropriate without further authorization from Borrower.

20. **Fees and Expenses**. Lender may seek allowance of its fees and expenses as provided for under 11 U.S.C. § 506(b) by filing a motion or through any other procedure permitted under the Bankruptcy Code or any order of the Bankruptcy Court.  Borrower shall not object to such request on any ground other than reasonableness

21. **Hold Harmless and Indemnification**. Lender is not responsible for performing Borrower's obligations with respect to the Collateral. Borrower will indemnify and hold Lender harmless from all claims, damages, and liabilities (including attorneys' fees and legal expenses) (collectively, "Indemnified Claims") in any matter relating to or arising out of any Loan Document, or in any way relating to the Collateral (including those Indemnified Claims involving hazardous materials). Borrower will promptly provide Lender with written notice of any Indemnified Claim. Upon Lender's request, Borrower will defend Lender from all Indemnified Claims, and will pay the attorneys' fees, legal expenses and other costs Lender incurs in connection therewith. Lender may, in its sole discretion, at Borrower's expense, employ Lender's own legal counsel to defend any Indemnified Claims.  Indemnified Claims shall not include any claims, assertions, or actions undertaken by an official committee, patient care ombudsman or patient privacy ombudsman appointed in this case, or by the Office of the United States Trustee.

22. **Power of Attorney**. Borrower appoints Lender as its attorney-in-fact to endorse its name on all instruments and other documents payable to Borrower. Lender may perform any action or execute any document that the Loan Documents require Borrower to take or execute. Lender's exercise of its rights under this Section does not relieve Borrower of any obligation under the Loan Documents. These powers of attorney are coupled with an interest and are irrevocable.

23. **Participations**. Lender may sell or transfer, whether now or later, one or more participation or other interests in the Loan (and the Loan Documents) to an affiliate of Lender ("Affiliate"). Lender may provide to such Affiliate any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan; provided, however, that such Affiliate shall be bound by any existing non-disclosure agreement between Lender and Borrower as well as any law that may restrict or condition the transfer of information to such purchaser or potential purchaser.  Such Affiliate will receive and keep that information in full confidence and will use that information solely for the purpose of determining whether to acquire an interest in the Loan. Lender shall notify Borrower of an intent to share information with an Affiliate.  Lender shall file a notice with the Bankruptcy Court of an intent to assign any portion of the Loan and rights under the Loan Documents to such Affiliate.

24. **Amendments, Modifications, Waiver**. Any amendment, modification, or waiver of any provision of any Loan Document will be effective only if it is in writing and signed by Lender. Any such amendment, modification, or waiver will be effective only in the specific instance and for the specific purpose for which given.

25. **Entire Agreement**. This Agreement and the Loan Documents constitute the entire agreement between the parties with respect to the Loan.

14

26. **Notices**. All notices and other communication allowed or required under the Loan Documents will be in writing, and delivered by Regular First Class U.S. Mail, postage prepaid, and addressed as follows:

| If to Lender: | If to Borrower: |
|---|---|
| [UPH contact] | [CIH contact] |
| With a copy to: | With a copy to: |
| [UPH counsel] | [CIH counsel] |

All notices provided in accordance with this Section will be deemed delivered and received one (1) Business Day after placed for delivery with the U.S Postal Service.

27. **No Waiver**. No failure or delay on the part of Lender (whether by express waiver or otherwise) in exercising any right, power, or remedy under any Loan Document, will impair or waive Lender's right to thereafter insist on strict compliance with the terms of such agreement or to exercise any other right, power or remedy thereunder. Lender's rights under the Loan Documents are cumulative, and are not exclusive of any other rights, powers, or remedies Lender may now or hereinafter have.

28. **Successors and Assigns**. This Agreement is binding upon and inures to the benefit of Borrower and Lender and their respective successors and assigns; provide, however, that Borrower may not assign or transfer any of its rights under any Loan Document without prior written consent from Lender, and in no event will any trustee or successor to Borrower's interests or Borrower's status as debtor in possession be entitled to an extension of credit pursuant to the Loan Documents.

29. **Attorneys' Fees**. Borrower will reimburse Lender for all costs and expenses (including all attorneys' fees) Lender incurs in protecting or enforcing its rights under the Loan Documents.

30. **Governing Law**. The Loan Documents will be interpreted, construed, and enforced pursuant to the federal laws of the United States and the laws of the state of Iowa without giving effect to the choice of law rules thereof.

