**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DES MOINES DIVISION**

In re:

**CENTRAL IOWA HEALTHCARE,**                    Case No. 16-02438-11als

            Debtor and Debtor in Possession.           Chapter 11

3 South 4th Avenue                              Hon. Anita L. Shodeen
Marshalltown, IA 50158

EIN: 42-0948420

**EXPEDITED MOTION FOR CONTINUANCE AND OMNIBUS OBJECTION OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S
(1) MOTION FOR ORDER APPROVING AUCTION AND BIDDING PROCEDURES
[DKT. # 25]; (2) MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING
DEBTOR TO OBTAIN DEBTOR IN POSSESSION FINANCING [DKT. # 26]; AND (3)
MOTION FOR ORDER AUTHORIZING INTERIM AND FINAL USE OF CASH
COLLATERAL AND PROVIDING POST-PETITION LIENS [DKT. # 17]**

      The Official Committee of Unsecured Creditors (the "Committee") of Central

Iowa Healthcare (the "Debtor") hereby files this motion for continuance of the hearing on, and

omnibus objection to, (1) the Debtor's proposed bidding and sale procedures (the "Bidding

Procedures Motion") [Docket No. 25]; (2) the Debtor's motion for authorization to obtain post-

petition financing (the "DIP Financing Motion") [Docket No. 26]; and the Debtor's motion for

authorization to use cash collateral (the "Cash Collateral Motion") [Docket No. 17]. In support of

its motion for continuance and objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT AND MOTION FOR CONTINUANCE

Every bankruptcy case involving a healthcare institution requires a delicate balancing of interests which include patient health, safety and welfare as well as the rights of creditors.  Although the Committee's fiduciary duty rests solely with the unsecured creditor class, it will always remain mindful of patient care issues as well.  Through the DIP Financing, Cash Collateral and Bidding Procedures Motions, however, the Committee believes that the Debtor will be locked into an expedited sale process that delivers the estate's assets to the proposed "stalking horse bidder" for a price far less than what might be realized through a robust auction process and ensures that unsecured creditors receive no recovery.  Effectively, the Motions as filed chill bidding for the sole benefit of UnityPoint Health, the proposed "stalking horse bidder," by precluding an appropriately fulsome marketing process and competitive bidding process, while stripping the Debtor's estates of valuable and otherwise unencumbered assets that should inure to the benefit of the Debtor's creditors.

The Committee, which has been working diligently since its recent formation, unanimously opposes any attempt to place these cases on an inevitable path of no recovery, particularly at this nascent stage of the proceedings.  The Committee requested that the Debtor and UnityPoint Health continue the Motions for a brief period of time, to allow it to analyze the relief requested against the factual back drop of the Debtor's liquidity concerns, assets and liabilities, and its restructuring and liquidation alternatives. However, UnityPoint Health has demanded that the Motions go forward, thus foreclosing an orderly, organized, and value maximizing sale and liquidation process.

In the end, the hurried rush to deliver over $80 million of potential assets to the proposed stalking horse bidder leaves absolutely nothing for unsecured creditors and in fact, will

likely leave the Debtor's estate administratively insolvent. Upon information and belief, the Debtors' assets include approximately **$26 million** of real property (of which more than half was completely unencumbered prior to the bankruptcy filing); approximately **$6.5 million** of current accounts receivable plus a yet to be determined amount of aged receivables; approximately **$15 million** of furniture, fixtures and equipment; approximately **$2 million** of inventory; and a yet to be determined value including four primary care clinics – which were recently re-designated as Rural Health Clinics and are now expected not only to break even but to be profitable – and a leasehold interest in the new, $35 million Outpatient Center, as well as estate claims, causes of actions, certificates of need, licenses and other general intangibles. All of this is proposed to be transferred in an expedited transaction to UnityPoint Health for the unreasonably small cost of funding a self-benefitting $4.5 million DIP loan and a mere $8 million cash, an amount that is likely insufficient even to pay the costs of this Chapter 11 case.

UnityHealth Point has unfortunately forced the Committee to file this pleading only days after it selected counsel. No explanation, other than the proverbial "melting ice cube," has been provided as to why the Motions must go forward on such an expedited basis. Less than seven days is woefully inadequate for the Committee to obtain meaningful discovery or explore alternatives outside litigation. Without an extension of time, the Committee will be severely hampered in its ability to fulfill its fiduciary obligations – obligations that are all the more pressing in a case such as this where there is no value being left behind for unsecured creditors, after substantial, previously-unencumbered assets are stripped from the Debtor's estate.

In view of these considerations, the Committee asks the Court to deny or condition the relief sought in the Motions as set forth below, or at least to adjourn the hearing on the Motions to allow compliance with minimum standards of due process. More specifically:

(i)        The <u>Bidding Procedures Motion</u> should be denied because, among other things, it effectuates a highly compressed marketing program that effectively forecloses competitive bidding.

(ii)        The <u>DIP Financing Motion</u> should be denied or amended (even assuming it can be demonstrated that no financing on more favorable terms can be obtained) because, among other things, the proposed financing is tied so directly to the Bidding Procedures that it serves as an overwhelming impediment to a fair and open auction. Furthermore, it imposes commercially unreasonable and burdensome terms upon the Debtor.

(iii)        With respect to the <u>Cash Collateral Motion</u>, use of cash collateral should not be conditioned upon the provision of adequate protection in light of the substantial equity cushion enjoyed by the pre-petition lenders.

Adjourning the hearing for one to two weeks will provide the Committee a chance to obtain critical financial information from the Debtor, explore alternative financing and help to bring all key constituencies together, without prejudicing the Debtor, patients or any other party. To the contrary, all stakeholders may benefit if alternative financing on more favorable terms is obtained, a more reasonable marketing period is negotiated, or another proposed stalking horse bid is brought to the table.