31. **Severability of Provisions**. Any provision of any Loan Document that is unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of such provision in any other jurisdiction.

32. **Time of the Essence**. Time is of the essence to Borrower's obligations under the Loan Documents.

33. **Headings**. The headings of the Loan Documents are for the convenience of reference, will not be used to interpret or construe the Loan Documents, and are not a part of the Loan Documents for any purpose.

34. **Venue; Jurisdiction; Service of Process**. Any litigation arising out of or relating to this Agreement or the Loan Documents will be brought in the Bankruptcy Court or a court located in Polk County, Iowa. Borrower consents to the jurisdiction of any such court. **The Parties each waive personal service of process in any litigation arising out of or relating to any of the Loan Documents, and agree that all such service of process may be made in the manner set forth for notices in Section 26 of this Agreement, and that service so made will be deemed completed one (1) day after delivered in compliance with Section 26 of this Agreement. The Parties expressly waive any other requirements of notice or personal service that any applicable law, regulation, or rule may require.**

35. **Milestones**. Unless Lender waives the requirement (in its sole discretion), Borrower will achieve the following milestones (each being a "Milestone") in the Chapter 11 case on or before the dates set forth below (or such later date as Lender may, in its sole discretion, agree):

   a. **Interim Order**. On or before December 20, 2016, the Bankruptcy Court will have entered the Interim Order.

   b. **Final Order**. On or before January 4, 2017, the Bankruptcy Court will have entered the Final Order.

   c. **Bid Procedures Order**. On or before January 4, 2017, the Bankruptcy Court will have entered the Bid Procedures Order, and approved the Asset Purchase Agreement.

   d. **Auction**. On or before February 3, 2017, the Auction will have concluded.

   e. **Sale Approval**. On or before February 10, 2017, the Bankruptcy Court will have entered an order, in form and substance satisfactory to Lender, confirming the Auction and authorizing the sale of Borrower's assets in accordance with the Asset Purchase Agreement and Bid Procedures Order pursuant to 11 U.S.C. Sections 105, 363, and 365.

   f. **Sale of Assets**. On or before March 1, 2017, Borrower will have concluded the sale of substantially all of its assets to Lender pursuant to the Asset Purchase Agreement.

36. **Jury Trial Waiver**. LENDER AND BORROWER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THE LOAN DOCUMENTS. NO OFFICER OF LENDER HAS AUTHORITY TO WAIVE, CONDITION, OR MODIFY THIS PROVISION.

16

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Agreed to this ___ day of December 2016:


ALLEN HEALTH SYSTEMS, INC d/b/a

UNITYPOINT HEALTH—WATERLOO


_____

By: _____

Its: _____


CENTRAL IOWA HEALTHCARE


_____

By: _____

Its: _____

18

# Exhibit 2

## 13-Week Budget

CIH Consolidated 13 Week Cash Flow

Assumed Petition Week:
12/12/2016

$ in thousands

| Forecast/Actual — Week Beginning | Actual 10/24/2016 | Actual 10/31/2016 | Actual 11/7/2016 | Actual 11/14/2016 | Actual 11/21/2016 | Actual 11/28/2016 | Actual 12/5/2016 | Forecast 12/12/2016 | Forecast 12/19/2016 | Forecast 12/26/2016 | Forecast 1/2/2017 | Forecast 1/9/2017 | Forecast 1/16/2017 | Forecast 1/23/2017 | Forecast 1/30/2017 | Forecast 2/6/2017 | Forecast 2/13/2017 | Forecast 2/20/2017 | Forecast 2/27/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | 948 | 803 | 1,298 | 542 | 701 | 641 | 1,286 | 109 | 534 | 100 | 328 | 100 | 364 | 100 | 632 | 100 | 454 | 100 | 447 |
| **Operating Cash Flow** | | | | | | | | | | | | | | | | | | | |
| *Receipts* | | | | | | | | | | | | | | | | | | | |
| Collection on Patient Accounts[1] | 1,663 | 1,099 | 844 | 1,383 | 1,289 | 1,287 | 1,314 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 |
| Other Collections[2] | 27 | 24 | 23 | 35 | 171 | 45 | 25 | | | | | | | | | | | | |
| **Operating Receipts** | 1,689 | 1,123 | 867 | 1,419 | 1,460 | 1,332 | 1,339 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 |
| *Disbursements* | | | | | | | | | | | | | | | | | | | |
| Payroll | 921 | 26 | 700 | 244 | 888 | 3 | 909 | 2 | 927 | 2 | 927 | 2 | 927 | 2 | 927 | 2 | 927 | 2 | 927 |
| Benefits | 99 | 121 | 97 | 161 | 90 | 166 | 126 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 |
| Contractors | 5 | - | 43 | - | - | 9 | 5 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| Hospital Supplies & Services | 686 | 390 | 309 | 592 | 445 | 365 | 538 | 607 | 731 | 405 | 840 | 607 | 731 | 348 | 686 | 417 | 888 | 451 | 686 |
| Utilities | 39 | - | 17 | 27 | 4 | 5 | 1 | 9 | 24 | - | 110 | 9 | 24 | - | - | 110 | 9 | 24 | - |
| Insurance | 13 | - | - | 32 | - | 71 | - | - | 45 | 320 | - | - | - | 56 | - | - | - | - | - |
| Taxes | 1 | 46 | - | - | 46 | - | - | - | 183 | - | - | - | 46 | - | - | - | - | 46 | - |
| Ordinary Course Professionals | 27 | 8 | 21 | - | 6 | 6 | 4 | 3 | 26 | 3 | 13 | 3 | 26 | 3 | 13 | 3 | 13 | 16 | 13 |
| Debt/Lease Payments[3] | - | - | 1 | - | - | - | 2 | - | - | 363 | 31 | - | - | - | 363 | - | - | - | 363 |
| Other | 24 | 18 | 414 | 29 | 17 | 36 | 24 | - | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Disbursements** | 1,815 | 608 | 1,602 | 1,085 | 1,495 | 661 | 1,609 | 743 | 2,013 | 940 | 2,363 | 743 | 1,876 | 475 | 2,167 | 654 | 1,959 | 660 | 2,167 |
| **Operating Cash Flow** | (125) | 515 | (735) | 333 | (35) | 671 | (270) | 425 | (845) | 228 | (1,195) | 425 | (708) | 693 | (999) | 514 | (791) | 508 | (999) |
| **Restructuring/Ch 11 Disbursements[4]** | 20 | 20 | 20 | 175 | 25 | 25 | 25 | - | - | - | - | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 |
| **Net Cash Flow** | (145) | 495 | (755) | 158 | (60) | 646 | (295) | 425 | (845) | 228 | (1,195) | 264 | (868) | 532 | (1,159) | 354 | (951) | 347 | (1,159) |
| **Financing Activity** | | | | - | - | - | - | - | 411 | - | 967 | - | 604 | - | 627 | - | 598 | - | 812 |
| **Ending Cash Balance** | 803 | 1,298 | 542 | 701 | 641 | 1,286 | 992 | 534 | 100 | 328 | 100 | 364 | 100 | 632 | 100 | 454 | 100 | 447 | 100 |
| *Financing Activity Detail[7]* | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | - | - | 411 | 411 | 1,378 | 1,378 | 1,982 | 1,982 | 2,609 | 2,609 | 3,206 | 3,206 |
| Borrowings | | | | | | | | - | 411 | - | 967 | - | 604 | - | 627 | - | 598 | - | 812 |
| Repayments | | | | | | | | | | | | | | | | | | | |
| Ending Balance | | | | | | | | - | 411 | 411 | 1,378 | 1,378 | 1,982 | 1,982 | 2,609 | 2,609 | 3,206 | 3,206 | 4,018 |

See attached schedules for detail

[1] Reflects average weekly collections YTD

[2] Transfer from Central Iowa Health Foundation (pending Foundation approval) to fund insolvency counsel retainer

[3] Assumes rent continues to be remitted directly to United Bank

[4] Reflects estimates provided by professionals; subject to change based on activity

[7] Assumed Petition Date of 12/16/2016

# Exhibit B

## Final Order

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In Re: | ) | Case No.  16-02438-11als |
| | ) | |
| **CENTRAL IOWA HEALTHCARE** | ) | Chapter 11 |
| | ) | |
| Debtor and Debtor in Possession. | ) | Hon. Anita L. Shodeen |
| | ) | |
| 3 South 4th Avenue | ) | **FINAL ORDER (I) AUTHORIZING** |
| Marshalltown, IA 50158 | ) | **DEBTOR TO (A) OBTAIN DEBTOR IN** |
| | ) | **POSSESSION FINANCING,  AND (II)** |
| | ) | **GRANT SUPERPRIORITY CLAIMS** |
| EIN: 42-0948420 | ) | **AND LIENS** |