The Committee remains ready, willing and able to sit down with the Debtor, UnityPoint Health and other stakeholders to negotiate a sale process that makes sense and maximizes value. The Committee cannot do so if the Debtor is locked into a process that can only lead to one outcome. Accordingly, a one to two week continuance of the hearing on the Motions is hereby requested.

## <u>OMNIBUS OBJECTION TO THE DEBTOR'S MOTIONS</u>

Taken together, the Debtor's Motions create a process by which UnityPoint Health, the proposed stalking horse bidder, is virtually certain to walk away with the Debtor's assets for minimal consideration, leaving unsecured creditors with nothing. At a high level, the Debtor seeks entry of orders that:

(i)    commit the estate to an auction in fewer than 30 days of all of their assets, <u>without an investment banker or other professional tasked with marketing those assets or running the sale process</u>;

(ii)    discourage competing bids by permitting less than three weeks for marketing and due diligence before final, irrevocable bids are due; and

(iii)    burden the estate with $4.5 million in additional secured debt to enable the consummation of a sale to UnityPoint Health that leaves no recovery for unsecured creditors.

In addition to these overarching considerations, the Cash Collateral, DIP and Bidding Procedures Motions—all of which are interrelated and interdependent—raise a host of other specific issues, described in detail below. In view of the serious flaws in the financing, bidding and sale process, and the lack of time that the Committee has had to address these issues with stakeholders, the Committee asks the Court to deny or condition the relief sought in the Motions as set forth herein.

## I.    BACKGROUND

### A.    General Background

On December 20, 2016, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The same day, the Debtor filed its Cash Collateral Motion, DIP Financing Motion and Bidding Procedures Motion. On December 22, 2016, the Court entered interim cash collateral and DIP financing orders. The Debtor and UnityPoint entered into a stipulation on January 3, 2017 to extend the interim DIP period and certain other milestone dates through January 18, 2017. The Court approved the stipulation in a second interim DIP financing order on January 4, 2017.

On December 28, 2016 and January 3 and 4, 2017, the United States Trustee appointed the members of the Committee. The Committee convened its organizational meeting and selected its counsel on Friday, January 6, 2017.

Promptly after being retained, Committee counsel sought the Debtor's consent to a brief adjournment of the hearing on the Motions to enable the Committee to perform critical due diligence and fulfill its fiduciary obligations. The Committee subsequently made the same request of UnityPoint Health. However, UnityPoint Health insisted that the hearing on the case-determinative Motions proceed just one week after the Committee was organized and retained counsel, necessitating the filing of this objection.

### B.    The Bidding Procedures Motion

The Debtor's Bidding Procedures Motion seeks approval of stalking horse bidder protections for UnityPoint Health, the establishment of bidding procedures and the scheduling of an auction and sale hearing. The Bidding Procedures Motion attaches an unsigned, proposed asset purchase agreement (the "<u>Stalking Horse APA</u>").[1]

Based on the Bidding Procedures Motion and the Stalking Horse APA, it appears that the offer that the Debtor has presented to the Court as the stalking horse bid contemplates the purchase of essentially all of the estate's assets, including real and personal property, accounts receivable, inventory, cash and causes of action (other than avoidance actions). Under the Stalking Horse APA, the Debtor cannot be compelled to assume contracts for which a cure amount must be paid, but neither is UnityPoint Health willing to pay any outstanding amounts owed under existing contracts with vendors. Instead, it appears that the intent of the Stalking Horse APA is that all vendor contracts with cure amounts will be rejected—leaving many creditors with substantial unpaid claim—while UnityPoint Health attempts to negotiate new deals with key vendors. If UnityPoint Health is unable to reach new vendor agreements by January 19 that are satisfactory to UnityPoint Health in its sole discretion, UnityPoint Health

---

[1] The Committee is informed that, as of January 11, 2017, the Debtor *still* does not have an executed agreement with UnityPoint Health.

may walk away from the Stalking Horse APA with impunity. In addition, UnityPoint has an unfettered diligence "out" for 15 days after it actually executes the currently unsigned Stalking Horse APA.

Nowhere in the Stalking Horse APA is there any commitment by UnityPoint Health to keep the hospital open for any specified period of time, or to continue to provide the Debtor's current levels of indigent or charity care. Nor is there any promise by UnityPoint to retain employees and save jobs – to the contrary, the Stalking Horse APA expressly disavows any such commitment, while leaving the Debtor liable for all WARN Act obligations. To the extent that UnityPoint Health decides, in its discretion, to hire any of the Debtor's employees, it will not assume or pay those employees' accrued paid time off.

As consideration for all of the Debtor's assets, UnityPoint Health proposes to (a) forgive repayment of amounts due under the DIP facility as of the sale closing, in the amount of up to $4.5 million; and (b) pay $8 million cash, most of which will be used to satisfy the Debtor's pre-petition secured debt.  In exchange for UnityPoint Health's $8.0 million cash bid for all of the Debtor's assets, the Debtor proposes to grant UnityPoint Health bid protections in the total amount of $750,000, consisting of a $250,000 break-up fee and a $500,000 minimum overbid requirement for competing bidders. Upon information and belief, the total consideration to be paid under the Stalking Horse APA, net of secured claims, will be insufficient to pay all administrative expense claims in the case.