Upon the motion dated December 20, 2016 (the "Motion") [Dkt. No. [_]], of the above-captioned debtor and debtor-in-possession (collectively, the "Debtor") for entry of an order (the "Interim Order"), *inter alia*, seeking (a) authority for the Debtor to borrow money from the Lender pursuant to the terms of the DIP Financing Agreement (attached hereto as Exhibit A), and use such funds strictly in accordance with the budget (attached hereto as Exhibit B) (the "Budget") to finance the operations of the Debtor's business; (b) adequate protection to the Lender in the form of an allowed superpriority claim and a lien for advances made under the DIP Financing Agreement; and (c) scheduling, pursuant to Bankruptcy Rule 4001, a final hearing for this Court to consider entry of a final order (the "Final Order") granting the Motion.

This Court held an interim hearing on December ____, 2016 (the "Interim Hearing"), and a final hearing on January ___, 2017 (the "Final Hearing"), and upon the record made by the Debtor at the Interim Hearing, including, without limitation, the admission into evidence of the *Declaration of Dawnett Willis in Support of First Day Motions* [Dkt. No. [_]] (the "First Day Declaration"), filed on December ___, 2016 (the "Petition Date"), the testimony presented or proffered at the hearing, and the other evidence submitted or adduced and the arguments of

counsel made at the Interim Hearing and the Final Hearing; and all objections to the entry of the
Final Order having been overruled, withdrawn or resolved pursuant to the terms of this Final
Order; and after due deliberation and consideration and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:**

1.    *Motion Granted*.   The relief requested in paragraphs ___ through ____ of the
Motion is granted on a final basis as described therein, except as otherwise provided herein.
Except as otherwise expressly provided in this Order, any objection to the entry of this Order that
has not been withdrawn, waived, resolved, or settled, is hereby denied and overruled on the
merits.

2.    *Lender's Good Faith*.   The Debtor and the Lender have demonstrated to the Court
that they have negotiated at arm's length, that the Lender has acted in good faith in the
negotiation and preparation of this Final Order, and that both parties have been represented by
counsel and intend to be and are bound by the terms of the DIP Financing Agreement and this
Final Order.   The terms of this Final Order reflect the Debtor's exercise of prudent business
judgment under exigent circumstances and are consistent with their fiduciary duties and are
supported by reasonably equivalent value and fair consideration.

3.    *Notice*.   Notice of the Motion and the final hearing with respect thereto has been
given to prevent immediate and irreparable harm pursuant to Bankruptcy Rules 2002, 4001, and
9006 and as required by sections 102, 105, 361, 362, 363 and 364 of the Bankruptcy Code.
Other than the notice provided for herein, no further notice of the relief sought in the Motion is
necessary.

4.    *Jurisdiction*.   This Court has jurisdiction over this Case and the parties and
property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.   This matter is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      *Findings Concerning DIP Financing*.  The Court finds that the Debtor requires financing to continue their operations and to preserve the value of their pre-petition assets.  The Court further finds that the Debtor is unable to obtain financing on more favorable terms from sources other than the Lender pursuant to, and for the purposes set forth in, the DIP Financing Agreement and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtor is also unable to obtain secured credit allowable as a general unsecured claim, as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or otherwise without granting liens ("*DIP Liens*") to the Lender under Section 364(c)(2), Section 364(c)(3), and 364(d)(1) of the Bankruptcy Code and the Superpriority Claims (as defined herein) under section 364(c)(1) of the Bankruptcy Code, on the terms and conditions set forth in this Final Order and the DIP Financing Agreement, and subject only to the Prior Permitted Liens (as defined in the DIP Financing Agreement).  The Court further finds as follows concerning the DIP Financing Agreement:

(a)      The terms of the use of the DIP Financing Agreement and the DIP Collateral described therein pursuant to this Final Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(b)      The DIP Financing Agreement and the use of the DIP Collateral have been the subject of good faith negotiations conducted at arm's length among the Debtor and the Lender and all of the obligations and indebtedness arising under or in connection with the DIP Financing Agreement and this Final Order (collectively, the "DIP Obligations") shall be

3

deemed to have been extended by the Lender in "good faith" as such term is used in Sections

363(m) and 364(e) of the Bankruptcy Code, and in express reliance upon the protections set

forth therein, and shall be entitled to the full protection of sections 363(m) and 364(e) of the

Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed,

or modified on appeal or otherwise.