In addition, the Debtor and UnityPoint Health are insisting on a highly accelerated sale process. While the milestone dates in the Bidding Procedures Motion are left blank, the Committee believes that the Debtor and UnityPoint Health will seek the same compressed timeline for marketing and due diligence set forth in the DIP Financing Motion:

- Qualified bids due some time prior to February 3, 2017
(most likely on February 1)

- Auction on February 3, 2017

- Sale hearing on February 10, 2017

- Sale to close no later than March 1, 2017

The Stalking Horse APA also contains provisions that, as a practical matter, prevent the Debtor from undertaking cost-saving measures during the pendency of the case to reduce its cash burn and enable a longer, more robust marketing period. For example, under the Stalking Horse APA, the Debtor must continue to "[c]onduct its business in the ordinary course on a basis consistent with past practice." Stalking Horse APA ¶ 8.02. In other words, it would be a breach of the Stalking Horse APA for the Debtor to temporarily reduce services in order to conserve cash during the bankruptcy case. Similarly, the Debtor may not seek to reject contracts or leases with unidentified "Key Vendors," even if the Debtor has no need for the contracts or leases during the pendency of the bankruptcy case, and despite the fact that UnityPoint Health apparently intends to enter into *new* agreements with those vendors. The result is that the Debtor must pay or accrue significant administrative expenses, increasing its cash burn and forcing it to rely on UnityPoint Health for financing.

C.      **The DIP Financing Motion**

The Debtor's DIP Financing Motion seeks authorization to obtain post-petition financing from UnityPoint Health and to grant liens and provide superpriority administrative expense status to UnityPoint Health. The Debtor previously sought to borrow up to $1.4 million on an interim basis and now seeks to borrow up to $4.5 million on a final basis. The key terms of the proposed DIP financing include:

- interest to be paid at a fixed rate of 9.5% per annum, calculated on a 360-day per year basis, payable upon the maturity date;

- upon default, interest to be paid at a fixed rate equal to 14.5%, calculated on a 360 day per year basis;

- additional one-time facility commitment fee of $50,000 (1.1% of the committed loan amount of $4,500,000), which shall be fully earned upon entry of the interim DIP order and payable upon the maturity date; and

- the Debtors shall pay all of UnityPoint Health's reasonable fees and expenses relating to enforcement of its rights under the DIP facility and the DIP loan documents.

- The DIP facility will mature on the earliest of: a) 120 days from the Petition Date (i.e., April 19, 2017); b) the date on which the Debtor enters into a definitive agreement to sell all or substantially all of its assets to a third party other than UnityPoint Health; c) 45 days from the Petition Date if the Bankruptcy Court has not entered the final DIP financing order by such time; d) the date on which an Event of Default occurs; or e) the date on which any "Termination Event" set forth in any DIP financing order occurs.

As currently presented. UnityPoint Health will be granted first-priority liens on all of the Debtors' previously-unencumbered property, other than Chapter 5 causes of action, and priming liens on all encumbered property, subject only to the permitted liens of Great Western, United Bank and possibly certain other undisclosed lien holders. There is no carve-out from UnityPoint Health's security interests for professional, court or trustee fees. The DIP indebtedness will also have superpriority administrative expense status, payable from "all cash" of the Debtor, apparently including the proceeds of Chapter 5 causes of action.

As noted above, even though the DIP facility matures, at the outside, on April 19, 2017, the proposed DIP order ties the Debtor to extremely aggressive sale milestones. In fact, it requires that the sale close a full *seven weeks* before the DIP financing maturity date.  No explanation is provided for the disparity between the dates.

D.      **The Cash Collateral Motion**

        The Debtor alleges that it is indebted to Great Western Bank ("GWB") in the

amount of $3,851,520.06 and to United Bank and Trust   ("United Bank") in the amount of

$1,420,556.70. The Debtor further alleges that GWB and United Bank hold "validly perfected

and enforceable liens on and security interests in, among other things, the Debtor's cash,

negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents,

proceeds, products, offspring, rents, or profits of property," and that the Debtor's obligations to

GWB and United Bank constitute legal, valid, binding and enforceable obligations. There is no

provision in the Cash Collateral Motion for a reasonable investigation by the Committee of

GWB and United Bank's alleged pre-petition liens and security interests, or an opportunity for

the Committee to challenge those liens and security interests if appropriate.

        Upon information and belief, the $3.85 million debt to GWB is allegedly secured

by a blanket lien on the Debtor's personal property, valued by the Debtor at approximately $25

million. Upon information and belief, the $1.42 million debt to United Bank is secured by liens

on two pieces of real property owned by the Debtor, valued by the Debtor at approximately $11

million.

        In its Cash Collateral Motion, the Debtor proposes to provide GWB and United

Bank with replacement liens, superpriority administrative expense claims and post-petition

monthly adequate protection payments in the full amount required under the pre-petition loan

documents. It is unclear, but it appears that GWB and United Bank's liens and claims would

attach to and be payable from all assets of the Debtor, including Chapter 5 causes of action. It is

also unclear whether the intent of the Cash Collateral Motion is to extend GWB's liens to the

Debtor's real property, and United Bank's liens to the Debtor's personal property.

II.    **OBJECTION TO THE MOTIONS**

    A.    **Objections to the Bidding Procedures Motion**

        1.    **The Sale Process Must Be Extended to Permit Robust
           Marketing and Adequate Due Diligence**

First and foremost, the sale process needs more time if it is to be anything more than a formality before handing over the Debtor's assets to UnityPoint Health. The proposed bid deadline, which must be at least a day or two before the auction date of February 3, leaves **less than three weeks** for the Debtor (without assistance of an investment banker or other professional broker dedicated to run the sale process) to identify and reach out to potentially interested parties, and for those parties to perform all due diligence and prepare final, non-contingent asset purchase agreements. That is an extraordinarily compressed timeframe, and the Committee's professionals have already been in touch with potential bidders who, while possibly interested in participating in an auction, have expressed concern that the bid deadline does not leave adequate time to meaningfully do so.