(c)     Absent the relief set forth in this Final Order, the Debtor and their business

operations will be immediately and irreparably harmed.   In particular, the Debtor requires

immediate postpetition financing, and continued use of the Collateral in order to, among other

things, continue to serve its patient base and provide healthcare services in Marshalltown while

the case is pending, as well as maintain the ability to pay payroll and employee benefit expenses

and otherwise preserve the value of the Debtor's estates for the benefit of its creditors and

stakeholders.   The borrowing under the terms of the DIP Financing Agreement and the use of

the DIP Collateral in accordance with this Final Order and the DIP Agreement are, therefore, in

the best interest of the Debtor.

6.     *Approval of DIP Financing Agreement*.   The Court hereby approves the DIP

Financing Agreement, on a final basis as set forth herein, and authorizes the Debtor and any of

their subsidiaries to execute, deliver, and perform their respective obligations under the DIP

Financing Agreement.   The Debtor is hereby authorized to borrow and be obligated under the

DIP Financing Agreement in an aggregate principal amount not to exceed Four Million Five

Hundred Thousand Dollars ($4,500,000) (the "Final Advance") on a final basis, inclusive of the

Interim Advance approved in the Interim Order, in accordance with the Budget to fund

operational and working capital purposes of the Debtor, interest and fees under the DIP

Financing Agreement, and the allowed costs and expenses of this Case, in each case (other than

4

the fees and expenses of the Lender reimbursable pursuant to the terms of the DIP Financing Agreement), solely in accordance with the final Budget (a copy of which is attached hereto as Exhibit B).  The Final Advance is hereby approved and shall be made available to the Debtor upon effectiveness of the DIP Financing Agreement and otherwise in accordance with the Budget without further request from the Debtor, provided, that such Final Advance shall be made solely in accordance with the DIP Financing Agreement and the Budget.

7.      In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified), including without limitation:

a.      the execution, delivery and performance of the DIP Financing Agreement; and

b.      the performance of all other acts required under or in connection with this Final Order and the DIP Financing Agreement.

The DIP Financing Agreement and the obligations thereunder constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of this Final Order and the DIP Financing Agreement.  No obligation, payment, transfer, or grant of security by the Debtor under the DIP Financing Agreement or this Final Order shall be voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including, without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim.

(a)     *Budget*. Attached hereto as Exhibit B and incorporated by reference herein is the thirteen-week budget (which has been approved by the Lender) setting forth the Debtor's projected loan advances, receipts and disbursements for such period (the "<u>Budget</u>").   The Debtor's borrowing of funds and use of the DIP facility (the "<u>DIP Facility</u>") shall be consistent with the types of expenses set forth in the Budget and subject to the requirements set forth in the DIP Financing Agreement and in accordance with the permitted variances and other terms contained in the Final Order and the DIP Financing Agreement.   The Lender shall have no obligation with respect to the Debtor's use of the DIP Facility and shall not be obligated to ensure or monitor the Debtor's compliance with the Budget or to pay (directly or indirectly) any expenses incurred or authorized to be incurred pursuant to the Budget.   Any and all cash borrowed under the DIP Facility shall be used by the Debtor in accordance with Interim Order, the Budget, and the DIP Financing Agreement.   Lender's consent to the Budget shall not be construed as consent to the use of the DIP Facility after the occurrence of an Event of Default (as defined below), regardless of whether the aggregate funds shown on the Budget have been expended.

8.     *Budget Compliance*.   The Debtor will use funds borrowed under the DIP Facility solely within the parameters of the Budget and the Permitted Variance (as defined in the DIP Financing Agreement).

9.     *Priority of DIP Liens and Superpriority Claims; Adequate Protection*.   The liens and claims granted to Lender pursuant to the DIP Financing Agreement and this order shall be junior to the liens of the holders of Prior Permitted Liens (including such liens and protections granted to the holders of Prior Permitted Liens in cash collateral orders entered by the Court), but shall in all other respects be:

(a)      entitled to adequate protection pursuant to Section 361;

(b)      entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code (the "Superpriority Claim") with priority over all administrative expense claims, secured claims, and unsecured claims now existing or hereafter arising under the Bankruptcy Code. The superpriority claims of the Lender may be repaid from any cash of the Debtor;