At a minimum, the Debtor needs 45 days to allow for robust marketing and sufficient due diligence. Without additional time, the sale process is highly unlikely to yield any competing bids, thus throwing the sale to UnityPoint Health despite the certainty that UnityPoint Health's bid allows no recovery for unsecured creditors and – based on the Debtor's most recent projections – will leave this case administratively insolvent.

UnityPoint Health is expected to argue that the Debtor lacks sufficient cash to extend the sale process, and that UnityPoint Health is unwilling to advance more than the $4.5 million provided for under the current DIP financing agreement. But the Debtor's updated budget projections show that it will have enough cash to operate under the current DIP financing

cap at least until the third full week in March and possibly longer. *See* Exhibit A, attached.[2]

Working backwards, the current amount available under the DIP facility would permit the

following, more reasonable sale milestones:

### *Proposed Alternative Timeline*

- **Bid deadline:**        **February 28**

- **Auction:**        **March 3-4**

- **Sale Hearing:**        **March 7**

- **Closing:**        **March 24**

This proposed alternative timeline allows six weeks for the Debtor to market its

assets and for interested parties to perform due diligence and prepare their bids, creating the

opportunity for a robust, competitive process. It provides 12 business days between the sale

hearing and the closing—exactly as long as UnityPoint Health demanded in the original timeline,

and thus presumptively giving adequate time for the transfer of all necessary certificates of need

---

[2] Those projections, which are the most recent that the Committee has obtained from the Debtor, do not even take into account cost-saving measures that could be implemented to conserve cash pending the closing of a sale. For example, the Debtor is borrowing money from UnityPoint Health to keep the Outpatient Center operating and to maintain all of the equipment there. Yet the Debtor's estate and its creditors will not realize any recovery whatsoever from the sale of the Outpatient Center. Upon information and belief, UnityPoint Health is purchasing the Outpatient Center for approximately $24 million in a separate transaction with CBC Marshalltown LLC, and none of the proceeds or benefits of the sale will flow to the Debtor or its creditors. It makes little sense under the proposed UnityPoint Health transaction to spend a single penny on the Outpatient Center going forward. Doing so benefits no one but UnityPoint Health, The resulting cost savings in the DIP budget may help buy additional time for the Debtor to more fully market its assets, and the prompt rejection of unnecessary equipment will reduce potential administrative expense claims in the case.

Similarly, UnityPoint Health is acquiring all of the Debtor's receivables, including those created during the bankruptcy case, when (upon information and belief) virtually all of the Debtor's vendors have put it on COD. The net effect of that is that the Debtor is digging itself deeper and deeper into a hole for the sole purpose of creating excess working capital for the benefit of UnityPoint Health—for which the Debtor will receive no credit or adjustment in the sale. This defies logic. Pending the closing of the sale, the Debtor should temporarily cut services to the minimum required to serve the emergent health needs of the community. By doing so, the Debtor may be able to reduce its cash burn and enable a more robust sale process.

Unfortunately, these critical, temporary cost-saving measures cannot be implemented consonant with the terms of the Stalking Horse APA, as described above. The Court should reject those terms; UnityPoint Health cannot be permitted to dictate how the Debtor operates or prevent the Debtor from taking appropriate steps to conserve cash pending a sale. Any attempts to do so are nothing more than efforts to force the Debtor to engage in an artificially accelerated sale process and to freeze out potential competitors.

and licenses. And it still falls within the term of the DIP facility, with no additional borrowing or

extension of time required.

    In addition to extending the sale runway, an investment banker, broker or some

other dedicated professional must be tasked with actively marketing the Debtor's assets and

running the sale process. The Committee proposes that Juniper, the Debtor's pre-petition broker,

be re-engaged immediately.

### 2. UnityPoint Health's Unsigned APA Does Not Merit Stalking Horse Protections

#### (a) UnityPoint Health's Bid Is Still Contingent on Due Diligence

    A true stalking horse provides value to a debtor by putting forth a "hard" bid—

something that the debtor can rely upon and that other bidders must bid against. *See, e.g.,*

*Reagan v. Wetzel (In re Reagan)*, 403 B.R. 614, 619 (B.A.P. 8th Cir. 2009) ("The purpose of a

stalking horse bid is merely to 'set the floor' on the auction price. . . . In the event that the

stalking horse bidder is outbid, courts often approve break-up fees '[t]o compensate the stalking

horse for the "cost" of showing its hand before the auction, conducting due diligence and

otherwise facilitating the creation of a market.'").

    Here, there is no "hard" bid. Indeed, the Committee is informed that, as of

January 11, there isn't even a signed APA. Rather, there is nothing but an unexecuted proposed

agreement with multiple "outs." UnityPoint Health, just like any other bidder, still has the

opportunity to perform due diligence and can withdraw its bid if the result of the due diligence is

not to its satisfaction. Moreover, if UnityPoint Health cannot reach satisfactory new contracts

with vendors – the vendors on whose backs this hospital has been run for well over a year,[3] and

---

[3] Upon information and belief, the Debtor's outstanding trade payables ballooned from $3.85 million in
2014 to ***more than $14.5 million*** at the Petition Date. This enormous increase in unsecured trade debt – which

whose contract cure costs UnityPoint Health refuses to pay – UnityPoint Health can simply walk away from the deal. A bid that is still contingent does not deserve bid protections.