(c)      secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests in and liens over unencumbered assets of the Debtor's estate; and, pursuant to Section 364(c)(3), by a junior lien on all encumbered assets of the Debtor's estate, and pursuant to Section 364(d)(1), by a priming lien over the assets of the Debtor's estate (collectively, the "DIP Liens"), including all of the Debtor's rights all pre- and postpetition property of the Debtor (including, without limitation, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all of the foregoing), whether now existing or hereafter acquired (collectively, the "DIP Collateral"); and

(d)      include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

10.      *Liens Senior to Certain Other Liens*.   Other than with respect to the Prior Permitted Liens, which are senior in all respects to the DIP Liens, the DIP Liens shall not be (i)

7

subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtor and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date; or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

11.    *Remedies After an Event of Default*. If an Event of Default occurs, all obligations under the DIP Financing Agreement will become immediately due and owing in full. Lender may thereafter, in its sole and absolute discretion, deliver written notice to Borrower, the Bankruptcy Court, the U.S. Trustee, and any Committee appointed in this case of the occurrence of the Event of Default (the "Notice of Event of Default"). Ten (10) days following the delivery of a Notice of Event of Default, the automatic stay provisions of 11 U.S.C. Section 362 shall be vacated and modified to the extent necessary to permit Lender to exercise all rights and remedies set forth in the DIP Financing Agreement (the "Termination Date"). Upon the occurrence of the Termination Date, Lender may also (in its sole and absolute discretion) take any of the following actions without further notice, and without further order from, or application to, the Bankruptcy Court:

a.    Terminate Commitment. Terminate any obligation to make any further advances or financial accommodations to Borrower;

b.    DIP Collateral. Enforce all rights against any DIP Collateral in the possession of Lender, including disposing of the DIP Collateral solely for application towards the obligations; and/or

c.    Other Action. Take any other action, or enforce any other right or remedy, provided by any applicable law, or the DIP Financing Agreement.

12.     *Limitations on Charging Expenses Against DIP Collateral*.  Subject to entry of the Final Order, no expenses of administration of this case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

13.     *Limitations under Section 552(b) of the Bankruptcy Code*.  The Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring, or profits from any of the collateral under section 552(b) of the Bankruptcy Code.

14.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the Lender pursuant to the provisions of Final Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

15.     *Reporting Requirements*. Debtor shall comply with its reporting requirements under the DIP Financing Agreement and under the Bankruptcy Code.

16.     *On-Site Diligence Requirements*.  The Debtor shall permit the Lender and its representatives (including its legal counsel, accountants, advisors, financing sources, and agents) to have full access, upon reasonable notice and during normal business hours throughout the period prior to the closing of any sale of all or substantially all of the Debtor's assets, to (a) the properties, books and records (including tax returns), premises, contracts, and documents of the

9

Debtor, including all financial and operating data and other information concerning the Debtor's business and/or the Debtor, as the Lender may reasonably request, and (b) officers and employees of the Debtor; *provided however*, that Debtor shall not be required to permit access to or deliver records or information to the extent restricted or forbidden by law. The Debtor shall use its commercially reasonable efforts to maximize the amount of information to which it provides the Lender access, whether by obtaining consent of third parties, entering into confidentiality agreements, or otherwise.

17.     *Perfection of the DIP Liens.*

(a)     The Lender and its agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens granted to them under the Final Order. Whether or not the Lender or its agents shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens, such DIP Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of the Final Order.

(b)     A certified copy of the Final Order may, in the discretion of the Lender and its agents, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of the Final Order for filing and recording.

10

(c)     The Debtor shall promptly execute and deliver to the Lender or its agents all such agreements, financing statements, instruments, and other documents as the Lender may reasonably request to evidence, confirm, validate, or perfect the DIP Liens.

18.     *Preservation of Rights Granted Under the Final Order.*

(a)     No claim or lien (other than the DIP Liens) having a priority senior to or *pari passu* with those granted by the Final Order to the Lender shall be granted or allowed while any portion of the DIP Obligations and the DIP Liens are outstanding; *provided, however*, that the DIP Liens and DIP Obligations shall remain subject and junior to the Prior Permitted Liens.

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash or otherwise satisfied, in the case of clause (i) below, the Debtor shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Financing Agreement if the Debtor seeks, or if there is entered, (i) any modification of the Final Order without the prior written consent of the Lender, and no such consent shall be implied by any other action, inaction, or acquiescence by the Lender, or (ii) an order converting or dismissing this case.