### (b)   UnityPoint Health's Proposed Purchase Price Is Grossly Inadequate

The Committee understands that the proposed purchase price, as well as other highly problematic provisions of the Stalking Horse APA, would normally be deferred until a hearing on the sale itself and still can be, if UnityPoint Health is not designated the "Stalking Horse" with all of the attendant benefits.  However, as currently proposed, the Stalking Horse APA is so egregious that awarding such status to UnityPoint Health would be inappropriate and harmful to the sale process.

First and foremost, upon information and belief, the purchase price under the Stalking Horse APA is not even enough to pay administrative expense claims in full. This has the effect of improperly preferring administrative claims paid under the DIP budget over those left behind with no hope of a full recovery, such as § 503(b)(9) claims. Faced with a similar dilemma, the bankruptcy court in *In re Townsends Inc.*, Case No. 10-14092 (CSS) (Bankr. D. Del.), initially rejected the debtors' proposed DIP financing for its sale process because the debtors had failed to provide reasonable certainty that all administrative priority claims would be paid through the sales process. The lenders in that case had sought to fund an expedited sale process that was not expected to pay their secured claims in full. The budget included the payment of some, but not all, administrative expense claims. The court initially refused to approve the financing—even if it meant derailing the sale process—because it would not countenance administratively insolvent debtors' preferring certain administrative claimants at the

---

dwarfs the Debtor's secured debt – reveals the extent to which the Debtor placed the burden of financing its operations on its vendors, who currently stand to recover nothing.

expense of others, who would likely receive no recovery on their claims. *Id.*, Hrg. Tr. Jan. 21, 2011, at 23-25.

Second, based on the Debtor's own schedules, it appears that the assets that UnityPoint Health would acquire in the sale have significant value. The Debtor estimates that those assets may be worth well over $80 million, including approximately $26 million of real property (the majority of which was completely unencumbered prior to the bankruptcy filing); approximately $6.5 million of unaged, liquid accounts receivable plus a yet to be determined amount of aged receivables; approximately $15 million of furniture, fixtures and equipment; approximately $2 million of inventory; and a yet to be determined value including four primary care clinics, the leasehold interest in the new, $35 million Outpatient Center, estate claims, causes of actions, certificates of need, licenses and other general intangibles.

In exchange for $80 million or more in assets, UnityPoint Health offers just $4.5 million in debt forgiveness (debt that, notably, was incurred creating receivables for UnityPoint Health's sole benefit) and $8 million in cash. If this were the deal being put before the Court for approval today, it would have to be rejected. Fundamental bankruptcy law requires that a proposed sale of substantially all of the assets of an estate, without awaiting plan confirmation and all the protections that are built into the confirmation process, requires close scrutiny. *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39, 43 (S.D.N.Y. 2003). In order to obtain approval of a sale outside the ordinary course of business prior to Chapter 11 plan confirmation, the debtor must demonstrate that the sale price is "fair and reasonable." *Id.* (citing 3 Collier on Bankruptcy, ¶ 363.02 [4] (15th ed. rev. 2005)). A sale price that is a mere fraction of the value of the Debtor's assets and leaves the Debtor administratively insolvent cannot be deemed to be "fair and reasonable."

Other provisions of the proposed Stalking Horse APA are nearly as troubling. For example, under the Stalking Horse APA, the Debtor is required to indemnify UnityPoint Health and its officers, directors, agents and affiliates from a broad universe of potential claims, without limit as to time or amount. Similarly, the Debtor remains liable for any Medicare or Medicaid recoupments or adjustments, even if they occur months or years after the closing. These provisions are not just unfair – they are unworkable. The Debtor will not have sufficient cash to reserve to pay these potential liabilities, nor can it keep its case open indefinitely in case it is later called upon to do so. UnityPoint Health has had ample opportunity to perform due diligence. If it is the prevailing bidder and offers a fair and reasonable price, it will take the Debtor's assets free and clear of claims and interests under § 363. That will have to be sufficient; the Debtor needs to have finality after the closing.

Since UnityPoint Health's proposed bid, as currently structured, could not even be approved by the Court, *a fortiori* it is not entitled to protection as a stalking horse bid.

### 3.    The Proposed Stalking Horse Protections Are Excessive and Will Chill Bidding

The protections proposed under the Bidding Procedures Motion are excessive. While a $250,000 break-up fee, by itself, might pass muster, when it is coupled with a $500,000 minimum overbid, it clearly creates a significant disincentive to competitive bidding. The unreasonableness of the $750,000 barrier to entry is highlighted by the fact that, at auction, overbid increments are only $250,000. The Committee submits that, if bid protections are found to be appropriate at all in this case (and the Committee believes that they are not), the minimum overbid amount be limited to $100,000.

4.      **Additional Objections to the Bidding Procedures Motion**

In addition to the objections described in detail above, the Committee further

objects to the Bidding Procedures Motion as follows:

- **The Bidding Procedures Order should require the Debtors to consult with the Committee.** Because the Committee has a significant interest in maximizing the value of the Debtors' assets, the Debtors should be required to consult with the Committee in determining whether a competing bid is a Qualified Bid, which bid should be determined to be the Baseline Bid going into the auction, whether to reject any bid at any point in the sale process, and which bid is the Prevailing Bid after each round and at the end of the auction.

- **The Bidding Procedures Order should clarify the value to be attributed to UnityPoint Health's bid**. The proposed order currently provides that "[f]or avoidance of doubt, the Debtor hereby agrees that the value attributed by the Debtor to any Bid made by the Purchaser at that Auction shall at least be equal to the sum of the following: (i) the dollar value of the cash consideration contained in such Bid; (ii) the dollar value of any additional consideration contained in such Bid; (iii) the dollar value of the Break Up Fee; and (iv) the dollar value of the Expense Reimbursement." It is unclear that "the dollar value of any additional consideration contained in such Bid" means – i.e., does this refer to the amount of UnityPoint Health's credit bid, or does it include something else, and if so, what? In addition, the reference to an Expense Reimbursement separate and apart from the $250,000 Break Up Fee appears to be in error.