(c)     If any or all of the provisions of the Final Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall, to the extent provided in sections 363(m) and 364(e) of the Bankruptcy Code, not affect (i) the validity, priority, or enforceability of any DIP Obligations incurred prior to the effective date of such reversal, stay, modification, or vacatur or (ii) the validity, priority, or enforceability of the DIP Liens.  Notwithstanding any such reversal, stay, modification, or vacatur, any use of the DIP Facility by the Debtor prior to the effective date of such reversal, stay, modification, or vacatur shall, to the extent provided in sections 363(m) and 364(e) of the Bankruptcy Code, be

11

governed in all respects by the original provisions of the Final Order, and the Lender shall be

entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the

Bankruptcy Code, the Final Order, and the DIP Financing Agreement.

(d)    Except as expressly provided in the Final Order, the order approving the

sale of all or substantially all of the assets of the Debtor (the "Sale Order"), or in the DIP

Financing Agreement, or as agreed to by the parties, the DIP Liens, the Superpriority Claim, the

507(b) Claim, and all other rights and remedies of the Lender granted by the Final Order and the

DIP Financing Agreement shall survive, and shall not be modified, impaired or discharged by

(i) the entry the Sale Order or the closing of such approved sale, (ii) the entry of an order

converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code, dismissing any of

the Cases, or (iii) the entry of an order confirming a plan of reorganization or liquidation in any

of the Cases. The terms and provisions of the Final Order and the DIP Financing Agreement

shall continue in the cases or in any superseding Chapter 7 cases under the Bankruptcy Code,

and the DIP Liens, the DIP Obligations, the Superpriority Claim, the Section 507(b) Claim, the

other administrative claims granted pursuant to the Final Order, and all other rights and

remedies of the Lender granted by the Final Order and the DIP Financing Agreement shall

continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash or

otherwise satisfied.

19.    *Limitation on Use of the DIP Obligations and the DIP Collateral*.  The Debtor

shall use the DIP Facility and DIP Collateral solely as provided in the Final Order, the Budget,

and the DIP Financing Agreement. Except as expressly set forth herein, neither the DIP Facility

nor the DIP Collateral may be used to (a) object, contest, or raise any defense to, the validity,

perfection, priority, extent, or enforceability of any amount due under the DIP Financing

12

Agreement, or the liens or claims granted under the Final Order or the DIP Financing Agreement, (b) assert any Claims and Defenses or any other causes of action against the Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors, (c) prevent, hinder, or otherwise delay the Lender's assertion, enforcement, or realization on the Collateral or the DIP Collateral in accordance with the DIP Financing Agreement or the Final Order, or (d) seek to modify any of the rights granted to the Lender hereunder or under the DIP Financing Agreement, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent, or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Financing Agreement and the Budget.

20.      *Events of Default*.  The Events of Default in the DIP Financing Agreement are herein incorporated by reference in their entirety.

21.      *Insurance*.  Debtor shall keep in force all insurance policies required by Lender under the DIP Financing Agreement.

22.      *Order Governs*.  Except as specifically amended, supplemented or otherwise modified by this Final Order, in the event of any inconsistency between the provisions of the Final Order and the DIP Financing Agreement, the provisions of this Final Order shall govern.

23.      *Limitation of Liability*.  In determining to make any loan under the DIP Financing Agreement, or in exercising any rights or remedies as and when permitted pursuant to this Final Order and the DIP Financing Agreement, the Lender shall not be deemed solely by reason thereof to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor.  Furthermore, nothing in this Final Order or the DIP Financing Agreement shall in any way be construed or

13

interpreted to impose or allow the imposition upon the Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtor.

24.    *Headings Merely Descriptive*.  All headings in this Final Order are descriptive and for reference only, and do not have separate meaning or change any terms therein.

25.    *Service of the Final Order*.  The Debtor shall serve this Final Order on all of the following parties: (a) the Office of the United States Trustee; (b) the Lender, and any other secured lender appearing in this case, and their respective counsel of record, if applicable; (c) all creditors known to the Debtor who have or may assert liens against any of the Debtor's assets; (d) the thirty (30) largest unsecured creditors of the Debtor, on a consolidated basis; and (e) all parties in interest who have filed a notice of appearance or upon whom service must be effected under the Federal Rules of Bankruptcy Procedure or the Local Rules.

26.    *Effectiveness*.  This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Final Order.

Signed on _____:


_____
UNITED STATES BANKRUPTCY
JUDGE

14