- **The Bidding Procedures Order should not permit UnityPoint Health to credit bid the DIP financing debt twice**. Under the proposed order, it appears that UnityPoint Health will be permitted to credit bid the outstanding amount of the DIP obligations as part of any overbid increment at the auction. That would constitute "double dipping," since the outstanding DIP obligations are already being credit bid as part of the $12.5 million original purchase price; thus, there is nothing left to credit bid for an overbid.

B.      **Objections to the DIP Motion**

The proposed DIP financing would cede control in the cases to UnityPoint Health.

UnityPoint Health is willing to provide financing if and only if it is the prevailing bidder. That

financing terminates if the Debtor selects another bid as the prevailing bid at auction. This means

that the Debtor can only consider bids from potential purchasers who are also willing and able to

serve as DIP lenders to carry the Debtor through to a closing. UnityPoint Health's financing is

also conditioned on the Debtor's sticking to the aggressive sale milestones dictated by

UnityPoint Health —a schedule that, as discussed above, is artificially compressed, apparently

for the express purpose of trying to freeze out potential competitors. As DIP lender, UnityPoint

Health also requires the Debtor to obtain a Bidding Procedures Order acceptable to UnityPoint

Health, giving UnityPoint Health significant control over the bidding procedures themselves. For

example, the requirement that Qualified Bids be substantially similar to UnityPoint Health's bid

forecloses the Debtor from the possibility of a deal or deals that may be structured very

differently—for instance, by selling some assets but not others, or by including the lease of the

Outpatient Center in a transaction in which the buyer does not actually purchase the building. In

a very real sense, approval of the proposed DIP financing from UnityPoint Health is tantamount

to a decision that UnityPoint Health will be able to purchase the Debtors' assets, at a sweetheart

deal price and without competition.

     In addition, the Committee has concerns about the following aspects of the

proposed DIP financing, which it believes are objectionable and cannot be approved:

- **Chapter 5 causes of action should expressly be excluded from UnityPoint Health's liens and superpriority administrative expense claims.** While those causes of action are carved out from the definition of "Collateral" in the DIP Agreement, they do *not* appear to be excluded under the order itself, which controls.

- **The Debtor must have an opportunity to cure defaults before the automatic stay is vacated.** Under ¶ 11 of the proposed final DIP order, the automatic stay is automatically vacated upon a 10-day notice of an event of default. This should be amended to permit the Debtor to cure any alleged default during the 10-day notice period, and to allow the stay to remain in place if the Debtor does so. Similarly, if the Debtor or the Committee challenges the default notice in Court during the 10-day notice period, the stay should remain in place pending the Court's determination of the default.

- **The § 506(c) waiver is unwarranted.** Section 506(c), which allows a debtor to recover expenses from its secured lender to the extent that those expenses are necessarily and reasonably associated with preserving or disposing of a lender's collateral, is designed to prevent "a windfall to the secured creditor at

the expense of the claimant." *Precision Steel Shearing, Inc: v. Fremont Fin. Corp. (In re Visual Industries, Inc.),* 57 F.3d 321, 325-26 (3d Cir. 1995) (citing *IRS v. Boatmen's First Nat'l Bank of Kansas City,* 5 F.3d 1157, 1159 (8th Cir. 1993)). The Supreme Court has held that §506(c) of the Bankruptcy Code waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for any but the most compelling of reasons, because provisions such as these are binding on all parties in interest. *Hartford Underwriters Ins. v. Union Planters Bank N.A.*, 530 U.S. 1, 12 (2000) (debtor's decision to waive rights under Bankruptcy Code § 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require"). Given that this case is effectively being run for the sole benefit of UnityPoint Health, a waiver of § 506(c) at this point is premature and improper.

- **The $50,000 commitment fee is excessive**. This is short-term financing solely for the purpose of enabling UnityPoint Health to purchase the Debtor's assets, under a Bidding Procedures Order that grants UnityPoint Health significant bid protections. In light of the extent to which UnityPoint Health will benefit from the extension of this minimal, short-term financing, the Committee suggests that the commitment fee should be waived.

- **The DIP loan unduly restricts the ability of the Committee to act in the best interest of the estate's creditors.** For example, ¶ 13(g) of the DIP agreement prohibits the Committee from using any proceeds of the DIP loan or any collateral to "prosecute any claim, defense or objection that challenges the rights of Lender, or *request any remedy or relief against or adverse to Lender*." This is particularly troubling given the identity between the DIP lender and the proposed stalking horse bidder, and appears to be an effort to prevent the Committee from challenging the bidding procedures or sale.

C.    **Objections to Entry of the Final Cash Collateral Order**

In their Cash Collateral Motion, the Debtor proposes to provide GWB and United Bank with replacement liens, superpriority administrative expense claims and post-petition adequate protection payments. The Committee submits that this is overreaching in light of the substantial equity cushion protecting the secured creditors (liquid accounts receivable of about $6.5 million, versus GWB's secured debt of less than $4 million, and real property valued at more than $11 million, versus United Bank's secured debt of less than $1.5 million) and the fact that the cash collateral used by the Debtors will be used to fund operations and maintain their

properties, thereby continuing to generate receivables subject to GWB's liens and protect the real

estate subject to United Bank's liens.

Under similar circumstances, courts have found secured lenders to be fully and

adequately protected without more. *See, e.g.*, *In re Kleibrink*, 346 B.R. 734, 760 (Bankr. N.D.

Tex. 2006) ("For purposes of determining whether a secured creditor's interest is adequately

protected, courts must analyze the property's equity cushion…"); *In re Salem Plaza Assocs.*, 135

B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a secured creditor was adequately protected

when cash collateral was used to pay necessary operating expenses); *In re Constable Plaza*

*Assocs.*, *L.P.*, 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash

collateral to operate and maintain office building, thereby protecting secured lender's collateral

and existing equity cushion). GWB and United Bank certainly do not need post-petition adequate

protection payments when they are already amply protected, it is anticipated that they will be

cashed out in a § 363 sale within weeks, and the Debtor urgently needs the cash to operate.

Further, "courts have uniformly required a movant seeking adequate protection to

show a decline in value of its collateral." *In re Continental Airlines*, 146 B.R. 536, 539 (Bankr.

D. Del. 1992); *see also In re Epic Capital Corp.*, 290 B.R. 514, 526 (Bankr. D. Del. 2003); *In re*

*Integrated Health Svcs., Inc.*, 260 B.R. 71, 74 (Bankr. D. Del. 2001); *In re Lane*, 108 B.R. 6

(Bankr. D. Mass. 1989) ("[Section] 361 certainly does tell us what constitutes lack of adequate

protection – a decline in the value of the secured creditors' interest in the property.")  At a

minimum, the Court must put GWB and United Bank to their proofs and require them to show

that their collateral has actually declined in value before they are granted any additional liens or

other protections.

In addition to the objections described in detail above, the Committee further objects to entry of a final cash collateral order for the following reasons:

- **The final Cash Collateral Order should not include findings as to the extent, validity, perfection or enforceability of GWB's and United Bank's pre-petition claims and lien.** The Debtor alleges that the pre-petition lenders hold valid, perfected and enforceable liens on "among other things, the Debtor's cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents, proceeds, products, offspring, rents, or profits of property." The Cash Collateral Order should not include findings in that regard or, if it does, those findings should not be binding on the Committee.

- **Chapter 5 causes of action should remain unencumbered**. The final Cash Collateral Order should expressly carve out avoidance actions from the replacement liens and superpriority administrative expense claims, if any, granted to GWB and United Bank.

- **The Committee should receive financial reporting**. Paragraph 12 of the Cash Collateral Motion requires the Debtor to provide GWB and United Bank with financial reports, balance sheets and income statements. These should likewise be provided to the Committee.

- **Only reasonable attorneys' fees should be paid to GWB and United Bank**. Paragraph 17 of the Cash Collateral Motion provides for the payment to GWB and United Bank of their attorneys' fees. There must be some mechanism to assess the reasonableness of those fees before they are paid by the Debtor. In addition, attorneys' fees are only payable out of the lenders' equity cushion in their respective collateral; since the amount of that cushion is not yet clear, payment of any attorneys' fees at this point would be premature.

- **The Committee should have a reasonable opportunity to review the proposed final Cash Collateral Order before it is entered.** The Debtor provided the Committee with a draft of a proposed Cash Collateral Order just one day before the hearing. The Committee should have a reasonable opportunity to review the terms of the proposed final order before it is filed.

III.   **CONCLUSION**

For the foregoing reasons, the Committee respectfully requests that the Court grant a one to two week continuance of the Motions or, in the alternative, deny the Motions or condition them as set forth above.

Dated:  January 12, 2017

Respectfully submitted,

CUTLER LAW FIRM

/s/ *Robert C.Gainer*
Robert C. Gainer
1307 50th St.
West Des Moines, IA 50266
Tel: (515) 223-6600
Fax:(515) 223-6787
rgainer@cutlerfirm.com

-and-

PEPPER HAMILTON LLP
Francis J. Lawall (*pro hac vice pending*)
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, Pennsylvania 19103-2799
Tel: (215) 981-4481
Fax: (215) 689-4693
lawallf@pepperlaw.com

Deborah Kovsky-Apap (*pro hac vice pending*)
Suite 1800
4000 Town Center
Southfield, MI 48075
Tel: (248) 359-7300
Fax: (248) 359-7700
kovskyd@pepperlaw.com

*Proposed Counsel for the Official Committee of
Unsecured Creditors*

# CIH Consolidated 13 Week Cash Flow

Assumed Petition Week:
12/19/2016

Forecast/Actual
Week Beginning
$ in thousands

| Week Beginning | Actual 10/24/2016 | Actual 10/31/2016 | Actual 11/7/2016 | Actual 11/14/2016 | Actual 11/21/2016 | Actual 11/28/2016 | Actual 12/5/2016 | Actual 12/12/2016 | Actual 12/19/2016 | Actual 12/26/2016 | Actual 1/2/2017 | Forecast 1/9/2017 | Forecast 1/16/2017 | Forecast 1/23/2017 | Forecast 1/30/2017 | Forecast 2/6/2017 | Forecast 2/13/2017 | Forecast 2/20/2017 | Forecast 2/27/2017 | Forecast 3/6/2017 | Forecast 3/13/2017 | Forecast 3/20/2017 | Forecast 3/27/2017 | Forecast 4/3/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Balance** | 948 | 803 | 1,298 | 542 | 701 | 641 | 1,286 | 992 | 1,396 | 1,029 | 1,987 | 1,694 | 1,948 | 100 | 622 | 100 | 444 | 100 | 437 | 100 | 444 | 100 | 437 | (232) |
| **Operating Cash Flow** | | | | | | | | | | | | | | | | | | | | | | | | |
| *Receipts* | | | | | | | | | | | | | | | | | | | | | | | | |
| Collection on Patient Accounts[1] | 1,663 | 1,099 | 844 | 1,383 | 1,289 | 1,287 | 1,314 | 1,209 | 1,237 | 1,307 | 1,119 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 |
| Other Collections[2] | 27 | 24 | 23 | 35 | 171 | 45 | 25 | 20 | 30 | 22 | 256 | - | - | - | - | - | \ | - | - | - | - | - | - | - |
| **Operating Receipts** | 1,689 | 1,123 | 867 | 1,419 | 1,460 | 1,332 | 1,339 | 1,230 | 1,267 | 1,329 | 1,376 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 | 1,168 |
| *Disbursements*[3] | | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll | 921 | 26 | 700 | 244 | 888 | 3 | 909 | 1 | 907 | - | 853 | 2 | 1,023 | 2 | 927 | 2 | 927 | 2 | 927 | 2 | 927 | 2 | 927 | 2 |
| Benefits | 99 | 126 | 97 | 166 | 90 | 171 | 126 | 161 | 161 | 90 | 96 | 95 | 97 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 | 95 |
| Contractors | 5 | - | 43 | - | - | 9 | 5 | 6 | - | - | 13 | 27 | 95 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| Hospital Supplies & Services | 690 | 390 | 317 | 600 | 445 | 366 | 538 | 495 | 381 | 236 | 408 | 617 | 2,066 | 358 | 696 | 427 | 898 | 461 | 696 | 427 | 898 | 461 | 696 | 570 |
| Utilities | 39 | - | 17 | 27 | 4 | 5 | 1 | 27 | (0) | - | 6 | 9 | 271 | - | 110 | 9 | 24 | - | 110 | 9 | 24 | - | 110 | 110 |
| Insurance | 13 | - | - | 32 | - | 71 | - | 12 | 163 | 43 | 147 | - | 57 | - | 56 | - | 56 | - | 56 | - | 56 | - | 56 | 82 |
| Taxes | 1 | 47 | 1 | 0 | 46 | 0 | - | 47 | (1) | - | 0 | - | 229 | - | - | - | 46 | - | - | - | 46 | - | - | - |
| Ordinary Course Professionals | 27 | 8 | 21 | - | 6 | 6 | 4 | 10 | - | - | - | 3 | 67 | 3 | 13 | 3 | 13 | 16 | 13 | 3 | 13 | 16 | 13 | 3 |
| Debt/Lease Payments[4] | - | - | 1 | - | - | - | 2 | - | - | - | 124 | - | 282 | - | 363 | - | - | - | 363 | - | - | - | 363 | 31 |
| Other | 20 | 12 | 404 | 17 | 17 | 30 | 24 | 18 | 23 | 1 | 21 | - | (45) | - | - | - | - | - | - | - | - | - | - | - |
| **Operating Disbursements** | 1,815 | 608 | 1,602 | 1,085 | 1,495 | 661 | 1,609 | 775 | 1,635 | 371 | 1,669 | 753 | 4,141 | 485 | 2,177 | 664 | 1,969 | 670 | 2,177 | 664 | 1,969 | 670 | 2,177 | 919 |
| **Operating Cash Flow** | (125) | 515 | (735) | 333 | (35) | 671 | (270) | 454 | (368) | 958 | (293) | 415 | (2,973) | 683 | (1,009) | 504 | (801) | 498 | (1,009) | 504 | (801) | 498 | (1,009) | 249 |
| **Restructuring/Ch 11 Disbursements**[5] | 20 | 20 | 20 | 175 | 25 | 25 | 25 | 50 | - | - | - | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 161 | 181 |
| **Net Cash Flow** | (145) | 495 | (755) | 158 | (60) | 646 | (295) | 405 | (368) | 958 | (293) | 254 | (3,134) | 522 | (1,169) | 344 | (961) | 337 | (1,169) | 344 | (961) | 337 | (1,169) | 69 |
| **Financing Activity** | | | | | | | | | | | | 1,285 | - | 647 | - | 618 | - | 832 | - | 618 | - | 500 | - | - |
| **Ending Cash Balance** | 803 | 1,298 | 542 | 701 | 641 | 1,286 | 992 | 1,396 | 1,029 | 1,987 | 1,694 | 1,948 | 100 | 622 | 100 | 444 | 100 | 437 | 100 | 444 | 100 | 437 | (232) | (163) |
| ***Financing Activity Detail***[6] | | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | | | | | - | - | 1,285 | 1,285 | 1,932 | 1,932 | 2,550 | 2,550 | 3,382 | 3,382 | 3,999 | 3,999 | 4,499 | 4,499 |
| Borrowings | | | | | | | | | | | - | 1,285 | - | 647 | - | 618 | - | 832 | - | 618 | - | 500 | - | - |
| Repayments | | | | | | | | | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Balance | | | | | | | | | | | - | 1,285 | 1,285 | 1,932 | 1,932 | 2,550 | 2,550 | 3,382 | 3,382 | 3,999 | 3,999 | 4,499 | 4,499 | 4,499 |

See attached schedules for detail

[1] Reflects average weekly collections YTD

[2] Transfer from Central Iowa Health Foundation (pending Foundation approval) to fund insolvency counsel retainer

[3] Reflects payment in the first forecasted week of estimated obligations for post-petition supplies and services for which invoices have not yet been received or have not yet been processed. The amount shown, to the extent not paid, shall be automatically rolled to the following forecast week

[4] Assumes rent continues to be remitted directly to United Bank

[5] Reflects estimates provided by professionals; subject to change based on activity

[6] Petition Date of 12/20/2016

OUCC EXHIBIT A

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 12, 2017, the foregoing instrument was filed electronically with the Clerk of Court using the CM/ECF system which sent notification of such filing to all registered users party to this case.

_____/s/ Courtney Bauman_____